IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:  1:22-CV-22171-JEM


MICHAEL J. FITZGERALD,
individually, and YELANY DE
VARONA, individually,

             Plaintiffs,
vs.

RONDA MCNAE, individually, and
WILLIAM MCNAE, individually,

             Defendants.
_____/

PORTIONS OF THIS TRANSCRIPT HAVE BEEN DECLARED

CONFIDENTIAL


VIDEOTAPE DEPOSITION OF

RONDA MCNAE


VOLUME 1
Pages 1 through 453


Friday, April 28, 2023
9:34 a.m. - 8:24 p.m.


ASSOULINE & BERLOWE, P.A.
Miami Tower
100 SE 2nd Street
Suite 3105
Miami, Florida 33131


Stenographically Reported By:
Alexa Goldman, FPR



1  video work with a company called Go Net Yourself, and

2  that is when I believe my husband had mentioned him.

3       Q.   Do you remember what your husband told you

4  about Mr. Fitzgerald?

5       A.   Very little bit.  Just that he's a funny

6  guy, nice guy.

7       Q.   Did he think you would like him?

8       A.   He did not say that.

9       Q.   So, prior to you -- when did you first meet

10 Mr. Fitzgerald in person?

11      A.   I met him in person July 31st, 2019.

12      Q.   And prior to you meeting him July 31st,

13 2019, other than your husband telling you that he met

14 him -- did you say nice guy or funny guy?

15           MS. CASEY:  Objection to the form.

16      A.   Both.

17 BY MS. GUSSIN:

18      Q.   Did you hear anything else about him?

19      A.   I did.  A couple -- it was while he was in

20 town Will had mentioned a few things about him.

21      Q.   Do you remember what Will mentioned about

22 him?

23      A.   That his dad had recently died.

24      Q.   Did Mike Fitzgerald tell Will that

25 directly?

1        Q.    But do you have any memories of having sex

2    with him in the shower?

3        A.    No.

4        Q.    Did you have sex at any other time the

5    weekend in Miami?

6        A.    No.

7        Q.    Do you remember -- do you have a memory of

8    saying, "ouch" when you were in the shower with your

9    husband?

10       A.    I don't remember having sex with my

11   husband.

12       Q.    So, was your last -- what memory do you

13   have after remembering that Will woke you up from

14   sleeping on the couch?

15            MS. FOTIU-WOJTOWICZ:  Mr. McNae.

16   BY MS. GUSSIN:

17       Q.    Sorry.  Mr. McNae.

18       A.    Going to bed.

19       Q.    You remember going to bed?

20       A.    Vaguely.  I remember being woken up and

21   going to the room, but that was about it.

22       Q.    You have since stated that you were blacked

23   out drunk that evening; is that correct?

24       A.    Yes.

25       Q.    How do you know that you were blacked out?



1      A.    It's my understanding if can't remember

2   parts of what happened the night before, that is

3   what's considered blacked out drunk.

4      Q.    Did you ever talk to any professional to

5   ascertain if you were blacked out that night?

6      A.    Many.

7      Q.    Okay.  What professionals did you speak

8   with to determine if you blacked out that night?

9      A.    My counselor.

10      Q.    Name please?

11      A.    Sarah Dellinger.

12      Q.    Did Sarah Dellinger confirm you were

13   blacked out drunk that night?

14      A.    I don't know anyone can officially confirm

15   that without being there or giving you a blood

16   alcohol test or whatnot.  Based on my recollection of

17   the memories and fragmented memories and behavior,

18   yes.

19      Q.    Other than Sarah Dellinger, did any other

20   professional tell you or help you ascertain that you

21   were blackout drunk that night?

22      A.    I can't remember.

23      Q.    Did you talk to Brock Weedman about it?

24      A.    Yes.

25      Q.    Okay.  Mike didn't know you were blacked



 1        A.    Yes.

 2   BY MS. GUSSIN:

 3        Q.    Okay.  You picked him up at the airport in

 4   San Francisco; is that correct?

 5        A.    That's correct.

 6        Q.    Okay.  Why did you pick him up at the

 7   airport in San Francisco?

 8        A.    I picked him up.  He asked if I could pick

 9   him up, so I picked him up.

10        Q.    Okay.  And prior to you picking him up at

11   the airport, did you have any conversations with

12   Mr. Fitzgerald in which you discussed what the

13   subjects you need to discuss were?

14        A.    Just what happened in Miami.

15        Q.    Did he know at the time that you were

16   concerned that perhaps Miami was not consensual?

