UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MICHAEL FITZGERALD
and YELANY DE VARONA,　　　　　　　　　　CASE NO. 22-cv-22171

　　　Plaintiffs,

v.

RONDA MCNAE and WILLIAM MCNAE,

　　　Defendants.
_____/

**DEFENDANT RONDA MCNAE'S RESPONSE TO PLAINTIFF'S L.R. 56.1
STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT**

　　　Defendant, Ronda McNae, through her undersigned counsel, hereby files this Response to the Plaintiff, Michael Fitzgerald's, Local Rule 56. 1 Statement of Material Facts in Support of Motion for Partial Summary Judgment (ECF No. 172), and states as follows:

**GENERAL OBJECTION**

　　　Defendant objects to numerous facts set forth in Plaintiff's Statement of Material Facts (specifically Statement No. 6 - 25) concerning the merits of Ronda McNae's sexual assault and rape allegations as irrelevant and inadmissible to the issues at hand. The parties' pre-contract formation conduct has no bearing on Plaintiff's pending motion for summary judgment, which concerns only whether the 10 statements identified by Plaintiff constitute a material breach of the Confidential Settlement Agreement. Accordingly, any purported facts that do not directly address this breach of contract claim are not properly before the Court and should be disregarded for purposes of summary judgment.

1

## **RESPONSE TO PLAINTIFF'S STATEMENT**

1. **Defendant's Response:** Undisputed.

2. **Defendant's Response:** Undisputed.

3. **Defendant's Response:** Undisputed

4. **Defendant's Response:** Undisputed.

5. **Defendant's Response:** Undisputed.

6. **Defendant's Response:** Disputed. R. McNae testified extensively that Fitzgerald forcibly pulled her hair and sexually assaulted her outside the Baoli restaurant and that back at the hotel, McNae was blackout drunk and did not consent to sex. See MCNAE 000974 - MCNAE 000978 (Texts with Detective Ridge from February 2020); R. McNae Depo 49:13)("Do you believe you were raped by Mr. Fitzgerald?" A: "Absolutely"); (R. McNae Depo 175:18) (A: "He grabbed it [my hair] and yanked it back, and forced himself onto me and started kissing me."  "I ran away as far as I could off the main block and around the corner.")

7. **Defendant's Response:** Disputed. McNae flew to San Francisco to visit her niece, something she committed to before the October 2019 assault. (RM Depo 293:15; MCNAE 003890). McNae also testified that she travelled to San Francisco was to visit her niece, visit a friend in San Francisco, and speak with Fitzgerald about what happened that night in Miami when McNae was intoxicated. (McNae Dep., p. 297-98).

8. **Defendant's Response:** Disputed. McNae testified that she intended to get her own hotel room and felt trapped sharing a room with Fitzgerald. (McNae Dep. 298:18 – 299:20; 303:16-24).

9. **Defendant's Response:** Disputed. McNae testified that the sexual encounter was nonconsensual. (McNae Dep. 304:15 – 306:17).

10. **Defendant's Response:** Disputed. There is ample evidence that Fitzgerald knew or should have known that his sexual encounter with McNae was nonconsensual, including testimony from McNae explaining *why* Fitzgerald knew his encounters were nonconsensual. (McNae Dep. 446:23 – 447:10)

11. **Defendant's Response:** Disputed. McNae testified that she was manipulated by Fitzgerald, in part, to cover up for his assault and rape. (McNae Dep. 334:14 – 335:15). During therapy, McNae also wrote on a journal page a list of those who abused or took advantage of her. "Fitz" was listed at the bottom and most recent. (MCNAE 003205).

12. **Defendant's Response:** Disputed in part**.** Defendant admits that she sent this text message, but Plaintiff's Statement omits important material facts, including:

    (a) When asked why she wrote that message, McNae stated; "I would say that I struggled with the fact that this is somebody who was a friend, a trusted friend, in a work relationship between he and my husband, and I was wrestling with everything that was going on." (McNae Dep. 347:4-13).

