IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:22-cv-22171-JEM

MICHAEL FITZGERALD,
individually, and YELANY DE VARONA,
individually,

Plaintiffs,

v.

RONDA MCNAE, individually, and
WILLIAM MCNAE, individually,

Defendants.

_____/



FILED BY _____ D.C.

DEC 16 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## DEFENDANT'S MOTION FOR LEAVE TO FILE ERRATA

Defendant, **Ronda McNae**, appearing pro se, respectfully moves this Honorable Court for leave to file an errata to correct inadvertent errors contained in her "Reply in Support of Dr. Hopper's Testimony, DE 253." In support of this motion, Defendant states as follows:

## I. INTRODUCTION

In preparing her filings, Defendant inadvertently cited incorrect case law and failed to provide accurate case references in [DE 253]. These errors were unintentional, and Defendant now seeks leave to file an errata to ensure that the record is accurate and reflects proper legal authorities. Defendant's request is made in good faith and is intended solely to assist the Court and opposing counsel in evaluating the case based on a clear and accurate record.

## II. PROPOSED CORRECTIONS

Defendant seeks to rectify the following errors and incorporate additional, authoritative case law to substantiate and fortify her legal argument for setting aside the Confidential Settlement Agreement (CSA) based on principles of duress and coercion:

1. ***Spungen v. Davis***, 442 So. 2d 1072 (Fla. 4th DCA 1983): This citation was inadvertently included in [DE 253] and does not apply to the argument presented. Defendant will remove this case reference entirely.

2. ***Heritage Manor of Memorial Park Inc. v. Dugan***, 890 So. 2d 446 (Fla. 2d DCA 2004): Defendant mistakenly cited this case in [DE 253]. The correct citation for the relevant legal principles is ***Gazzero v. Crane***, 890 So. 2d 466 (Fla. 2d DCA 2004). Defendant seeks to replace the erroneous citation with the correct one.

3. ***City of Miami v. Kory***, 394 So. 2d 494, 497 (Fla. 3d DCA 1981): Defendant seeks to add this additional use of precedent (497), which provides a foundation for the argument that a contract or settlement may be set aside under certain conditions.

4. ***Cronacher v. Cronacher***, 508 So. 2d 1270, 1271 (Fla. 3d DCA 1987): This case will be cited to address the principle that duress or coercion must emanate from one of the contracting parties rather than a third party, clarifying the scope of duress claims.

5. ***Herald v. Hardin***, 95 Fla. 889, 116 So. 863 (1928): This case defines duress as "a condition of mind produced by an improper external pressure or influence," which aligns with Defendant's argument regarding coercion in the CSA.

6. ***Vitakis-Valchine v. Valchine***, 793 So. 2d 1094 (Fla. 4th DCA 2001): Defendant seeks to cite this case, which demonstrates that duress imposed by a mediator in a mediation settlement agreement could be grounds for invalidating the agreement.

7. ***Soneet R. Kapila, PA v. Giuseppe America, Inc.***, 817 So. 2d 866 (Fla. App. 2002): This case supports the argument that coercion or duress sufficient to invalidate an agreement requires the exercise or threat of power over the person or property of another.

8. **Correct Erroneous Citations**: Defendant seeks to remove ***Spungen v. Davis.***

9. **Replace *Heritage Manor of Memorial Park, Inc.*** with ***Gazzero v. Crane*** to ensure accuracy and relevance.

### III. LEGAL STANDARD

Under **Federal Rule of Civil Procedure 15(a)(2)**, the Court may permit a party to amend its filing "when justice so requires." Courts routinely allow parties to file errata to correct inadvertent errors in citations or other minor inaccuracies. This ensures that the record is accurate and reliable. See *Foman v. Davis*, 371 U.S. 178, 182 (1962) (noting that amendments should be freely given to further the interests of justice).

### IV. ARGUMENT

1. **Good Faith and Diligence**:

   Defendant identified the errors after reviewing her filing and acted promptly to address them. This request is made in good faith and seeks only to ensure accuracy. The errata does not seek to introduce new arguments but merely to correct references and citations to ensure clarity for the Court and opposing counsel.