17        A.    No.

18            MS. FOTIU-WOJTOWICZ:  Objection to the form

19   of the question.

20   BY MS. GUSSIN:

21        Q.    So, you never told him that you were

22   concerned that Miami was not consensual?

23        A.    I did not acknowledge it.

24        Q.    You stated you had some questions about

25   Miami; is that correct?



RONDA MCNAE REDACTED Vol. 1 Confidential                    April 28, 2023
FITZGERALD V MCNAE                                                     301

1        Q.   What was the intention when you went to the

2   hotel room, dropped off your suitcase, when there was

3   one bed in one hotel bedroom?

4        A.   To drop off my suitcase and then to go

5   explore the city.

6        Q.   But what was your intention as to where you

7   were going to sleep on that evening after exploring

8   the city?

9        A.   I typically book things last minute.  So, I

10  didn't have any plan or idea of what was going to

11  happen.  I just wanted to drop things off and be able

12  to walk around before the sun went down.

13       Q.   Was your plan to get a hotel room later in

14  the day?

15       A.   Again, I did make a comment saying, I will

16  get my own hotel room.  And he stated, Why would you

17  do that?

18       Q.   And what did you say when he said, Why

19  would you do that?

20       A.   I said nothing.

21       Q.   But why didn't you get your own hotel room?

22       A.   I said nothing.

23       Q.   But why didn't you get your own hotel room?

24       A.   I don't know.

25       Q.   And what did you do, did you walk around



1   impression that you were in love with Mike?

2          MS. FOTIU-WOJTOWICZ:  Objection to the form

3   of the question.

4       A.   Well, I also understand he is seeing and

5   knowing this one piece.  So, he doesn't know who I

6   am.  And when I say, Oh, I love ya, that could be

7   taken many different ways.

8   BY MS. GUSSIN:

9       Q.   When you sent these messages to Tom Wiper

10  were you concerned that the phrase "I love the guy"

11  could get taken out of context?

12         MS. FOTIU-WOJTOWICZ:  Objection to the form

13  of the question.

14         MS. CASEY:  Objection to the form of the

15  question.

16      A.   As I read this today, 100 percent.

17  BY MS. GUSSIN:

18      Q.   When you sent these instant messages to Tom

19  Wiper, were you writing these messages because you

20  were concerned that you had been raped by

21  Mr. Fitzgerald?

22         MS. FOTIU-WOJTOWICZ:  Objection to the form

23  of the question.

24      A.   Again, being that this was in November of

25  2019, I didn't acknowledge that I was raped until



1  January, February of 2020.

2  BY MS. GUSSIN:

3       Q.   During the deposition of Mr. McNae

4  yesterday, we talked about the phrase "brother

5  husbands," do you remember hearing that conversation?

6       A.   Yes.

7       Q.   What is the phrase "brother husbands"?

8       A.   It is a silly joke that we have made

9  between my husband and I, even with my sister when

10 she helps out or makes dinner for us, we'll go,

11 "sister wives."  Very innocent.

12      Q.   Did you refer to your husband and

13 Mr. Fitzgerald as brother husbands?

14      A.   As a joke.

15      Q.   And if we can refer, please, to Exhibit 30

16 which is the three-way text messages.

17      A.   I should have done a better job of

18 organizing.

19           MS. FOTIU-WOJTOWICZ:  I'll organize them

20 for you.

21 BY MS. GUSSIN:

22      Q.   Do you see on McNae 3469 of Exhibit 30?

23           MS. FOTIU-WOJTOWICZ:  3469?

24           MS. GUSSIN:  Yeah.  Oh, sorry.  It's 3468.

25



1      A.   Did I ever -- sorry, say -- reframe the

2   question.

3   BY MS. GUSSIN:

4      Q.   Did you ever retain an attorney to assist

5   you in bringing a lawsuit against Mr. Fitzgerald in

6   the state of California or the state of Washington?

7      A.   I have never retained an attorney in either

8   Washington or San Francisco aside from the attorney

9   in Washington who helped with the contract.

10      Q.   Is that Mr. Max Meyers?

11      A.   Yes.

12      Q.   Did you ever interview any attorneys in

13   either the state of California or the state of

14   Washington in contemplation of bringing a lawsuit

15   against Mr. Fitzgerald?

16      A.   Yeah, back where there was a period of time

17   I debated.

18      Q.   What were the names of the attorneys you

19   met with?

20      A.   I would not know the names.  I would not

21   recall.