    (b) McNae also testified: "I would say the unacknowledged trauma that I had from being raped and then sodomized and trying to figure this out with the fact that this man was saying that he was going to -- he was saying that he -- his executive team will circle around him and have my husband pushed out of Microsoft, there was a lot going on in my mind." (McNae Dep. 346:21-347:2).

13. **Defendant's Response:** Disputed. There was no "affair."  R. McNae Depo 49:13)("Do you believe you were raped by Mr. Fitzgerald?" A: "Absolutely"); (R. McNae Depo 175:18) (A: "He grabbed it [my hair] and yanked it back, and forced himself onto me and started kissing me." "I ran away as far as I could off the main block and around the corner.")

14. **Defendant's Response:** Disputed in part. McNae does not dispute that she attended this mental health workshop but denies that she intended to gain a "deeper understanding" of an "extramarital affair" with Fitzgerald.. R. McNae testified extensively that Fitzgerald forcibly pulled her hair and sexually assaulted her outside the Baoli restaurant and that back at the hotel, McNae was blackout drunk and did not consent to sex. See MCNAE 000974 - MCNAE 000978 (Texts with Detective Ridge from February 2020); R. McNae Depo 49:13)("Do you believe you were raped by Mr. Fitzgerald?" A: "Absolutely").

15. **Defendant's Response:** Undisputed.

16. **Defendant's Response:** Undisputed.

17. **Defendant's Response:** Disputed. There was no "affair." R. McNae Dep 49:13)("Do you believe you were raped by Mr. Fitzgerald?" A: "Absolutely"); (R. McNae Depo 175:18) (A: "He grabbed it [my hair] and yanked it back, and forced himself onto me and started kissing me." "I ran away as far as I could off the main block and around the corner."); see also (MCNAE 3468, where W. McNae writes: "I read it and I have one thing to say. Don't expect to speak to me again without me exploding. Don't message me or engage with me unless it's work related. You've made your thoughts clear and when I see you I'll make mine clear")

18. **Defendant's Response:** Disputed. Fitzgerald was open about the large sums of money he would be receiving as early as October 2019. Ronda McNae did not "discover" that information in February and it was well known to the parties *before* the subject events occurred. **(**McNae Dep. 267:21-268:15); (MCNAE 3461, Fitzgerald 's 9/29/2019 text to the McNaes – "Confidential of course. We will IPO tomorrow morning. Keep an eye out for the announcement")

19. **Defendant's Response:** Undisputed. However, McNae testified that "I went through a period where I struggled to -- in order to gain information, I did the best thing I knew what to do in that moment. That is something I wouldn't do again, but that was a way, given the circumstances, given the harm, trauma,

and the feelings that I was feeling, that was the option that I had." (McNae Dep. 395:21 – 396:4)

20. **Defendant's Response:** Disputed in part. It is undisputed that McNae told Fitzgerald that she was too intoxicated in Miami to knowingly consent to sex with Fitzgerald, but the rest of Plaintiff's statement is disputed, as it consists of Plaintiff's editorialization on what McNae "ignored". McNae testified that her sexual encounter with Fitzgerald in San Francisco was not consensual. (McNae Dep. 304:15 – 306:17).

21. **Defendant's Response:** Disputed, as it misstates and ignores the period where McNae, through counseling, learned that her sexual encounter with Fitzgerald was nonconsensual. (See MCNAE 000918, that McNae had "Finally gathered the courage to call the police department. They will call me back for a statement. My body won't stop shaking").

22. **Defendant's Response:** Disputed**.** McNae testified "That was a joke, and that was something that Yelany [Fitzgerald's current wife] also helped instigate." (McNae Dep. 412:24 – 413:4).