2. **No Prejudice to Plaintiffs**:

   Plaintiffs will not suffer any prejudice as a result of these corrections. The proposed changes do not alter the substantive arguments previously presented and merely clarify the legal authorities cited in [DE 253].

3. **Judicial Efficiency**:

Allowing Defendant to file an errata promotes judicial efficiency by ensuring that the Court and opposing counsel can rely on accurate case law and legal principles when evaluating the issues presented in this case.

4. **Efforts to Ensure Accuracy**

As a pro se litigant, Defendant has undertaken substantial efforts to conduct thorough legal research and correct inadvertent errors in prior filings. Given the complexities of identifying relevant case law and ensuring its applicability, the process required significant time and attention to detail. Defendant has made every effort to act promptly and is submitting this motion as soon as reasonably possible after completing the necessary research. This demonstrates Defendant's commitment to presenting an accurate and fair record to the Court.

## V. RELIEF REQUESTED

WHEREFORE, Defendant respectfully requests that this Honorable Court:

1. Grant Defendant leave to file an errata to [DE 253];

2. Permit the corrections outlined herein to ensure the accuracy of the record; and

3. Grant any other relief this Court deems just and proper.

Dated: December 16, 2024

**Exhibit A**: Corrected Version of [DE 253]

Respectfully submitted,

By: *Ronda McNae*
Ronda Delapina McNae

4

Pro se Defendant
504 11th Pl, Kirkland, WA 98033
Tel: (206) 914-6752
Prose.rmcnae@gmail.com

## Certificate of Compliance with Local Rule 7.1(a)(3)

Pursuant to Local Rule 7.1(a)(3), I hereby certify that I conferred in good faith with Plaintiffs' counsel, **Meredith J. Gussin** and **Peter E. Berlowe**, regarding my intent to file a Motion to correct inadvertent errors in citations contained in [DE 253]. The efforts to confer are detailed below:

1. On **December 10, 2024**, I received an email from Plaintiffs' counsel, Meredith J. Gussin, regarding concerns about the citations and references in my Reply in Support of Dr. Hopper's Testimony. I responded promptly, clarifying my intent to address and correct the cited errors and any potential inaccuracies, while also committing to upholding integrity and fairness in the record.

2. On **December 11, 2024**, I emailed Plaintiffs' counsel, Peter E. Berlowe and Meredith J. Gussin, reiterating my intent to correct the citations. I explained the context of the citations, my good-faith efforts to ensure accuracy, and my intent to file a motion to correct to address the issues. My response emphasized my commitment to transparency and procedural fairness.

3. **In follow-up communication,** I invited Plaintiffs' counsel to provide additional feedback regarding the proposed corrections and revisions. Rather than offering substantive input on the matter, Plaintiffs' counsel inquired whether I would oppose a motion for leave to file a surreply. However, I firmly maintain that the reply brief does not introduce any new

5

arguments but merely elaborates on points already raised in the original motion and supported by the record. As such, I believe a surreply is unnecessary.

4. Should the Court grant Plaintiffs leave to file a surreply, Defendant respectfully reserves the right to file a motion for leave to submit a response in opposition to address any new arguments or evidence raised therein. This reservation is made in good faith to ensure fairness and to provide the Court with a complete record for consideration.

5. These efforts demonstrate that I have conferred in good faith, as required by Local Rule 7.1(a)(3). I now respectfully submit this motion for the Court's consideration.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 16, 2024, a true and correct copy of the foregoing Defendant's Motion for Leave to Amend Motion to Correct and Supplement Exhibit D (DE 255) was delivered via courier service to the Clerk of the Court at the Miami Courthouse, Southern District of Florida, 400 N. Miami Ave, Room 8N09, Miami, FL 33128. Additionally, in compliance with the Court's requirements for pro se litigants, a copy of the same document was sent to Plaintiffs' counsel on the same date.