22      Q.   Did you, in fact, meet with any attorneys?

23      A.   Not in person.

24      Q.   Did you call attorneys?

25      A.   I received a few calls.



1  settlement agreement and receiving money from

2  Mr. Fitzgerald?

3              MS. FOTIU-WOJTOWICZ:  Objection to the form

4  of the question.

5              MS. CASEY:  Objection to the form of the

6  question.

7       A.   I believe you're mischaracterizing the

8  sequence of events how that happened.

9  BY MS. GUSSIN:

10      Q.   Was entering the settlement agreement a way

11 for you to get money out of Mr. Fitzgerald?

12             MS. FOTIU-WOJTOWICZ:  Objection to the form

13 of the question.

14      A.   Mr. Fitzgerald had offered to pay for

15 counseling.  He admitted the harm he had done to me

16 and my family.  He paid, and then stopped paying

17 saying I needed to sign an agreement.

18 BY MS. GUSSIN:

19      Q.   Wasn't it your idea initially that

20 Mr. Fitzgerald pay you emotional distress money?

21             MS. FOTIU-WOJTOWICZ:  Objection to the form

22 of the question.

23      A.   That was a joke, and that was something

24 that Yelany also helped instigate.

25



1  says, "I will support you if you want me to, that

2  goes without saying."  You respond at 11:13, "I sure

3  hope you support me given the circumstances.  I'm

4  prepared to deal with the consequence of my actions

5  and choices.  I do not expect you to be present in

6  our lives, at least physically present."

7              Then you say February 2nd, 2020, at 12:32,

8  "I also don't think it's at all fair to financially

9  raise a kid on my own."  And then you say on

10 February 2nd, 2020 at 1543, "Now would it be

11 appropriate to ask B to send me the ring you got her?

12 Tell her I need to borrow it.  You think I'm

13 kidding."

14             Then on February 2nd, 2020, at 2136, "Oh,

15 can I expect to get balloons and flowers saying

16 congratulations, you'll be the size of a beached in

17 no time."

18             Does any of this refresh your recollection

19 as to asking Mr. Fitzgerald for financial support?

20      A.   Yes.

21      Q.   Do you remember asking Mr. Fitzgerald to

22 get you a goldendoodle?

23             MS. FOTIU-WOJTOWICZ:  Objection to the form

24 of the question.

25      A.   Where do you see that?



```
 1   BY MS. GUSSIN:
 2        Q.   If you don't remember, you can just say you
 3   don't remember.  I'm just asking if you remember
 4   asking for a goldendoodle?
 5        A.   I didn't know if you were asking about a
 6   specific part.  No, I don't remember.
 7        Q.   Do you remember asking Mr. Fitzgerald for
 8   fat clothes?
 9        A.   I don't remember.
10        Q.   Do you remember asking Mr. Fitzgerald for a
11   push present?
12        A.   I don't recall at this exact moment.
13        Q.   Do you recall asking Mr. Fitzgerald for
14   Alexander McQueen sneakers?
15        A.   I do not recall in that text messages.
16        Q.   Do you remember on February 3rd, 2020, at
17   1359, you brought up the idea of signing an NDA on
18   the bottom of McNae 2092?
19        A.   That was a joke.
20        Q.   Did he know you were joking?
21             MS. FOTIU-WOJTOWICZ:  Objection to the form
22   of the question.
23             MS. CASEY:  Objection to the form of the
24   question.
25        A.   I don't know.
```



```
 1   BY MS. GUSSIN:
 2        Q.   Did you tell him you were joking?
 3        A.   On the following page I said, "Oh, my God,
 4   you didn't say no."
 5        Q.   Right.  So?
 6        A.   It's my way of saying, Oh, you're serious.
 7        Q.   Okay.  And then on February 3rd, 2020, at
 8   2031, you bring it up again, "Are you typing up your
 9   NDA right now?"
10        A.   Again, me joking and that was just how I
11   was choosing to engage in that conversation at that
12   moment.
13        Q.   Okay.  Do you recall sending Mr. Fitzgerald
14   pictures of your belly so he would believe you were
15   pregnant and starting to show?
16        A.   Yes.
17        Q.   Do you recall telling Mr. Fitzgerald you
18   going to need a calculator to help figure out how
19   much it would cost to support a baby?
20        A.   Yes.  With Yelany's help.
21        Q.   Why didn't you tell Mike in any of these
22   text messages that you believe he raped you?
23             MS. FOTIU-WOJTOWICZ:  Objection to the form
24   of the question.  Mischaracterizes the document.
25        A.   What was your question?
```



```
 1   admit every single lie he's ever told.

 2             MS. GUSSIN:  Okay.

 3             MS. FOTIU-WOJTOWICZ:  Let's take a break.

 4             THE VIDEOGRAPHER:  The time is now

 5   7:45 p.m.  We're going off the record.

 6             (Thereupon, a break was taken from

 7   7:45 p.m. to 7:54 p.m., after which the following

 8   proceedings were held:)

 9             THE VIDEOGRAPHER:  The time is 7:54 p.m.

10   We're back on the record.

11             MS. FOTIU-WOJTOWICZ:  Okay.  For the

12   record, the defendant Ronda McNae stipulates that the

13   Statements 1 through 10 that have been marked

14   Exhibit 14 through 23, were authored by her,

15   authored, posted, stated by her.

16             MR. BERLOWE:  Ronda McNae?

17             MS. FOTIU-WOJTOWICZ:  Ronda McNae.  And not

18   necessarily that they were all in their complete

19   context, but the statements as marked where, you

20   know, some of them include statements from others,

21   but where it says Ronda McNae or the Instagram post

22   says Ronda McNae, those statements were made by

23   Mrs. McNae.

24             MS. GUSSIN:  Can we also stipulate that

25   Mrs. McNae entered into Exhibit 13, which is the
```



```
 1  confidential settlement agreement?

 2            MS. FOTIU-WOJTOWICZ:  We can stipulate that

 3  her signature is on that contract.  You can just ask

 4  her that one.

 5  BY MS. GUSSIN:

 6       Q.   Ms. McNae, I'm going to show you what's

 7  been previously marked as Exhibit 13.  Do you

 8  recognize this document?

 9       A.   I do.

10       Q.   Is that your initial on bottom of pages one

11  through five of Exhibit 13?

12       A.   My initials and where I signed is the only

13  thing I recognize about this document.

14       Q.   You had an attorney that you hired to help

15  you negotiate Exhibit 13; is that correct?

16            MS. FOTIU-WOJTOWICZ:  Objection to the form

17  of the question.

18       A.   I will testify that I initialed and signed

19  this document.

20  BY MS. GUSSIN:

21       Q.   Were you in the presence of anyone when you

22  initialed and signed Exhibit 13?

23       A.   Just my husband.

24       Q.   Did you initial and sign Exhibit 13 at your

25  home?
```