23. **Defendant's Response:** Disputed in part**.** McNae did make those statements asking for financial support and clothes following the brief period between her statement that she was pregnancy and Fitzgerald's knowledge that it was not true. But McNae did not push or offer to sign an NDA, and her statement was made in jest. (MCNAE 2092 – 2093, consisting of McNae's text "Are you going to make me sign an NDA too? (Emoji face")

24. **Defendant's Response:** Disputed. Fitzgerald already knew McNae's pregnancy statement was not true and shared these beliefs with his best friend, Tom Wiper. This was the same day he was committing to paying for counseling. (FITZ000816 - FITZ000818)

25. **Defendant's Response:** Undisputed.

26. **Defendant's Response:** Disputed in part. McNae testified that she read through a proposed agreement but was "unsure where to start" (MCNAE 2110).

27. **Defendant's Response:** Disputed, part. R. McNae asked Myers to represent her because Fitzgerald was insisting on nondisclosure language. (MCNAE 000007). Plaintiff's characterization gives the false impression that McNae might have been the one insisting on specific language or terms of the agreement.

28. **Defendant's Response:** Disputed, in part, and specifically Plaintiff's characterization that R. McNae was represented by "competent" counsel. R. McNae testified that she did not thoroughly review the agreement and her prior attorney did not fully explain the terms and ramifications of signing it. (McNae Dep. 435:19-25; 435:9-20).

29. **Defendant's Response:** Undisputed.

30. **Defendant's Response:** Undisputed.

31. **Defendant's Response:** Undisputed.

32. **Defendant's Response:** Disputed in part. Plaintiff correctly states R. McNae's testimony regarding her lack of financial means to pay for counseling five times a week. However, McNae disputes that her health insurance coverage was sufficient to alleviate the financial burden that counseling created, which is what Plaintiff suggests in the remaining part of this Statement. The evidence cited by Plaintiff does not support Plaintiff's suggestion that R. McNae's need for counseling did not impose an undue burden and extreme financial hardship on McNae.

33. **Defendant's Response: Disputed.** Plaintiff has improperly editorialized McNae's testimony. R. McNae testified that she did not thoroughly review the agreement and her prior attorney did not fully explain the terms and ramifications of signing it. (McNae Dep. 435:19-25; 435:9-20).

34. **Defendant's Response:** Undisputed.

35. **Defendant's Response:** Undisputed.

36. **Defendant's Response:** Undisputed.

37. **Defendant's Response:** Disputed in part. While the Agreement generally prohibited McNae from writing about Fitzgerald, it permitted McNae to talk generally about her life and experiences, and did not prohibit McNae from communicating to law enforcement officials about Fitzgerald. *See Agreement § 4(A)* (noting that "[t]he McNaes may speak or write generically about their life events).

38. **Defendant's Response:** Undisputed.

39. **Defendant's Response:** Undisputed.

40. **Defendant's Response:** Undisputed.

41. **Defendant's Response:** Disputed. McNae disputes that such communications constitute a breach of contract, because:

    a. Fitzgerald suffered no damages from McNae's Statements, and the Statements do not constitute a "material" breach of the agreement. SoftwareOne and Microsoft both knew about the rape allegations before the Agreement was signed and years before McNae's 2022 Statements. (Fitzgerald Dep. 167:21 – 168:16). Tom Wiper, Fitzgerald's friend,

    testified that Fitzgerald suffered no reputational damage. (Wiper Dep. 49:3-10; 92:2-6; 103:4 - 104:14).  Fitzgerald's wife Yelany de Varona testified that she did not believe McNae's allegations. (de Varona Dep. 53:11-21).  And while Fitzgerald alleged in his complaint that his job at SoftwareOne was negatively impacted, Fitzgerald confirmed that he voluntarily left his job and agreed to a negotiated settlement agreement with SoftwareOne where he would retain his PSUs (stock options). (Fitzgerald Dep. 403:11-20; 410:6-413:16.)

    b. In addition, the agreement is unenforceable based on McNae's affirmative defense of duress, as Ronda McNae was suffering from PTSD and debilitating anxiety at the time it was executed due to Fitzgerald's assault and rape. See McNae's therapy records (MCNAE1233, 1234-35, 1820-1821, 1986-1987, 1990-1991, 1996, 2005; and MCNAE2036-2037).)