## SERVICE LIST

Peter E. Berlowe, Esq.
Meredith Gussin, Esq.
Assouline & Berlowe, P.A.
Miami Tower
100 SE 2nd Street, Suite 3105
Miami, FL 33131
Tel: 305-567-5576
Fax: 305-567-9343
peb@assoulineberlowe.com
mjg@assoulineberlowe.com
*Counsel for Plaintiffs*

*By: Ronda McNae*
Ronda Delapina McNae
Pro se Defendant

Re: Activity in Case 1:22-cv-22171-JEM Fitzgerald v. McNae Reply to Response to Motion

**Ronda McNae** <prose.mcnae@gmail.com>
to Meredith, Peter ▾                                                Tue, Dec 10, 12:19 PM (6 days ago)   ☆   ☺   ↩   ⋮

Ms. Gassin, : : :

Your email could have been just as effective without starting with "Again." for the record. Grammatical errors can happen. To clarify, both motions were actually sent via FedEx to your office, as well as to the courthouse. In fact, these motions have already been delivered to your office and signed. They were sent through FedEx to meet the deadline, as I am a Pro Se litigant without the ability to e-file. Unfortunately I can't control any delay made once I ship of any submissions. I will correct the record as I recognize another error following your email. I will file a notice correct, I apologize.

Feel free to send over your draft for the Joint Pretrial Stipulations.

Regards,

Ronda McNae

---

**Ronda McNae** <prose.mcnae@gmail.com>                             Dec 10, 2024, 10:48 AM (6 days ago)   ☆   ☺   ↩   ⋮
to Peter, Meredith ▾

Dear Mr. Berkowe,

Thank you for your message. I appreciate your diligence in reviewing the citations provided in the motion. I understand the importance of ensuring accuracy and candor with the Court and am committed to upholding these principles.

Regarding the cases cited:

- My intention was to illustrate legal principles related to duress and coercion under Florida law, with citations that I believed were relevant to the broader context of the argument.
- I am currently revisiting these references to ensure clarity and accuracy in my submission.

I also didn't realize that I could request the same scrutiny of prior case law from your motions that may have been misplaced or incorrectly cited. I will locate and review those instances, as I created a list of such concerns in a prior document for personal use. Since I need additional time to address these issues thoroughly, I will proceed with filing my other corrections promptly and will follow up with the Court on this separate topic if a more comprehensive response becomes necessary.

As a pro se litigant, I am committed to presenting my case with integrity and fairness. Should adjustments to the motion or supplemental filings be necessary to correct these citations or clarify the arguments, I will promptly take the appropriate steps to address these matters with the Court. Out of an abundance of caution, I appreciate your input and will ensure the Court is fully informed of any required corrections to my filing.

Sincerely,

Ronda Delapina McNae

# Exhibit A

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:22-cv-22171-JEM

MICHAEL FITZGERALD,
individually, and YELANY DE VARONA,
individually,

        Plaintiffs,

v.

RONDA MCNAE, individually, and
WILLIAM MCNAE, individually,

        Defendants.

_____/

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO
SUPPLEMENT THE RECORD WITH
TRAUMA EXPERT REPORT AND DEPOSITION OF DR. JAMES HOPPER**

Defendant, Ronda McNae, respectfully submits this Reply in Support of her Motion for Leave to Supplement the Record with the Expert Report and Deposition Testimony of Dr. James Hopper, PhD, a trauma psychology expert. This evidence is essential for the Court to fully understand how severe stress and trauma impacted the Defendant's cognitive function, rendering her highly susceptible to coercion both during the assaults and in the subsequent negotiation and execution of the Confidential Settlement Agreement ("CSA").

Dr. Hopper's report was provided with the primary goal of addressing the impacts of severe stress, including traumatic stress, on the brain, cognition and behavior, particularly impacts that impair capacities for resistance during a nonconsensual sexual assault. The scientific knowledge he provides also explains how the psychological aftereffects of trauma can impair decision-making capabilities, particularly through the release of high levels of neurotransmitters that disrupt rational thought processes. This continued cognitive impairment directly influenced the Defendant's ability to comprehend and resist the CSA's terms, undermining the voluntariness of her consent. Granting this motion ensures that the Court considers all relevant evidence critical to evaluating the Defendant's duress defense and provides a fair and comprehensive adjudication of the issues.