RONDA MCNAE REDACTED Vol. 1 Confidential    April 28, 2023
FITZGERALD V MCNAE              433

1   A.  I don't recall where we were, but nobody

2  went through this document with me.  I just signed

3  it.

4   Q.  Did you ask your attorney to review the

5  document with you prior to your signing it?

6     MS. FOTIU-WOJTOWICZ:  Objection to the form

7  of the question.

8     MS. CASEY:  Objection to the form of the

9  question.

10    MS. FOTIU-WOJTOWICZ:  Instruct the witness

11  not to answer that question on attorney-client

12  privilege.

13  BY MS. GUSSIN:

14   Q.  Are you now claiming that you signed

15  Exhibit 13 under duress?

16     MS. FOTIU-WOJTOWICZ:  Objection to the form

17  of the question.

18   A.  Being that I needed -- I didn't have the

19  financial means for counseling and Mr. Fitzgerald had

20  paid a month and said I needed to sign a contract

21  before he continued and I did need the financial

22  resources to go to counseling five times a week, I

23  initialed and I signed this agreement, but I did not

24  understand what I was signing.

25

```
 1   BY MS. GUSSIN:

 2       Q.   So, when you signed Exhibit 13 without

 3   understanding what you were signing, did you have any

 4   intent to comply with the terms set forth in

 5   Exhibit 13?

 6           MS. FOTIU-WOJTOWICZ:  Objection to the form

 7   of the question.

 8           MS. CASEY:  Same objection.

 9       A.   Sorry, repeat the question.

10           MS. GUSSIN:  Sorry, Alexa.

11           (Requested portion read back.)

12       A.   I signed this believing I was able to talk

13   about things generically and I lost my chance to

14   report to law enforcement.  That is the extent about

15   what I knew about this contract.

16   BY MS. GUSSIN:

17       Q.   It is your belief Exhibit 13 prohibited you

18   from speaking to law enforcement?

19           MS. FOTIU-WOJTOWICZ:  Objection to the form

20   of the question.

21       A.   Since I did not read this thoroughly nor

22   had anyone gone through each line item, I didn't

23   understand fully what I was signing.

24   BY MS. GUSSIN:

25       Q.   Did anyone tell you that you couldn't
```



1  report to law enforcement after signing Exhibit 13?