42. **Defendant's Response:** Undisputed that McNae sent Statement 1, but SoftwareOne representatives knew about McNae's accusations for years prior, in 2020. (Fitzgerald Dep. 167:21 – 168:16).

43. **Defendant's Response:** Undisputed.

44. **Defendant's Response:** Disputed in part. It is undisputed that R. McNae sent Statement 2 but Defendant objects to and disputes Plaintiff's paraphrasing, which does not fully or fairly represent the statement's meaning and context. (McNae 001342).

45. **Defendant's Response:** Disputed in part**.** It is undisputed that Statement 2 was communicated to SoftwareOne and Microsoft – but McNae disputes that such communication violated the Settlement Agreement, because:

    a. Fitzgerald knew that individuals at Microsoft and SoftwareOne were aware of McNae's sexual assault allegations before the parties entered into the Agreement, and in Fitzgerald's view "I presumed that people thought the allegations were untrue…" (Fitzgerald Dep. 168:6-16).

    b. Fitzgerald is unsure whether McNae breached the Agreement by communicating with individuals who already knew about the events (or already discussed those issues with McNae. (Fitzgerald Dep. 167:5—16).

46. **Defendant's Response:** Disputed in part. It is undisputed that R. McNae sent Statement 3 but Defendant objects to and disputes Plaintiff's paraphrasing, which does not fully or fairly represent the statement's meaning and context.

47. **Defendant's Response:** Undisputed.

48. **Defendant's Response:** Disputed in part. It is undisputed that R. McNae sent Statement 4 but Defendant objects to and disputes Plaintiff's paraphrasing, which does not fully or fairly represent the statement's meaning and context.

49. **Defendant's Response:** Disputed in part. It is undisputed that R. McNae sent Statement 5 but Defendant objects to and disputes Plaintiff's paraphrasing, which does not fully or fairly represent the statement's meaning and context.

50. **Defendant's Response:** Undisputed.

51. **Defendant's Response:** Disputed in part. It is undisputed that R. McNae sent Statement 6 but Defendant objects to and disputes Plaintiff's paraphrasing, which does not fully or fairly represent the statement's meaning and context.

52. **Defendant's Response:**. Disputed in part. It is undisputed that R. McNae sent Statement 7 but Defendant objects to and disputes Plaintiff's paraphrasing, which does not fully or fairly represent the statement's meaning and context. Additionally, it is disputed that the Statement refers to McNae indirectly, as the Statement does not refer to Fitzgerald by name. It is a question of fact on whether "the average person upon reading [the] statements could reasonably have concluded that the plaintiff … was implicated[.]" *Miami Herald Pub. Co. v. Ane,* 423 So. 2d 376, 389 (Fla. 3d DCA 1982),

53. **Defendant's Response:** Disputed in part. It is undisputed that R. McNae sent Statement 8 but Defendant objects to and disputes Plaintiff's paraphrasing, which does not fully or fairly represent the statement's meaning and context. Additionally, the evidence Plaintiff cites (McNae 1699-1701) does not prove that Statement 8 was published to thousands of R. McNae's followers and members of the public.