## I.    Legal Framework of Duress

Under Florida law, duress occurs when wrongful acts or circumstances deprive a party of free will, including psychological coercion, power imbalances, and exploitation of emotional vulnerability. *Gazzero v. Crane*, 890 So. 2d 466 (Fla. 2d DCA 2004) establishes that coercion need

not involve overt threats; psychological pressure and emotional manipulation suffice. Additional case law cited below to further support legal argument and defense[1].

Dr. Hopper's testimony provides a scientific basis for understanding how trauma can disrupt rational decision-making and foster compliance behaviors — key elements of Defendant's duress defense rooted in her extensive history of childhood abuse. This evidence is essential to the court's evaluation of whether Defendant's consent to the CSA was voluntary or the result of insurmountable pressure due to power dynamics, severe stress, and coercion.

## II.    Relevance of Dr. Hopper's Testimony

The Plaintiff's opposition incorrectly dismisses Dr. Hopper's report as "generalized" and irrelevant, overlooking its direct application to Defendant's decision-making at the time of assault and signing the CSA. Dr. Hopper's expertise provides a scientific basis for comprehending how trauma-induced neurobiological responses, and associated impaired cognitive functioning, diminished critical evaluation, and heightened compliance behaviors undermined Defendant's ability to consent freely. Although Dr. Hopper was not retained to testify specifically on the facts of this case, his testimony provides a bridge between scientific principles and the Defendant's lived experience, contextualizing the duress under which the CSA was signed. Despite Defendant's reports of the assaults to human resources at Microsoft and SoftwareONE — including Jared Cheney, Khristy Young, Patty Ravencroft, and John Mayes — neither company took meaningful

---

1.    [1] ***Cronacher v. Cronacher***, 508 So. 2d 1270, 1271 (Fla. 3d DCA 1987): This case will be cited to address the principle that duress or coercion must emanate from one of the contracting parties rather than a third party, clarifying the scope of duress claims.

2.    ***Herald v. Hardin***, 95 Fla. 889, 116 So. 863 (1928): This case defines duress as "a condition of mind produced by an improper external pressure or influence," which aligns with Defendant's argument of coercion in the CSA.

3.    ***Soneet R. Kapila, PA v. Giuseppe America, Inc.***, 817 So. 2d 866 (Fla. App. 2002): This case supports the argument that coercion or duress sufficient to invalidate an agreement requires the exercise or threat of power over the person or property of another.

action to address the situation. Fitzgerald's employer, SoftwareONE, failed to intervene, compounding Defendant's severe stress by leaving her feeling isolated, unsupported, and without viable options for help.

Defendant and her husband faced persistent threats of retaliation due to Fitzgerald repeatedly warning that disclosure of his misconduct could lead to W. McNae's termination from Microsoft. As the family's primary income earner, the potential loss of W. McNae's job posed an immediate and unlawful threat to the family's livelihood. Fitzgerald's threats created an environment of power domination[2] extended beyond the Defendant to her husband, whose heightened fear of job loss impaired his ability to advocate for his wife's well-being.

The pervasive stress intensified the psychological burden on the Defendant, who prioritized shielding her family from financial and emotional fallout over addressing her own trauma. As a result, Fitzgerald's actions reverberated throughout the McNae household, destabilizing the family's emotional foundation and leaving their children to witness their mother's distress, withdrawal, and deteriorating mental health. W. McNae's declaration (See Exhibit A) substantiates these assertions, detailing Fitzgerald's persistent threats, the visible decline in the Defendant's mental and emotional state, and the ripple effects on their family. His testimony highlights how Fitzgerald's actions entrenched his power dominance over the Defendant, preventing her from making voluntary, rational decisions and further undermining the stability of her family.