2          MS. FOTIU-WOJTOWICZ:  Objection to the form

3  of the question.  Instruct the witness not to answer

4  if the answer calls for any information that's been

5  provided to you by any attorney.

6     A.   Sorry.  Repeat the question.

7  BY MS. GUSSIN:

8     Q.   Did anyone tell you that by signing

9  Exhibit 13 you were prohibited from going to law

10  enforcement?

11          MS. FOTIU-WOJTOWICZ:  Same objection.

12     A.   Attorney-client privilege.

13  BY MS. GUSSIN:

14     Q.   Did you ask your attorney?

15     A.   Attorney-client privilege.

16     Q.   You talked to Tami Wakasugi about this

17  exhibit; is that correct?

18     A.   I did.

19     Q.   Exhibit 13.

20          Is Tami Wakasugi an attorney?

21     A.   She is not.  She's a friend and an

22  employer.

23     Q.   Other than Tami Wakasugi, did you discuss

24  Exhibit 13 with anyone?

25     A.   I don't remember.



1        A.   Senior tech correspondent with Business

2   Insider.

3        Q.   Did you reach out to Ashley Stewart on

4   July 15th, 2022?

5        A.   According to this document in front of me,

6   yes.

7        Q.   In this correspondence, which is marked

8   Exhibit 132, did you forward to Ashley Stewart

9   communication between Mr. McNae and SoftwareONE?

10            MS. FOTIU-WOJTOWICZ:   I'm sorry, can you

11   say that again.

12            (Requested portion read back.)

13       A.   I forwarded the email that my husband, Will

14   McNae, authored to Ashley Stewart.

15   BY MS. GUSSIN:

16       Q.   Do you see in Exhibit 132 Mr. Fitzgerald is

17   referenced by name?

18       A.   I see that.

19       Q.   Okay.  Now I'm going to show you what I'm

20   going to mark as Exhibit 133.

21            (Thereupon, Exhibit 133 was marked.)

22   BY MS. GUSSIN:

23       Q.   Which is McNae 2230 through McNae 2278.

24            Who is Gretchen Carlson?

25       A.   Gretchen Carlson worked for Fox News, and



1  she was a part of a pretty large NDA scandal.

2       Q.   Who is Julie Roginsky?

3       A.   That is her partner.  They both started a

4  non-profit organization to help women in situations

5  like these.

6       Q.   Do you know who is Sarvenaz Bakhtiar?

7       A.   I don't recall.

8       Q.   And is Exhibit 133 an email dated

9  January 20th, 2022, from you to Julie Roginsky,

10  Gretchen Carlson, and Sarvenaz Bakhtiar?

11       A.   I'm sorry, what was the question?

12       Q.   Whether Exhibit 133 was an email from you

13  dated January 20th, 2022, to Julie Roginsky, Gretchen

14  Carlson, and Sarvenaz Bakhtiar?

15       A.   Yes.

16       Q.   Do you see the subject of the email on

17  Exhibit 133 is:  Settlement agreement final signed by

18  all parties 61520.PDF?

19       A.   Yes.

20       Q.   Did you send a copy of the confidential.

21  settlement agreement to Julie Roginsky, Gretchen

22  Carlson, and Sarvenaz Bakhtiar on January 20th, 2022?

23       A.   I did.

24       Q.   Other than Ashley Stewart and Gretchen

25  Roginsky, have you sent any communication regarding



1   Mr. Fitzgerald to any third parties?

2          MS. FOTIU-WOJTOWICZ:  Objection to the form

3   of the question.

4          MR. BERLOWE:  You said the names wrong.

5   BY MS. GUSSIN:

6      Q.   Other than Ashley Stewart, Julie Roginsky,

7   Gretchen Carlson, and Sarvenaz Bakhtiar, have you

8   communicated with other third parties about

9   Mr. Fitzgerald?

10         MS. FOTIU-WOJTOWICZ:  Objection to the form

11  of the question time frame.

12  BY MS. GUSSIN:

13     Q.   Since June of 2020?

14     A.   I don't remember.

15     Q.   Is there anything that would help refresh

16  your recollection?

17     A.   At the moment my brain is a little fried.

18     Q.   Have you reached out to any other public

19  figures other than the ones we have already gone

20  through in Exhibits 132 and 133?

21     A.   I don't recall at the moment.

22     Q.   Did you reach out to someone at ABC News?

23     A.   At the moment I do not recall.

24     Q.   Was there someone named John Quinones you

25  reached out to?