54. **Defendant's Response:** Disputed in part**.** Defendant admits that Statement 9 was sent but objects to Plaintiff's selective paraphrasing, which does not fully or fairly represent the statement's meaning and context. In addition, Defendant disputes that Statement 9 referred to "Fitzgerald by reference". It is a question of fact on whether "the average person upon reading [the] statements could reasonably have concluded that the plaintiff … was implicated[.]" *Miami Herald Pub. Co. v. Ane,* 423 So. 2d 376, 389 (Fla. 3d DCA 1982),

55. **Defendant's Response:** Disputed in part. It is undisputed that R. McNae sent Statement 10 but Defendant objects to and disputes Plaintiff's paraphrasing, which does not fully or fairly represent the statement's meaning and context. Additionally, it is disputed that the Statement refers to McNae indirectly, as the Statement did not refer to Fitzgerald by name, and it is a question of fact on whether "the average person upon reading [the] statements could reasonably have concluded that the plaintiff … was implicated[.]" *Miami Herald Pub. Co. v. Ane,* 423 So. 2d 376, 389 (Fla. 3d DCA 1982),

56. **Defendant's Response:** Disputed in part. McNae admits to having sent Statements 1 through 10, but disputes that Statements 7, 9 or 10 referred to Fitzgerald "indirectly." Neither statement identified Fitzgerald by name, and it is a question of fact on whether "the average person upon reading [the] statements could reasonably have concluded that the plaintiff … was implicated[.]" *Miami Herald Pub. Co. v. Ane,* 423 So. 2d 376, 389 (Fla. 3d DCA 1982). In addition, McNae contends that Statements 1 through 10 do not constitute "material" breaches of contract, and that whether a particular statement amounts to technical "violation" of the agreement is insufficient to support a breach of contract claim.

57. **Defendant's Response:** Undisputed.

58. **Defendant's Response:** Undisputed.

59. **Defendant's Response:** Undisputed.

60. **Defendant's Response:** Undisputed.

61. **Defendant's Response:** Undisputed.

62. **Defendant's Response:** Disputed. The fact that Ronda's husband, Will McNae, has argued in state court – after this lawsuit was filed and after McNae's 2022 statements, that paragraph 16 allows for communications with law enforcement does not mean that Ronda McNae "is aware" that such communications were permissible. Nor does it mean that Ronda McNae was "aware" that such communications were permissible when they were made in 2022. The state court has not ruled on the merits of W. McNae's argument as to paragraph 16 - and no court has issued any interpretation as to paragraph 16 and what it permits.

## ADDITIONAL FACTS

63. SoftwareOne's CEO, Dieter Schlosser, knew about McNae's sexual assault allegations as early as March 2020 and Schlosser spoke with Fitzgerald and told him that SoftwareOne would be investigating the issue. (Fitzgerald Dep. 134:20 – 135:4; 136:4-15).

64. Tom Wiper, Fitzgerald's close friend, testified that he did not believe McNae's accusations and it did not affect their friendship. (Wiper Dep. 49:3-10; 92:2-6).

65. When asked if he was aware of any relationship Fitzgerald had with family, friends or co-workers that was negatively affected by McNae's allegations, Wiper was not aware of any reputational harm. (Wiper Dep. 103:4 - 104:14).

66. Fitzgerald's wife Yelany de Varona testified that she did not believe McNae's allegations. (de Varona Dep. 53:11-21).

67. Fitzgerald knew that individuals at Microsoft and SoftwareOne were aware of McNae's sexual assault allegations *before* the parties entered into the Agreement. (Fitzgerald Dep. 167:21 – 168:16). And in Fitzgerald's view, "I presumed that people thought the allegations were untrue…" (Fitzgerald Dep. 168:6-16).

68. Fitzgerald offered to step down from his job at SoftwareOne in 2020, but was told that was unnecessary. (Fitzgerald Dep. 234:8-14). When Fitzgerald spoke with SoftwareOne's CEO, Schlosser told him that he 'had his back' because Schlosser and Fitzgerald were friends, and that Schlosser told him it "didn't seem like something I would do." (Fitzgerald Dep. 256:11-24).

69. SoftwareOne's CEO was supportive of Fitzgerald, and disbelieved McNae's allegations, such that when Microsoft learned of the complaint against Fitzgerald, SoftwareONE's CEO told Microsoft "to get f—ked". (Fitzgerald Dep. 261:25 – 262:15).