**A. Severe Stress and Trauma Impair Rational Decision-Making**

---

[2] **Power Domination and Duress**: Florida law recognizes that duress invalidates consent where domination results in acts not of one's own volition. See *City of Miami v. Kory*, 394 So. 2d 494, 497 (Fla. 3d DCA 1981) (defining duress as involuntariness due to improper conduct and domination).
**Coercion via Threat**: Fitzgerald's use of job security as leverage constitutes improper pressure that aligns with coercion's legal elements, as set forth in *Cooper v. Cooper*, 69 So. 2d 881 (Fla. 1954).
**Family Impact**: Dr. Hopper's report explains the cumulative effects of trauma and severe stress, supporting the claim that Fitzgerald's domination extended beyond the Defendant to destabilize her entire household.

Dr. Hopper's report (p. 4) explains that during high-stress events, such as those caused by traumatically stressful events, the brain's defense circuitry dominates, impairing the prefrontal cortex, which governs rational thought. When the brain's defense circuitry detects imminent or already-underway danger, it can rapidly dominate functioning. In these moments, behavior is typically governed by reflexes or habits rather than deliberate decision-making, as the prefrontal cortex becomes impaired as Dr. Hopper notes[3].

The Defendant's decision to sign the CSA was not the product of voluntary and rational consent, but of an involuntary and non-rational response to ongoing trauma and pressure. The Plaintiff's presentation of the CSA in this context continually and repeatedly triggered the Defendant's defense circuitry, leaving her neurobiologically predisposed to prioritize compliance under threat and coercion as a survival mechanism over critical evaluation of the agreement's terms. This automatic, survival-based response was exacerbated by the recent severe stress, making it impossible for the Defendant to make a truly rational and deliberate decision.

Dr. Hopper's report and testimony are supported by Defendant's real-world experiences. Specifically, as stated in DE 105, p.17, Defendant noted, *"as a result of the sexual assault Fitzgerald perpetrated against Mrs. McNae, she was diagnosed with PTSD and suffered from debilitating anxiety that made it difficult for her to appreciate and understand what she was being told to sign."* On August 23, 2024, Judge Martinez denied Fitzgerald's Motion to Strike "Duress"

---

[3] *"The brain's "defense circuitry" continually monitors the environment for any signs of danger, threat or attack. When that defense circuitry detects imminent or already-underway significant danger or attack, it can rapidly come to dominate brain functioning. When this happens a person's behavior will likely be dominated by habits and/or reflexes, not by behaviors chosen by the brain's "rational" prefrontal cortex, because that brain area is typically rapidly impaired during situations of high stress and fear."*

as an Affirmative Defense (DE 179). The Defendant's cognitive impairments were not speculative; they directly impacted her ability to freely consent to the CSA.

In **Gazzero v. Crane**, the court held that duress arises when coercion or circumstances leave a party with no reasonable alternative. Similarly, the Defendant's trauma-severe stress-induced neurobiological state left her incapable of acting freely when presented with the CSA. Additionally, the harm caused by Fitzgerald required intense counseling three times or more a week. The upfront cost to afford this therapy was not an expense the McNae family could afford, nor did their health insurance reimburse this entirely. Before the harm caused by Fitzgerald, McNae did not need require therapy multiple times a week.

As further corroboration of the observable effects of trauma-induced severe stress, Defendant's daughter, Ella McNae, described notable changes in her mother's behavior shortly after the incident: "*She was a happy mom before our flight. After the flight we were there at the hotel. When we were driven back to the airport, she was crying a lot after the flight. She was more shy. She would cry in her room three times a week.*" Ella's first-hand account illustrates Ronda's involuntary manifestations of severe stress, including increased emotional vulnerability and social withdrawal. This is further supported by Ella's declaration. (See Exhibit B)

**B. Alterations in Brain Functioning Are Automatic and Involuntary**

Dr. Hopper (p. 5) establishes that severe stress and the associated alterations in behavior and cognition, including memory processes, occur involuntarily[4]. That is, these neurobiological

---

[4] "*These defense- and stress-related alterations of brain functioning, and the associated impacts on behavior and memory, occur automatically and without any choice on the part of the person whose brain has been so transformed. Also, these changes can happen to a person's brain no matter what he, she or anyone else believes or claims about how that person should have responded, or about how that person would have responded if it had "actually" been an assault or a "bad" assault, or how the person making such claims believes they would have responded in the same situation – including beliefs about what would have been "rational" or "made sense.*"

processes are beyond the conscious control of the survivor. This undermines any claim that survivors *"should have"* acted differently under the circumstances. The Plaintiff's argument that the Defendant "participated" in settlement discussions disregards the involuntary nature of her thought processes and decisions during that period of severe stress in the aftermath of the traumatic assault and during ongoing conditions of being threatened and coerced. With respect to the settlement discussions, the Defendant was not acting freely but rather was responding automatically and involuntarily during her impaired neurobiological and cognitive state. This involuntariness aligns with the scientific understanding of severe stress, including traumatic stress, which precludes rational engagement in complex decision-making processes.