70. Fitzgerald testified that his reputational damage with Microsoft, if any, occurred in 2020, years before the Agreement was purportedly breached. During his deposition, Fitzgerald stated that in 2020, he was no longer included in the kind of engineering meeting and rollout sessions with Microsoft like he was in the past. (Fitzgerald Dep. 265:5-14).

71. Fitzgerald believed his relationship with Microsoft soured because of Mr. McNae's 2020 email to Microsoft representatives, but acknowledged that no one at SoftwareOne told Fitzgerald that the reason he was not working with Microsoft was because of Ronda or Will McNae. (Fitzgerald Dep. 256:20 – 266:3).

72. After McNae's Statements were made in 2022, it was Fitzgerald who provided notice of this action to SoftwareOne, which included a copy of the Confidential Settlement Agreement, at which point he was placed on paid leave. (Fitzgerald Dep. 321:12 - 322:10).

73. Fitzgerald believes he was placed on leave because of McNae's allegations and the impact it could have on SoftwareOne, testifying that this was "insinuated" to him. (Fitzgerald Dep. 515:6-16).

74. As part of this investigation, SoftwareOne's attorney began investigating Fitzgerald's use of his expense account, and whether Fitzgerald improperly used SoftwareOne funds to pay for R. McNae and W. McNae's travel, meals or other expenses when the group met in Miami in 2020. (Fitzgerald Dep. 398:19 – 399:11).

75. Fitzgerald testified that after her filed this lawsuit, he "didn't want to go back to SoftwareOne. So I decided there's no way forward based on this." (Fitzgerald Dep. 324:15-22).

76. Fitzgerald voluntarily decided to leave SoftwareOne in December 2022. (Fitzgerald Dep. 394:5-11).

77. As part of his voluntary termination, Fitzgerald negotiated and entered into a Settlement Agreement with SoftwareONE, which provided that, among other things, Fitzgerald would be entitled to retain his unvested performance share units (PSUs), which are similar to stock options (Fitzgerald Dep. 403:11-20; 410:6-413:16.)

78. Fitzgerald testified that each year, he and SoftwareOne agreed on what annual performance goals had to be met for him to receive 100% of his target quarterly and annual bonuses for that year. (Fitzgerald Dep. 306:10-308:7.) What percentage of the target bonus Fitzgerald would receive was tied to the company meeting agreed-upon yearly revenue and profit goals. (Fitzgerald Dep. 315:1-6.)

79. At regular intervals, SoftwareOne calculated Fitzgerald's bonus by comparing the agreed-upon company performance targets for that year to the actual performance achieved by SoftwareONE and then paid a bonus according to that calculation. (Fitzgerald Dep. 317:5-23.) For example, Fitzgerald explained that 2021 - "was a very poor year performance-wise for SoftwareOne," so Fitzgerald "achieved 53 percent of [his] goals annually for the year" and therefore he was paid about 50% of his target bonus that year. (Fitzgerald Dep. 313:12-316:5.)

13

80. Fitzgerald acknowledged that he did not know whether he would be eligible to receive his full quarterly and annual bonuses for 2022. Fitzgerald Dep. 520:21-521:13

Dated this 9th day of September, 2024.	Respectfully submitted,

LAW OFFICES OF GOMEZ & GOMEZ
Attorneys for Defendant
4300 Biscayne Boulevard, Suite 305
Miami, FL 33137
(Tel.) 305-825-5506
(Fax) 305-825-2699
Designated Email:
Primary: richardgomez@rgpalaw.com
Secondary:pleadings@rgpalaw.com

BY: /s/ Richard M. Gomez
RICHARD M. GOMEZ
Fla. Bar No.: 987130

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of September, 2024, I electronically filed the foregoing document with the U.S. District Court. Notice will automatically be electronically mailed to all individuals who are registered with the U.S. District Court CM/ECF System

BY: /s/ Richard M. Gomez
RICHARD M. GOMEZ