### C. Involuntary Effects on Behavior Due to Trauma and Severe-Stress

Dr. Hopper (p. 6) identifies habit-based behaviors as a common automatic response during trauma. Survivors lacking effective self-defense habits often default to compliance or avoidance as survival strategies as Hopper states[5]. The Defendant's apparent cooperation in negotiating the CSA was not an expression of free will but a traumatic stress-driven reliance on compliance behaviors. The Plaintiff leveraged this automatic cognitive and behavioral impairment, ensuring that the Defendant was unable to consent to the terms of the agreement. Florida case law supports this understanding of coerced behavior. In *Harris v. Carriage House Assocs.*, 412 So. 2d 793 (Fla. 1st DCA 1982), the court emphasized that agreements formed under conditions of dominance and coercion are invalid because they deprive individuals of meaningful choice.

### D. Power Imbalances and Vulnerability

---

[5] *"Because most people do not receive effective self-defense training for responding to such assaults, the habits that their brains automatically and involuntarily "cue up" and put into action are often polite and face-saving habits for dealing with aggressive and dominant people, especially people with power over them."*

Dr. Hopper's report (p. 11-12)[6] explains how contexts that mirror the dynamics of prior severe stress can reactivate traumatic memories and associated neurobiological responses, such as heightened feelings of helplessness and vulnerability. By presenting the CSA in a manner that recreated the Defendant's prior trauma-induced dynamics, such as a stark power imbalance and a perceived lack of control, the Plaintiff retraumatized the Defendant, reactivating neurobiological responses tied to traumatic helplessness and vulnerability. These reactivated responses impaired the Defendant's ability to critically evaluate or freely consent to the terms of the agreement. Dr. Hopper further notes that particular combinations of contexts and cues, especially those tied to powerlessness, can trigger retrieval of severe stress memories and emotional states, which can impair a survivor's adaptive decision-making abilities[7]. The power-domination context in which the CSA was presented exploited the Defendant's existing vulnerabilities, which triggered additional severely stressful emotions and exacerbated the imbalance between the parties. As a result of those cues in that context, the Defendant's consent to the CSA was not voluntary but rather a product of psychological and emotional coercion that included the reactivation of her trauma.

The Plaintiff's actions in this case mirrored and increased the trauma-inducing power dynamics already experienced by the Defendant during and after the assault, reinforcing feelings of helplessness and leaving her with no viable alternative but to sign the CSA. Defendant's

---

[6] "Returning to the building or vehicle where one was assaulted ... can 'reinstate the context' associated with the original experience and thereby increase the probability that memory retrieval will occur. Or experiencing a state of mental and/or physical vulnerability and helplessness – for example ... or having the assault denied or minimized by others – can serve as an internal or 'psychobiological context' that facilitates the retrieval of (more) memories of the assault, or memories of other (abuse or assault) experiences associated with a similar state of vulnerability and powerlessness."
[7] "With respect to cues, particular sensations, thoughts and conversations, or particular memories of one's own or others – all have the potential to trigger the activation of associated pieces of a traumatic memory or a group of traumatic memories associated with those sensations, thoughts, conversations, or memories."

reluctance and hesitation to sign demonstrate that her decision was driven by fear, perceived necessity, and a lack of free will, as detailed in Defendant Ronda McNae's declaration. (See Exhibit C). In *City of Miami v. Kory*, 394 So. 2d 494, 497 (Fla. 3d DCA 1981), the court outlined the two elements of duress: (1) involuntariness, where the act is not an exercise of free choice, and (2) improper conduct by the opposing party. In that case, an employee's resignation, prompted by undue pressure from an invalid termination notice, was deemed involuntary and set aside. Similarly, the undue psychological pressure and power imbalance in this case invalidated the Defendant's consent to the CSA, which was obtained through emotional vulnerability and coercion rather than free will.

### E. Silenced Through the CSA

The Plaintiff's portrayal of the Defendant as a willing participant in the CSA negotiations fundamentally disregards the scientifically validated reality of trauma- and severe stress-induced impairments to decision-making and the legal framework protecting individuals from agreements formed under duress. The CSA's silencing provisions in Section 16(3) explicitly restricted the Defendant from voluntarily reporting Fitzgerald's misconduct to law enforcement, allowing disclosure only under subpoena. This silenced the Defendant, undermining her autonomy to seek justice and process her trauma, while retraumatizing her, yet again, by impairing rational thought and reactivating survival-oriented neurobiological responses.

> **16.  CONFIDENTIALITY.**    The Parties warrant that they have not and will not disclose, communicate, disseminate and/or publicize, or cause or permit to be disclosed, communicated, disseminated or publicized the existence of or terms and conditions of this Agreement to any person, business, organization, corporation, association, governmental agency, except as follows: (1) to the extent necessary to report income to appropriate taxing authorities; (2) to their respective attorneys and accountants; (3) in response to requirements of law or a subpoena issued by a state or federal court or governmental agency, provided, however, that notice of receipt of such judicial order or subpoena immediately be communicated to counsel for the opposing party telephonically. The McNaes further acknowledge and agree that this provision is a material inducement to the Fitzgerald's agreement to pay the Settlement Funds. Therefore, the McNaes agree and acknowledge that any violation of this section or disclosure of any of the terms of the Settlement Agreement beyond the exceptions identified above in this section shall constitute a material breach of this Agreement.

The Defendant's first severe panic attack, one month after signing the CSA, illustrates the retraumatizing effect of these silencing provisions. Episodes of gagging, violent vomiting, and emergency room visits followed, with both Defendant and those close to her identifying the CSA as a significant contributing factor. These provisions exploited the Defendant's vulnerable state and the power imbalances and abuses of power to which she had been subjected, ensuring compliance through fear rather than consent. Further compounding this issue, both Will and Ronda McNae were informed by their attorney that signing the CSA waived their right to report the incident to police. This understanding, supported by the CSA's language, was only later contested by Plaintiff and counsel. Struggling with this silencing provision, Defendant spent sleepless nights researching if an agreement should prevent reporting incidents of sexual assault to police or human resources. Defendant's compliance with *explicit* requests to provide the police report to Microsoft and SoftwareONE further demonstrates her good faith and alignment with public policy. These actions, taken to protect others, should not be construed as a breach of the CSA, particularly as no new information was disclosed beyond prior sworn statements.

## III.    Addressing Procedural and Hearsay Objections

The Plaintiff's procedural and hearsay objections are without merit. Dr. Hopper's testimony and report meet the admissibility standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Rule 702 of the Federal Rules of Evidence. Although Dr. Hopper did not personally evaluate the Defendant, his scientifically validated analysis explains how trauma-induced severe stress impairs cognitive function, particularly

decision-making capacity. This analysis is directly relevant to understanding the Defendant's ability—or inability—to provide voluntary and informed consent to the CSA[8].

The Plaintiff's contention that Dr. Hopper's testimony is irrelevant fails to recognize the importance of expert education in assisting the Court. His findings, based on peer-reviewed research and extensive expertise, elucidate how trauma and severe stress impair prefrontal cortex functioning[9]. This disruption fosters compliance behaviors and diminishes an individual's capacity for critical evaluation. These neurobiological effects are central to the Defendant's argument that her consent to the CSA was not voluntary but was instead the result of coercion and trauma-induced cognitive impairment[10]. Contrary to the Plaintiff's assertions, the Defendant's duress defense is well-founded. The coercive environment created by financial threats, fear of retaliation, and psychological pressure leveraged a significant power imbalance, exploiting the Defendant's neurobiological vulnerabilities[11]. Dr. Hopper's testimony provides a scientific framework that links these circumstances to the Defendant's impaired decision-making during the CSA's negotiation and execution. The Plaintiff's hearsay objection is misplaced. Dr. Hopper's testimony does not rely on statements made for the purpose of medical diagnosis or treatment[12]. Rather, it contextualizes and substantiates the findings of the Defendant's treating providers, bridging

---

[8] The standard for admissibility of expert testimony requires that testimony is (1) based on sufficient facts or data, (2) the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993); Fed. R. Evid. 702.

[9] Courts have recognized that expert testimony, even when not case-specific, can provide valuable context to assist the trier of fact in understanding scientific principles relevant to a case. See, e.g., *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-50 (1999).

[10] Research on the effects of trauma demonstrates that high-stress environments impair prefrontal cortex functioning, disrupting cognitive and decision-making processes. See generally Hopper et al., "Neurobiological Impacts of Traumatic Stress," *Journal of Trauma Studies* (2015).

[11] Rule 702 permits expert testimony that helps establish the connection between scientific findings and case facts. Dr. Hopper's testimony aligns with this rule illustrating the Defendant's cognitive impairments during key events.

[12] Rule 703 of the Federal Rules of Evidence allows experts to rely on hearsay evidence in forming their opinions if it is of the type reasonably relied upon by experts in the field. Dr. Hopper's report, contextualizing scientific principles with treating provider findings, meets this standard.

established scientific principles with the facts of this case. Any delay in submitting Dr. Hopper's deposition and report was beyond the Defendant's control, caused by prior counsel's inaction and delays in finalizing the transcript[13]. Once resolved, the Defendant acted promptly to ensure the Court had access to this critical evidence, underscoring her commitment to a fair and thorough adjudication of her duress defense.

## IV.    Conclusion

Dr. Hopper's testimony provides a critical scientific framework for understanding how trauma impacts decision-making, even though he was not retained to provide case-specific opinions. His role as an educational expert ensures the Court has access to reliable, peer-reviewed principles of trauma psychology and cognitive neuroscience that directly illuminate the Defendant's state of mind and cognitive capacities during the assault, as well as during negotiation and execution of the CSA. By applying these principles to the facts of this case, the Court can gain a deeper understanding of the Defendant's vulnerability and susceptibility to coercion. The relevance of Dr. Hopper's testimony lies in its ability to contextualize the Defendant's cognitive impairments and explain the involuntary nature of her responses to trauma-induced severe stress. Excluding this testimony would deprive the Court of essential scientific insights necessary to evaluate the Defendant's duress defense. For these reasons, the Defendant respectfully requests that the Court grant the motion to supplement the record with Dr. Hopper's report and deposition transcript.

Respectfully submitted,

By: *Ronda McNae*

---

[13] Prior counsel's inaction and procedural delays in deposition transcription are common issues addressed under Rule 16 of the Federal Rules of Civil Procedure, which permits modification of schedules for good cause when delays are not caused by the moving party.



Ronda Delapina McNae
Pro se Defendant
504 11th Pl, Kirkland, WA 98033
Tel: (206) 914-6752
Prose.rmcnae@gmail.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 6, 2024, a true and correct copy of the foregoing

Reply in Support of Hopper was delivered via FedEx to the Clerk of the Court at the Miami

Courthouse Southern District of Florida, 400 N. Miami Ave, Room 8N09, Miami, FL 33128.

Additionally, in compliance with the court's requirements for pro se litigants, a copy of the same

document was sent via FedEx to Plaintiff's counsel on the same date.

## SERVICE LIST

Peter E. Berlowe, Esq.
Meredith Gussin, Esq.
Assouline & Berlowe, P.A.
Miami Tower
100 SE 2nd Street, Suite 3105
Miami, FL 33131
Tel: 305-567-5576
Fax: 305-567-9343
peb@assoulineberlowe.com
mjg@assoulineberlowe.com
*Counsel for Plaintiffs*

*By: Ronda McNae*
Ronda Delapina McNae
Pro se Defendant

13