E-FILED          JVJV251976 - 2024 MAY 20 01:25 PM          POLK
                    CLERK OF DISTRICT COURT                 Page 2 of 2



State of Iowa Courts

**Case Number**        **Case Title**
JVJV251976             OAKLEY LECKWOLD
**Type:**              JV-MODIFICATION OF DISPOSITIONAL ORDER

So Ordered

_____
Rachael E. Seymour, District Associate Judge,
Fifth Judicial District of Iowa

Electronically signed on 2024-05-20 13:25:05

| Washington State Department of **CHILDREN, YOUTH & FAMILIES** | LICENSING DIVISION (LD) **Home Study** |
|---|---|

| Written by: ☑ DCYF ☐ CPA |
|---|

**Family Name:** Ronda D McNae and William J McNae

▮▮▮▮▮▮▮

**Family Address:** 504 11th Pl Kirkland WA 98033

**Home Study Type:** Kinship Care

**Home Study Outcome:** Recommended for placement and adoption.

**Interstate Compact on the Placement of Children (ICPC)** requested home study has been approved for the adoption of ▮▮▮▮▮ and ▮▮▮▮▮▮▮

| Applicant(s) Name, Contact, and Background | |
|---|---|
| **Applicant A Name:** Ronda D McNae | **Applicant B Name:** William J McNae |
| **Preferred Name (if applicable):** | **Preferred Name (if applicable):** Will |
| **Pronouns:** She/Her | **Pronouns:** He/Him |
| **Date of Birth:** 04/04/1986 | **Date of Birth:** 06/09/1977 |
| **Cell Phone Number:** +1 206 914 6752 | **Cell Phone Number:** +1 425 941 7374 |
| **E-mail:** prose.rmcnae@gmail.com | **E-mail:** prose.wmcnae@gmail.com |
| **Gender:** Female | **Gender:** Male |
| **Identified Race:** Asian, Native Hawaiian or other Pacific Islander, White | **Identified Race:** White |
| **Hispanic/Latino:** Yes | **Hispanic/Latino:** No |
| **Member of or eligible for membership in a Federally Recognized Tribe:** No | **Member of or eligible for membership in a Federally Recognized Tribe:** No |
| **Tribe(s):** | **Tribe(s):** |
| **Primary Language:** English | **Primary Language:** English |
| **Secondary Language:** Spanish, Tagalog | **Secondary Language:** |
| **Occupation:** Talent | **Occupation:** Director at The Partner Masters |
| **Work Schedule:** Varies; not consistent | **Work Schedule:** 40 hours, Monday - Friday |
| **Date of Final Interview:** 03/20/2024 | **Date of Final Interview:** 03/21/2024 |

| Household Composition | |
|---|---|

There are no additional adults living in the home or on the property.

| Adult Household/Property Member(s): | | | | | |
|---|---|---|---|---|---|
| Name | Date of Birth | Relationship to Applicant | Lives in the Home or on the Property | Date Interviewed | Involved in Caregiving |
| | | | | | |

There are children living in the home or on the property.

**Home Study**
**DCYF 10-043 (REV. 12/2023) INT/EXT**

| Child Household/Property Member(s): | | | | | |
|---|---|---|---|---|---|
| Name | Date of Birth | Relationship to Applicant | Lives in the Home or on the Property | Date Interviewed | Involved in Caregiving |
| Ella McNae | 08/11/2010 | Child of applicant(s) | Lives in the home | 03/13/2024 | Yes |
| Liam McNae | 12/03/2012 | Child of applicant(s) | Lives in the home | 03/13/2024 | No |

## Child Specific Information

This home study includes child specific information.

| Child-Specific Information: | | | |
|---|---|---|---|
| Name | Date of Birth | Prior Relationship | Placed in the Home |
| ███████████████ | 06/27/2019 | Yes | No |
| ███████████████ | 04/08/2021 | Yes | No |

## Children and Youth Served

**Child-Specific Information:**

█████████████

Washington state received an ICPC request from Iowa Department of Health and Human Services for a relative (unlicensed), adoption home study for Ronda and William (Will) McNae to be considered a placement option for Ronda's niece ████████████████(DOB 6/27/2019) and nephew████████████ (DOB 4/8/2021). Ronda and Will were previously licensed foster parents with the state of Washington from 4/2/2015 to 11/2/2015. This home study assessment includes information written in their approved home study completed 3/26/2015.

████████████████came into care on 3/22/2023 due to parental substance abuse, mental health challenges, neglect, and domestic violence.█████tested positive for cocaine via hair drug screen. It is unknown what kinds of long-term effects this may have on her. The department reports that████████has significant scoliosis. She will need to be re-evaluated for services when she starts school. ███████ dentist has suggested that she may need braces in the future. Should█████be placed in the McNae's care, they are prepared to ensure all of her medical, dental, and educational needs are met.

Ronda and Will are aware that██████has been diagnosed with multiple sclerosis and that she must wear a back brace for many hours per day. Should████████be placed in their care, they anticipate scheduling her to see a pediatrician immediately to prevent any lapse in care.

Ronda and Will understand that the children tested positive for substances in hair follicle testing. They anticipate having both children assessed and know that this can mean delays in various areas of functioning. They have already lined up a therapist who would have availability to see both children, if they are placed in the McNae's care.

Ronda and William have had FaceTime sessions with the children in the past. The McNae's hope that virtual visits are increased before a potential placement change. The McNae's hope to maintain open communication with Ronda's sister and the children's father.  However, their primary focus initially will be on providing██████and████████with the stability, love, and consistency they need to flourish. Ronda is the children's maternal aunt. She will be able to keep them connected to their culture and extended family members, as appropriate and allowed per court order. The McNae's understand that they must follow the court order regarding visitation. The McNae's are open to facilitating virtual visits and are open

to in person visits at a public, agreed-upon, and court-approved location.

████████████ have two older paternal half-siblings. Ronda is in contact with their mother and the McNae's are open to maintaining contact between them.

██████ is not currently placed in this home and therefore was not interviewed for the purpose of this home study.

██████████

████████ tested positive for cocaine, amphetamine, and THC via hair drug screen. It is unknown what kinds of long-term effects this may have on him. The McNae's are prepared to meet his needs in the short and long-term.

Documents received from Iowa Department of Health and Human Services noted that ████████ s a picky eater. The McNae's have experience working with children who are picky eaters and feel confident in their ability to meet this need.

The McNae family will support ████████ cultural and relational permanency in the same ways as outlined above for ████████

██████ is not currently placed in this home and therefore was not interviewed for the purpose of this home study.

**Foster Care Assessment:**

This home study does not include an assessment for the applicant(s) to provide care for any additional children.

During the home study process, the applicant did not express any concerning limitations on placement preferences.

## Background and Family of Origin Applicant A

Ronda was born in Norfolk, Virginia to Susan Young and Ron Herd. Her family moved to Seattle when she was five-years-old.

Ronda was raised by her mother Susan. Her father Ron was involved until she was about five-years-old. Her earliest memories of him are fishing with him or when he and Susan would get into arguments. Ronda recently reconnected with him, as he lives in Everett, but they don't have ongoing contact or a relationship.

Susan remarried to William (Bill) Young. Susan and William had two children together. Bill was a blue-collar worker and worked for a local utilities company in Washington. Susan worked outside of the home and often took money and gifts from the men she was involved with. Susan and Bill later divorced, and Susan now resides in Iowa near their children Lea and Alexa. Ronda prefers to have minimal to no contact with her mother at this time, unless it relates to the open dependency case. Bill now resides in Texas and is engaged. Ronda has no contact with her step-father or his fiancé. Ronda has no reason to believe that they pose a physical threat to herself or a child in her care at this time, however she would never leave a child in her care alone with Bill or allow him near her family. Please see the following sections for details.

Ronda has three sisters: Sirena (39), ████ (30), and ████ (27).

Ronda describes her childhood as unfortunate. She was exposed to a lot of harm that created trauma and believes that her parents had kids when they probably shouldn't have. Her older sister was parentified at a young age and the siblings were often left home alone at a young age or with questionable babysitters.

Ronda identified that despite the trauma of her childhood and how poorly her parents treated her, she has a tendency to trust others and see the best in people. Ronda has put herself in situations where she could have been harmed - such as helping a woman whose car was broken down on 520 - despite being warned of the potential

dangers. Ronda's world view is that the world is safe, despite her early childhood experiences. It was really only until 2019 when she learned that "you repeat what you don't repair" and that children who have been victimized are at a high risk of being re-victimized/taken advantage of. She acknowledged that because she is so trusting, she has been taken advantage of. She has started to be more protective in the past five years, having people earn her trust rather than giving it freely. Despite her early childhood experiences, Ronda has demonstrated an ability to form healthy attachments with others.

It was assessed that the applicant has family members who have behaviors that may impact the care of children.

As mentioned in the following section, Ronda has concerns about her mother Susan, her stepfather William, her sister███ the children's biological father, and her youngest sister█████ Ronda has boundaries with all of the above-mentioned people and there is also physical distance between her and each of them at this time. Ronda recognizes that she will have to follow the case plan, should ████████████ be placed in her care.

It was assessed that the applicant has chaotic, limited, or lack of relationship(s) within their family of origin.

Please see the following sections.

| Trauma Applicant A |
| --- |

It was assessed that the applicant experienced childhood trauma.

Ronda's mother Susan lived in the Philippines and met Ronda's father Ron while he was deployed there overseas with the Navy. Susan returned with Ron to the United States where they married. Ronda reports that Ron was often deployed and out of the home. When he was home, Ronda reports intense domestic violence between him and Susan and intense neglect. Ron would use drugs in front of Ronda and her sister. Susan would often engage in sex work, leaving Ronda and Sirena alone for long periods of time. When Susan was home, she would not provide basic care and Sirena had to look after them. Ronda recalls being pawned off to unfit babysitters and reports generally feeling unprotected and unsafe. Ronda added that her mother didn't have a role model for how to be a parent and was likely repeating what she knew from her own childhood.

When Ronda was five-years-old, her mother met Bill while Ron was overseas. Susan moved to Washington State with Bill. For the first few years, Ronda remembers thinking Bill was great; he took them hiking, canoeing and to the beach. Over those first years in Washington, Susan divorced Ron and married Bill. Shortly thereafter, Susan got pregnant with the first of two daughters that she would have with Bill. Ronda recalls that around the time of her mom's first pregnancy, Ronda found pornographic magazines and websites up on the computer in the home. Ronda reported this to Susan, but Susan ignored her. When Ronda was eleven, Bill began sexually abusing her in her bedroom at night while she was sleeping. The sexual abuse lasted for about one year. Ronda did not initially report the abuse because she was afraid. After several months of abuse, she told her older sister Sirena. Sirena waited a year before she told Susan. Susan reacted by screaming and crying but continued her relationship with Bill. Ronda connected with a middle school counselor and reported what was happening at home. Susan and Bill told Ronda to recant her story and she did, afraid of what might happen. Ronda connected with a therapist in high school at age 14 and reports that through the years there were a 'ton' of CPS reports that never resulted in any removals by CPS [verified]. By the time Ronda was in high school and reported Bill to the authorities, she was told they wouldn't be able to charge him because of Susan and since her story had changed multiple times. Ronda was kicked out of Susan and Bill's home and went to live with another family her sophomore/junior year in high school. By her senior year of high school, Bill had been "kicked out" of the family home. Ronda believed that he was the reason why she didn't have a good relationship with her mother and with a little persuasion from Susan, Ronda decided to move back home with Susan and her sisters. By that time, Sirena had left for the Marines and Ronda felt responsible for her younger sisters. Unfortunately, things between Ronda and Susan were not better. Regardless, Ronda managed to graduate and get into college with the help of a school counselor. She spent the last months of her senior year of high school couch hopping. Later, Sirena would also disclose that Bill sexually abused her, but she did not report to the authorities. Years later, Bill continued to spy on Ronda, listen in on Susan's phone conversations, and stalked Susan and Ronda. Ronda doesn't trust Bill, especially if he was in the same state as her, and they have no contact whatsoever at this time.

Susan would beat Ronda and her sister with a belt, sometimes until they bled. Susan and Bill used harsh forms of discipline physically, like hitting their hands with a meat tenderizer. Susan continued to have sexual relations with

men outside of her marriage. Bill would make Ronda listen to recordings of Susan having sex with other men and Susan would make Ronda do things like type sexual messages to men on the internet. Ronda hoped things would change because she loved her mother despite the years of abuse and neglect. Ronda identified that she's been working through her childhood experiences for long enough now that she isn't triggered in the ways she was before. She identifies that her mom and her sisters are enablers who trauma bond and are enmeshed, so she puts that on the side and doesn't allow that to dysregulate herself. She has put herself at a distance from her family in order to avoid being involved in their drama. Ronda takes care of herself by seeing her counselor weekly, listening to a Podcast, reading, and engaging in ongoing education.

It was assessed that the applicant experienced systemic or intergenerational trauma.

Ronda identified that she and her sisters have all experienced intergenerational trauma. She hopes to break the cycle and change the narrative with her own children.

It was assessed that the applicant experienced trauma as an adult.

Ronda identified that watching her mother-in-law's cognitive decline has been heartbreaking, but she's been grateful to have some time with her and the opportunity to gather information from her.

In October 2019, Ronda was raped by a colleague of Will's at Microsoft. She reported the incident to the FBI and local authorities, and the criminal investigation is ongoing. She has not sought out a protection order as the perpetrator lives across the country. Ronda has no reason to believe that this person poses a threat to herself or a child in her care at this time. She knows that she can call law enforcement and file for a no contact order if there were any issues in the future. Through her work in a trauma intensive program that she participated in following the 2019 incident, she learned that adults who experience childhood abuse, particularly sexual abuse, are at greater risk of re-victimization. Despite her years of therapy, she realized that she had been naïve to trust this person and it left her vulnerable. Ronda found this to be enlightening and continues to work through this in therapy today. They hope the federal court case will be wrapped up in 2024.

Ronda is trauma-informed and knows how to regulate herself. Ronda experiences occasional triggers if she sees someone who looks like the perpetrator otherwise, she has no day-to-day triggers. Previously, she would gag when she thought about it until she threw up. She realized her body was holding onto something. If she feels that someone is trying to control or harm someone else, she will gag. If she is dysregulated and feels stuck in fight or flight - which she reports hasn't happened in a while - she has learned how to deal with bullies, not engage, and take care of herself. This unfortunate event taught her not to trust everyone, to not assume the best of people, and how to set boundaries and speak up for herself.

It was assessed that the applicant has not been a perpetrator or alleged perpetrator of domestic violence.

Ronda was served a protection order in March/April 2023 alleging that she had been grooming, harassing, and stalking a friend of her daughters. Ronda reports that he youth had contacted her and disclosed that he was self-harming. Ronda had turned to the school (amongst other professionals in her life) to report the disclosure and kept the text records. The protection order was dismissed in June 2023 as the judge agreed that the child had gone to Ronda for mentorship. This resulted in Ella and Liam being removed from their school. The McNae's no longer have contact with the youth or their family. This writer was unable to locate any record of this event in public records, however Ronda provided a copy of the denied protection order court proceedings. This was clearly very difficult for Ronda to be accused of something that she herself was a victim of. She continues to be disappointed that the family was threatened by an adult showing support and care for their child who was going through a hard time and who was asking for help.

The applicant demonstrated an understanding of domestic violence and how it may impact children.

## Caregiver Health and Wellbeing Applicant A

The applicant completed an Applicant Medical Self Report (DCYF 13-001A). In addition, a licensed health care provider completed an Applicant Medical Report (DCYF 13-001) for this applicant.

Although the applicant has current or historical health conditions (physical or mental) it was assessed that they will not impact the applicant's daily functioning and/or care of children.

An Applicant Medical Report Form was received on behalf of Ronda completed by Dr. Bhaskar of The Everett Clinic dated 3/5/2024 and updated/clarified on 3/11/2024. Ronda has a history of chronic joint pain, PTSD, and anxiety. She is currently diagnosed with Ankylosing Spondylitis (arthritis), Behcet's Disease (an inflammatory disorder resulting in ulcers), and Generalized Anxiety Disorder (GAD).

Ronda hopes that by continuing to work on her trauma, that her pain and inflammatory issues will be reduced. Dr. Bhaskar notes that Ronda is a "good parent but is overwhelmed with her health and other issues. Added care of kids may not be of best interest at this time for her." Regarding Dr. Bhaskar's comments, Ronda states that for coding purposes, Dr. Bhaskar has coded her current mental health diagnosis as GAD rather than PTSD or anxiety. Ronda spoke with Dr. Bhaskar for the purpose of him filling out the form and she identified that he likely stated it's not in her best interest due to the ongoing federal case and the additional stress that it has caused. Ronda also shared that she is honest with her doctor and that he's protective of her. She expressed that even though it will be a challenge to care for two additional children, she is willing to do whatever she needs to do to care for her niece and nephew. While the case has been all-consuming, they are also nearing the end and it's temporary. The children and their well-being will be their primary focus, if they are placed in their care. Ronda is supported by her husband should she be unable to provide care to a child for any reason. She has noticed that her autoimmune issues have decreased since she came forward about the rape and has been working through everything in therapy. She feels confident that she has the support system in place to care for herself and care for her relatives.

Ronda has been diagnosed with PTSD, depression, and anxiety in the past and is currently diagnosed with PTSD. She first noticed symptoms of depression when she was living with her mother and her stepfather. Ronda knew she needed help and asked to see a doctor, but her mom didn't believe in mental health help. Ronda would cry at home, but school was a positive break from her difficult home life. It wasn't until 2008/2009 that she noticed symptoms of anxiety related to the abuse from her stepfather. In 2014, Ronda first started addressing her trauma and triggers. Her primary care provider has diagnosed her with GAD for billing purposes, but both her therapists have diagnosed her with PTSD.

Ronda has been stable on her medications since about June 2015. Her therapists don't prescribe but her primary care provider does.

On her hardest days, Ronda identified that she is in her feelings. She questions if she is doing the right thing and if she has any self-doubt, then she can be emotional. If she's feeling that bad, then she texts her therapist Dr. Dellinger and asks for a visit.

Ronda started going to therapy in 2011 with Dr. Brock Weedman, an expert in trauma and EMDR therapy. She started individual therapy with Dr. Sarah Dellinger in 2020 starting with 3 to 5 sessions per week. Since 2023, Ronda has attended therapy with both Dr. Weedman and Dr. Dellinger. She has also participated in a 'Child Abuse Recovery Week,' 'Trauma Intensive' program, marriage counseling with Will, and a Storyteller/Writers workshop regarding navigating past traumas and expressing them. She hopes to attend the 35th Annual Boston International Trauma Conference in May 2024 led by the Trauma Research Foundation.

Case 1:22-cv-22171-JEM   Document 275-2   Entered on FLSD Docket 01/14/2025   Page 8 of
195
Case 1:22-cv-22171-JEM   Document 259   Entered on FLSD Docket 12/17/2024   Page 19 of 40

An Applicant Mental Health Report Form was received on behalf of Ronda completed by Dr. Sarah Dellinger of EQUIP Counseling, PLLC dated 3/11/2024. Dr. Dellinger reports that they first started seeing Ronda 2/19/2020 and they see each other weekly. Ronda is currently diagnosed with PTSD. Dr. Dellinger states that Ronda is currently stable with episodes of dysregulation and she is able to re-ground. Dr. Dellinger does not prescribe medication, as that is managed by Dr. Bhaskar. Regarding Ronda's ability to care for additional children, Dr. Dellinger states "client does not believe current diagnosis would impact care of additional children." Ronda clarified that Dr. Dellinger won't answer for the patient; she wants to empower her clients to speak up for themselves. Dr. Dellinger added "client has developed strong set of coping strategies to deal with symptoms that may arise correlated to her diagnosis."

An Applicant Mental Health Report Form was received on behalf of Ronda completed by Dr. Brock Weedman dated 3/14/2024. Dr. Weedman reports that they first started seeing Ronda 4/6/2011 and they currently see each other once per month. Ronda is currently diagnosed with PTSD. Dr. Weedman states that Ronda is stable and has "good insight and awareness of symptoms and triggers." Dr. Weedman states "I do not believe her mental health condition would impact her ability to care for additional children." Dr. Weedman added that Ronda is a caring, nurturing, and consistent parental figure/mother."

Ronda reported that she hasn't been dysregulated in a while and she attributes it to her engagement in therapy. She identified seeing a pattern from her childhood and the assault in 2019 where she was quiet about something that happened to her and needed to learn how to speak up and advocate for herself.

It was assessed that the applicant's historical or current alcohol and/or drug use will not impact the applicant's daily functioning and/or care of children.

Ronda drinks one to two alcoholic beverages every two months, usually when she is with friends or on vacation. She is cautious about alcohol due to her medications. She does not use tobacco/nicotine, marijuana, street drugs, or prescription pills not for their intended use.

## Historical Intimate Partner and Supportive Relationships Applicant A

It was assessed that the applicant's prior significant intimate relationships will not impact the care of children.

Ronda reports having two significant relationships in her past; one in high school and one in college. She has never been married before Will and has no contact with her ex-boyfriends.

It was assessed that the applicant has not been involved in an unstable partnership/marriage in the past.


It was assessed that the applicant has supportive relationships (friendships, colleagues, etc.).

Ronda is supported by her husband Will, her friends, her therapists and primary care provider, her fictive cousin, their children's Godfather Matt, and mentors and other connections she has made.

## Background and Family of Origin Applicant B

William was born 6/9/1977 to Bill and Marjorie and raised in Bellevue.

Will's father Bill was previously married and had two grown daughters (22 and 25 years older than Will) by the time he married Will's mother Marjorie. Will's mother was also previously married and had Will's older brother who is nine years older than Will. Bill was an art teacher growing up and Marjorie was a music teacher. Marjorie will be 84-years-old this year and Bill passed away ten years ago. Marjorie lives in an assisted living facility in Kirkland where she gets monitored for Alzheimer's.

Will's sisters are so much older than him that they never grew up under the same roof and don't have much of a relationship today. Once Bill passed away, their relationship became even more distant.

Will describes his upbringing as culturally rich, particularly in music and the arts. His father taught him to be a craftsman in woodworking and he helped his father to build a house on Whidbey Island. Education was very

Case 1:22-cv-22171-JEM   Document 275-2   Entered on FLSD Docket 01/14/2025   Page 9 of
195
Case 1:22-cv-22171-JEM   Document 259   Entered on FLSD Docket 12/17/2024   Page 20 of 40

important to his family as well as studies in music. Since his parents taught, they had summers off to spend with the kids. Will excelled academically and played the saxophone, clarinet, and violin. He also played several sports like football, baseball, track, and basketball.

Will had a strong attachment with his parents and he was able to form strong, positive relationships with others. He was also independent, being the youngest of the siblings, and he was able to easily make friends wherever he went.

It was assessed that the applicant has family members who have behaviors that may impact the care of children.

Will's brother David was Marjorie's power of attorney. Will and David started to have some disagreements in 2020 around Marjorie's property, her needs, and what level of care she needed. Marjorie went through a cognitive assessment and changed her power of attorney to Will. The process was challenging and included legal issues which caused a rift between the brothers. Will doesn't have contact with David or his children as a result. David has demonstrated that he is willing to go to great lengths to tarnish Will and Ronda's reputation, so they have no contact outside of their attorneys at this time. Will has no reason to believe that David would be a threat to a child in his care however David can be vindictive and it's unknown what he might be capable of through legal means. Will hopes that the situation will calm down with lack of contact and the boundaries they've set.

It was assessed that the applicant has chaotic, limited, or lack of relationship(s) within their family of origin.

Please see the paragraph above regarding David.

## Trauma Applicant B

It was assessed that the applicant experienced childhood trauma.

Will identified that he experienced a "little t" trauma event as a child. When Will was in second grade, Bill had a grand mal seizure. Will was present and called 911. It was hard to see his father in a vulnerable state, but it also taught Will to take responsibility and not panic in an emergency.

It was assessed that the applicant did not experience systemic or intergenerational trauma.

It was assessed that the applicant experienced trauma as an adult.

Will's father passed away in January of 2014 after a short battle with pancreatic cancer. Will and all of his siblings were able to be with him in his final days, which was a very hard time for the family.

Will identified that in 2015, becoming foster parents and working with the faith-based private agency that at times was not supportive was a challenge. They were told mixed messages about licensing requirements and the agency was not supportive of them contacting the child's assigned social worker directly with concerns. The McNae family resided on property owned by the agency which was a subsidized housing development for foster families. The agency terminated their license with just a few days' notice for contacting the social worker and the termination of their license resulted in the family losing their housing. This was an unusual and unique situation. This writer discussed with Ronda and Will the expectations and support available when taking placement of a child through ICPC. They appear to have a clear understanding of what supports are, and are not, available to them. They are prepared to cooperate with both Iowa and Washington to support the children in their care.

Will identified that the last four years and the situation with his mother, her estate, and the ensuing challenges with David have been traumatic.

Will also shared that Ronda's experience of being sexually assaulted was traumatic for the family.

Will has learned that he does better when he and Ronda are working together and on the same page. Will feels they are working towards a resolution, standing up for justice, and advocating for their needs. Will has been in counseling to work through everything they've gone through. He focuses on breathing exercises, talking through things with Ronda, and is mindful of his tendency to shut down and compartmentalize. He acknowledges that he

has a tendency to turn his emotions off in order to stay present. He manages this by walking the dogs, coaching sports, and otherwise being active or engaging in activities to take his mind off things.

It was assessed that the applicant has not been a perpetrator or alleged perpetrator of domestic violence.

The applicant demonstrated an understanding of domestic violence and how it may impact children.

## Caregiver Health and Wellbeing Applicant B

The applicant completed an Applicant Medical Self Report (DCYF 13-001A). In addition, a licensed health care provider completed an Applicant Medical Report (DCYF 13-001) for this applicant.



Will and Ronda participated in an intensive marriage workshop in 2022 which allowed them to delve into their respective experiences and work on building a stronger connection and marriage. They have also done couples therapy off-and-on with Dr. Weedman.

Will reports that on his hardest days, he shuts down emotionally and responds in a non-emotional manner. This occurs when he faces pressure from work or if he feels overwhelmed with everything going on with the federal lawsuit. Will takes care of himself by seeing his therapist, coaching his children's sports, being outside, and enjoying movie nights with the family.

It was assessed that the applicant's historical or current alcohol and/or drug use, will not impact the applicant's daily functioning and/or care of children.

Will drinks one to two beers one to two times per month. Will is open to not drinking at all, should the children be placed in their home and there be any issues or concerns about them seeing someone drinking. However, he is able to role model appropriate and safe adult alcohol consumption for his own teen children. He also acknowledges that with two younger children, he may need to be available for emergencies. In an emergency, should Will feel he cannot or should not drive, Ronda is available, they could call a shared ride program, they can call emergency services, or they could call on neighbors or friends.

## Historical Intimate Partner and Supportive Relationships Applicant B

It was assessed that the applicant's prior significant intimate relationships will not impact the care of children.

Will had one significant girlfriend that he dated all three years of college. They parted amicably their senior year after realizing their different goals in life.



## Current Relationships (Shared by Applicant A & B if applicable)

Will and Ronda met in 2008 at a local church where they were both active members. They dated actively for about three months before getting engaged and married on February 22, 2009. Both Will and Ronda recount that an integral part of their dating relationship was getting to know each other during a two-week mission trip to Uganda in the fall of 2008. During the trip, Will became ill, and Ronda was able to be a caretaker for him while he was in the local clinic. They report that they had to learn how each of them communicated under difficult circumstances.

The McNae's describe their relationship and marriage as very strong. There has never been a time when they have considered divorce or been separated. They talk things through and make major decisions together. Decisions pertaining to the children are mostly made with Ronda leading and financial decisions are led by Will. Their marriage is a high priority to both of them and both feel that they balance each other out.

It was assessed that family violence within the household or family may impact the care of children.

Ronda's mother has been in relationships marred by domestic violence in the past.



It was assessed that there is no concerns regarding unstable partnerships/marriages in this family.

Children of applicant(s) including adult children, minor children, and other children applicant(s) has parented:

| Name of Child | Date of Birth | Applicant's Relationship to Child |
|---|---|---|
| Ella McNae | 08/11/2010 | Parents |
| Liam McNae | 12/03/2012 | Parents |

Ella McNae

Case 1:22-cv-22171-JEM   Document 275-2   Entered on FLSD Docket 01/14/2025   Page 12 of
195
Case 1:22-cv-22171-JEM   Document 259   Entered on FLSD Docket 12/17/2024   Page 23 of 40

Ronda describes Ella as intellectual, intuitive, and creative. She is very curious and asks a lot of questions. She understands the importance of standing up for herself and her friends at school. She is resilient and adaptable. She plays basketball and has taken on a leadership role on one of the teams she's on. She's a rule follower but sometimes fibs, but Ronda knows when to spot deception.

Will describes Ella as a thoughtful girl who has established a record of trust with them so she can be trusted to babysit Liam and help around the house. She is insightful and has an ability to "read the room." She makes friends quickly but has learned the hard way about how friends can sometimes turn on you. She plays sports and is very active. She does well in school and is fun to be around.

Ella started to exhibit some signs of depression after she was suddenly moved from a private Christian school. Ronda sought out an evaluation for Ella and it was identified that her symptoms were due to forced alienation by the school. She is prescribed a low dose of anxiety medication and had a few counseling sessions. She's been back at baseline for some time now and stable on her medication.

This Home Study Specialist interviewed Ella privately in person on 3/13/2024. Ella reported that she is 13-years-old, in the 7th grade, and uses she/her pronouns. Ella thinks it would be fun to have her cousins come stay with her. She always wanted more siblings. Ella reported that rules in the home are to be nice to each other, keep their rooms clean and picked up, get everything done (like homework and chores), help when not asked, do the dishes, put other's needs above your own, don't be selfish, and tell the truth. Rules around food in the home are no food downstairs (because they try to keep the playroom clean), no food in their bedrooms (though a snack is okay), and they can help themselves to food whenever they want something. Ella reported that there is enough food for everyone in the home.

When her parents are stressed/angry/frustrated, her mom drinks root beer, cleans, and apologizes afterwards if they get into an argument. Her dad gives "a look," never yells, and apologizes if there was a misunderstanding. Ella anticipates helping her parents with the children if they are placed by babysitting, taking the kids to a nearby park to play, or going to the waterpark in downtown Kirkland (within walking distance).

Liam McNae

Ronda describes Liam as goofy and as someone who likes to make people laugh. He's a smart kid, though COVID-19 set him back. He's a helper and enjoys playing sports and video games. In the summer, they go on bike dates where they talk and have a heart-to-heart. Liam is good at asking for one-on-one time.

Will describes Liam as a child who is emotionally sensitive - he can pick up on how others are feeling. He needs to check in to verify they are connected, usually by asking for one-on-one time or saying he loves them. He has always been a little behind Ella in his ability to communicate, so he struggles to talk through more challenging conversations. Liam is starting to see how making and keeping friends can be challenging.

Liam was also impacted by leaving public school for private school then coming back three years later and having to pick back up where he left off with that peer group. He has seen a counselor in the past to help process these transitions. He is also active and enjoys playing sports.

This Home Study Specialist interviewed Liam privately in person on 3/13/2024. Liam reported that he is 11-years-old, in the fifth grade, and uses he/him pronouns. Liam would like to see his cousins more often and thinks it would be "delightful" if they came to live with his family. Rules in the home for Liam are to put his dishes in the dishwasher, put back what he takes out, and keep his belongings organized. Rules around food in the home are no food in bed, no drinks or food in the playroom, and ask first before having something unhealthy, otherwise he helps himself if he needs something to eat. Liam reported that there is enough food for everyone in the home.

When his parents are stressed/frustrated/angry, they usually take the family someplace and do something together to take their minds off the issue. Liam anticipates helping his parents with the children if they are placed in the home by reading or playing with the kids. Liam stated that he wouldn't be responsible for babysitting without Ella also present, as he isn't old enough.

Ronda suffered a miscarriage in October during their first pregnancy. She and Will had been married for about six months. They have processed their feelings of grief and loss in therapy.

As an adult, Ronda connected with a family at her church who helped her to continue healing from her past. They became very close, and Ronda considered their children to be like siblings. Over the last several years, Ronda started to recognize how enmeshed and codependent the family was. She started to set boundaries with them and has ended contact with them entirely today.

Ronda has worked hard in therapy since 2011 to establish a solid foundation for dealing with her family history and setting boundaries with her sisters and mother. She has had minimal contact with her father over the years and no contact with her stepfather. She anticipates setting boundaries with her sister in order to keep ███████████ safe while ensuring that contact meets the court ordered visitation plan.

Will has had to set boundaries with his brother since they had a falling out regarding the care of their mother in 2020. They do not have contact outside of their attorneys at this time.

Ronda experiences stress related to the ongoing federal court case, the open dependency case in Iowa as it relates to her niece and nephew, and the complicated relationships between her family members due to CPS involvement. She regularly attends therapy, uses her self-care and coping skills, and leans on her supports. She recognizes that their family has a lot going on, but Ronda identifies herself as someone who speaks up and isn't afraid of whistleblowing. She also believes that this builds her resilience to stress when under adversity. Ronda added that certainly the timing of things could be better - having a federal court case is challenging - however the care of her niece and nephew is her highest priority, and she wants to be there for her relatives. She identified that if it were one over the other, she would pick the children and their well-being over her own legal matters.

Will experiences stress related to the boundaries they have put in place but it's not necessarily a daily stressor. There is stress related to the legal court case, but they have attorneys who are taking care of that. When they do run into parents or community members with whom there has been conflict, they ignore and don't engage. Will manages stress by coaching his children's sports, being outside, and enjoying movie nights with the family.

There are no other adults in the home or on the property.

It was assessed that the applicant(s) has/have chaotic, limited, or lack of relationship(s) within their current family.

Ronda's relationships with her childhood family members are limited and in the case of her father and stepfather, she has no relationship with them today. Ronda demonstrates an awareness of these relationships, has demonstrated an ability to set appropriate boundaries, and has attended therapy related to her childhood.

## Caregiving / Parenting Experience (Shared by Applicant A & B if applicable)

Ronda has had considerable experience with children through the years. In addition to being the parent to her two biological children, she has been a camp counselor for sixth graders, taught dance and cheer camps for young girls, worked as a nanny for six years, and volunteered for seven years in the children's ministry at a local church. She has also worked with children at an orphanage in Uganda for two weeks during a mission trip in 2008 and has taught high school bible study. Will learned to change diapers and care for children at an early age while helping care for his 8 nieces and nephews. He is also an active, hands-on father to Ella and Liam. He worked in an orphanage in Uganda for two weeks in 2008 and has coached their children's various sports teams.

During their time as licensed foster parents in 2015, the McNae's took placement of one 2.5-year-old child. The child was placed with the McNae's for over five months. They knew a relative was going through the ICPC process to take the child. The placement was temporary, and they were happy when the child reunified with family. Will reported that he learned a lot about trauma and how it can impact children's development, explaining that the child was used to a more chaotic home environment and was initially unsettled being in a calm home with routine. Additionally, the child was used to eating McDonald's food only and they were very patient while they introduced new, healthy foods into the child's diet. They are grateful that they have been able to stay in contact with the child's relatives.

Case 1:22-cv-22171-JEM   Document 275-2   Entered on FLSD Docket 01/14/2025   Page 14 of
195
Case 1:22-cv-22171-JEM   Document 259   Entered on FLSD Docket 12/17/2024   Page 25 of 40

The applicant(s) has personal experience with foster care, guardianship, or adoption.

Ronda has previous experience filing a Child in Need of Services (CHINS) petition for herself when she was trying to get away from her abusive stepfather and mother. Ronda and Will were previously licensed for foster care in the state of Washington in 2015. They are going through this home study process in order to be considered a placement option for Ronda's sister's children who are placed in out-of-home care in Iowa.

Ronda and Will co-parent well because they are slightly different; Ronda reported that she is stricter and sets clear boundaries whereas Will is kind and believes the children the first time they say something. While Ronda is strict, she also gives the kids room for grace and forgiveness. Ronda has learned a lot about how she missed out on serve and return interactions from her parents as a child. She has worked to correct that as a caregiver herself and ensure that she is giving her children the emotional support they need.

Will describes his parenting style as taking things at face value and he gives the kids the benefit of the doubt. That can sometimes come across as him being the "easy" parent, making Ronda the stricter parent. Will identified that their parenting styles are complimentary. They learned in the past that they can get into trouble if the kids play them against each other. Now, the kids know that if they play the parents against each other, then there are consequences. Now that Will works from home, Ronda and Will are there at the same time and can talk things through before enforcing something.

Ronda is the primary caretaker as a stay-at-home parent however Will works from home and is available to share in parenting responsibilities. Ronda is grateful for how involved and hands-on Will is with parenting and how equal their tasks are including grocery shopping, laundry, cooking, etc.

Ronda and Will were challenged when the child they had placement of in 2015 was told they would be changing placements with only one week's notice. Ronda talked to the child at length about the move, where they were going, why, and how to prepare. Day by day, the child started to act out, display aggression, started to store food, and became dysregulated. Ronda worked with the child's daycare and contacted the assigned social worker and CASA to support the child. Ronda would have liked to see a slower transition, as it was clearly difficult for the child, but she did what she could to make the transition as smooth as possible. Ronda learned that there are a lot of resources out there and that she has to advocate for them.

The McNae's have experienced challenges with Ella's basketball coach and their boundaries with the team. Ronda and Will initially couldn't agree upon when to speak up since Will was the assistant coach and more enmeshed in the situation. Eventually, they decided to speak up and take action by taking Ella off the team. It was a challenge to finally make that decision, and to be on the same page about what action to take.

Will identified that it was hard for Ella when she was removed from private school. They had her assessed at Seattle Children's Hospital and then got her in to see her primary care provider. Ella was prescribed medication from her primary care provider and started seeing a counselor. When they noticed that she wasn't doing well, they sought out community supports and got services in place to help her move through that difficult transition.

Will identified that Liam went through a phase of making inappropriate comments, likely based on something he had seen on YouTube, with the intention of being funny/making people laugh. They needed to help him understand what was appropriate and what wasn't appropriate, then consistently reinforce it. This behavior went away over time.


The applicant(s) was not required to complete training as a part of the unlicensed home study or training was exempted for the Kinship License.

Ronda and Will were previously licensed foster parents in Washington state and during that time they both completed Orientation, Caregiver Core Training (CCT), and training on the Period of PURPLE Crying. They also held valid CPR and First Aid training while they were licensed. Ronda voluntarily completed 12 hours of Kinship Core Training (KCT) and 27 hours of CCT during this home study assessment. She earned a CPR, AED, First Aid, and Bloodborne Pathogens certificate from National CPR Foundation on 3/23/2024. She is also interested in

Case 1:22-cv-22171-JEM   Document 275-2   Entered on FLSD Docket 01/14/2025   Page 15 of
195
Case 1:22-cv-22171-JEM   Document 259   Entered on FLSD Docket 12/17/2024   Page 26 of 40

participating in the local kinship support groups and plans to take Boundaries as Self-Care on April 18, 2024. This writer also recommended that she take Self Care for Caregivers and Building Parental Resilience for Kinship Caregivers when they are offered by the Alliance for Child Welfare.

The applicant(s) demonstrated an understanding of, and agreed to promote normalizing experiences, act as a prudent parent in day to day decision making, support a healthy and balanced childhood experience and treat the child as part of the family.

| Child Development and Expectations (Shared by Applicant A & B if applicable) |
|---|

The applicant(s) demonstrated knowledge about child development, including cognitive, physical, emotional, social development, and appropriate expectations for routines and chores. The effects of trauma on childhood development were discussed and the applicant(s) understands that children in out-of-home care may demonstrate what some consider atypical childhood development.

Ronda reported that she has talked to both of her children in an age appropriate way about how she was assaulted because they both noticed that something was wrong. Ronda explained that something had happened that was wrong and that there is a federal court case going on. Ronda understands that children hear and notice things and have a right to know what's going on but that it needs to be age appropriate. This demonstrates that the McNae's have an ability to role model navigating difficult subjects but in a way that doesn't further traumatize or cause anxiety in children. Additionally, Ronda believes it is important to have conversations about good touch/bad touch with their children. The McNae's have open communication with their children and are forthcoming and honest so that their kids can come to them with anything they need to talk about. Ronda explained that she tends to run things by her supports first, before talking to the children, like her therapists, Will, and friends, to get input on how to approach difficult topics.

The applicant(s) agrees to access any services for children in out-of-home care (e.g. counseling, physical therapy, etc.) per the case plan.

Ronda and Will have applied to care for children who are two-years-old and over. They do, however, understand that newborns and infants are completely dependent on their caregivers. They understand that infants communicate through behaviors and crying, and caregivers need to observe and learn the child's cues to respond appropriately.

Ronda and Will understand that children in the toddler/pre-school stage of development need caregivers to be attuned to their needs, responsive to potential delays, and access services to support behavioral challenges, attachment challenges, or regressions. Ronda identified that being trauma-informed is important including an emphasis on safety, consistency, and patience. Ronda and Will aim to create a nurturing environment that encourages expression and healing for children in this stage of development.

Ronda and Will understand that children in the school aged stage of development need a stable and supportive home environment to facilitate learning and emotional well-being. Caregivers should be attentive to signs of anxiety, difficulty with trust, or challenges with social interactions. Ronda and Will understand that they will need to be patient, understanding, and consistent with routines.

Ronda and Will understand that preteens need compassion and structure from their caregivers. Caregivers need to recognize potential emotional, social, and academic challenges and provide support, encouragement, and trust. Ronda and Will understand that preteens need open communication, stable routines, and access to counseling. Based on her experiences as a child, Ronda is committed to ensuring children in her care understand that their thoughts and feelings are valid, and she works to listen attentively and respect their instincts.

Ronda and Will understand that teenagers need an approach from caregivers that matches their developing independence and identity. Caregivers should balance empathy with expectations, provide support, reinforce positive decision-making, foster emotional intelligence, and maintain open communication. Teenagers have a right to be heard and caregivers should ensure they feel valued and understood. Ronda and Will anticipate showing patience, respect, and a commitment to listening and responding to their unique needs.

**Home Study**
**DCYF 10-043 (REV. 12/2023) INT/EXT**                                                                                        **Page 14**

Case 1:22-cv-22171-JEM   Document 275-2   Entered on FLSD Docket 01/14/2025   Page 16 of
195
Case 1:22-cv-22171-JEM   Document 259   Entered on FLSD Docket 12/17/2024   Page 27 of 40

The McNae's anticipate obtaining evaluations for ███████████ by a pediatrician so that they can get a baseline and ensure they have immediate local assistance, should they be placed in their care. Beyond that, should a child in their care not meet their developmental milestones, Ronda and Will will consult with the doctor/dentist, the assigned social worker, reach out to community-based supports like specialists, reach out to a counselor/therapist if appropriate/needed, and look for referrals within the community depending on the issue. Ronda would also try to see past the behavior to determine if there is a need not being met or if something is a trauma response.

## Behavior Management (Shared by Applicant A & B if applicable)

Ronda's mother maintained no structure and had inconsistent rules in the home. As a result, Ronda spent much of her childhood parenting her younger sisters. Ronda was disciplined physically, verbally, and emotionally. She would never discipline her children or children in her care in the ways she was disciplined as a child. Ronda feels that her mother's parenting style was highly ineffective. The amount of trauma and fear that it instilled in the siblings has damaged them in the long-term. Ronda was so afraid of repeating the cycle of abuse and neglect that she did a lot of reading, education, and therapy to learn alternative methods to parenting and how to have healthy relationships with others.

As a child, Will was disciplined by talking things through, losing free time with friends, having to do extra chores, and losing TV privileges. Will was positively impacted by his parents' parenting style as he felt his parents' expectations were clear and they held him accountable.

As parents themselves, Ronda and Will focus on positive reinforcement and constructive discipline techniques. They focus on understanding the reasons behind the behaviors, teaching responsibility, and encourage self-regulation. They set clear expectations, offer choices, use natural and logical consequences, and model the behavior they want to see. Their goal is to foster an environment of respect, empathy, and open communication, helping children develop a strong sense of self-worth and emotional intelligence. Ronda tends to utilize big consequences for actions the first time so that the behavior isn't done again - like when Ella called Liam a bad word, Ronda made her write an essay. Ronda also endorses that taking accountability or ownership of their own actions is important in their home. Will identified that they can talk to Ella about things, and she can think abstractly. Liam thinks more black and white and needs more concrete consequences.

There isn't a hierarchy of power in the home and discipline varies depending on who saw the behavior happen, who the child went to, and based on what they decide when Ronda and Will talk about it later. If a child lies, Ronda is usually better at spotting deception and catches those incidents more often. Will often catches behavior outside the home, since he's at sport events and practice.

Collaterals report that Ronda and Will take game time away, use natural consequences, take away privileges like time with friends or cell phones, or children have to write an essay on why they need to be nice/write an "I'm sorry" letter. They also talk to the children, give time outs if needed, and reward/recognize good behavior. This matches what Ronda and Will self-reported.

Ronda stated that first and foremost, they will have a lot of grace and patience with ███████████ if they are placed in her care. She anticipates using chore charts, schedules, and stickers to reward good behavior. She anticipates trying to find a way to introduce the children to their home without it being overwhelming. She has thought about making it an activity rather than a lecture. She intends to start simple, with the basics, and then slowly introduce other things about their home, expectations, and routine. She also anticipates waiting to see what the children's temperament is like and they will adjust accordingly.

Will recognizes that the children may not have had consistent rules and because they have lived in several homes in the last year, they may have had a variety of expectations put on them. He intends to be very patient and give the kids time to get adjusted. They hope their own children will be strong role models and lead by example.

It was assessed that there was an instance or mention of inappropriate discipline or potential for the use of inappropriate discipline in the future.

One collateral reported that Ronda and Will spanked their children on their hand once when the children were very young. Spanking was also discussed in the previous home study assessment. The McNae's do not spank and

Case 1:22-cv-22171-JEM   Document 275-2   Entered on FLSD Docket 01/14/2025   Page 17 of
195
Case 1:22-cv-22171-JEM   Document 259   Entered on FLSD Docket 12/17/2024   Page 28 of 40

haven't spanked their children as they found it highly ineffective. Growing up in a home where she was beat, Ronda always saw corporal punishment as a lack of communication between the parent and child. Ronda and Will understand Washington state's discipline policy and agree to follow it.

## Diversity, Equity and Inclusion (Shared by Applicant A & B if applicable)

Ronda identifies as Filipino and may have Native American, Indian, and Scottish heritage on her father's side. She reports feeling very disappointed in her lack of cultural ties to her heritage. She states that she missed out on the Filipino influences in her life because she did not have any ties or connections to that part of her family and her mother did not incorporate that into her upbringing. Ronda describes making holidays a big deal for her children to compensate for what she was lacking as a child herself. Will identifies as Scottish. The McNae family participates in traditional Christian and American holidays including Christmas, Easter, Thanksgiving and Birthdays.

When they were licensed foster parents, Ronda and Will were open to fostering/adopting children from any cultural/ethnic background. Ronda keenly understands what it is like to not have a connection with your cultural ethnic background and is actively seeking to find that for herself today. Thus, she understands the importance of maintaining these connections for children in care in their home. Will also values cultural connections and has an appreciation for cultural practices and beliefs outside of his own. Together they would make maintaining any child's cultural heritage a priority in their home. They look forward to learning more about what traditions Oakley and Rowan have already established, as well as introducing them into their family and celebrating their traditions together.

Ronda shares the same cultural background as her niece and nephew. She hopes to foster a positive sense of self and pride in them. She anticipates having open discussions about race and identity in her home and will provide them with tools to navigate and challenge racial biases. Will reported that they already talk to their own children about race and how they are a mixed-race family. He anticipates continuing to help children in their care develop their sense of self-awareness and identity.

The McNae family has attended a non-denominational Christian church in the past but aren't regularly attending at this time. They read and study the Bible on their own time and teach about Jesus and the Bible to their children. Even though their own personal faith is strong, both Ronda and Will understand that their own religious practices and preferences may not be the same as children in their care. They invite children in their care to explore their faith and spirituality and would never force a child to participate in their religion. They hope to foster an environment in their home where all spiritual beliefs are valued and nurtured.

Ronda and Will will support a child in their care exploring their sexual orientation, gender identity, and expression (SOGIE). They would use the child's pronouns, preferred name, and allow the child to dress in a manner of their choosing. Ronda has a connection with a local nonprofit which is dedicated to supporting and affirming youth. Ronda and Will are confident that they have community-based resources to support a child in their care who is exploring their SOGIE.

Ronda and Will will support a child who identifies as LGBTQ+ by fostering an environment of unconditional love and acceptance. They will ensure children in their home feel safe and supported to express their true selves without fear of judgement or rejection. They strive to have open communication with all children in their home. They are open to seeking out resources and ongoing education to better understand the child's needs and to advocate for their rights and well-being. They also have close friends who are part of the community who they could lean on for support.

It was assessed that the applicant(s) has the ability to parent a child from different backgrounds or experiences, including race, ethnicity, religion, spirituality, sexual orientation, gender identity, and gender expression.

## Education (Shared by Applicant A & B if applicable)

Ronda graduated high school, attended college at Northwest University in Washington, and attended community college in California. Will graduated from The University of Denver with a Bachelor of Arts Degree in Music Performance. He was very active in school programs throughout high school including music and sports. They both

identify their educational experiences as successful and place a high importance on education for children in their care.

The applicant(s) considers their educational experience a success.

It was assessed the applicant(s) has realistic educational goals for children in out-of-home care.

It was assessed the applicant(s) is willing to advocate for and support children with a variety of educational challenges, including a need for an Individualized Education Plan (IEP) or 504 Plan.

## Resources (Shared by Applicant A & B if applicable)

It was assessed that the applicant(s) appears to have readily available resources in the form of family/friend support, community, emergency contact(s), and child care (or a plan for child care).

Ronda and Will acknowledge that their family has a lot going on for them right now however they add that no one gets to choose when challenges occur. They demonstrate a high level of resilience and flexibility and are doing everything in their capacity to open their home to Ronda's relatives to avoid the need for the children to enter foster care.

## Home Environment (Shared by Applicant A & B if applicable)

Ronda and Will have lived in their two-story, four-bedroom, two-bathroom home for 7 years. The home is located at the end of a short private driveway in a suburban neighborhood of Kirkland. The neighborhood is near schools, shopping, and a park. The front yard contains a basketball hoop, two raised gardening beds, and a covered storage area where the family keeps their bikes. The backyard contains a treehouse, swing, a soccer goal, and a trampoline. The kitchen, living room, and a full bathroom are located upstairs. There is an enclosed balcony located off the kitchen with a BBQ and outdoor furniture. The family has a Ring doorbell including a camera in the kitchen which faces the front door. They understand that they cannot use the monitoring system to supervise children and that children in out-of-home care must have privacy. The downstairs/basement contains a playroom with toys, games, a piano, a couch, an office area, and a crafting table with a sliding glass door leading to the backyard. There is also a laundry/storage room located downstairs which contains the washer and dryer, a door leading to the backyard, and a storage area with a fridge, camping gear, craft supplies, and various items in storage. The second bathroom is located in between the playroom and storage room.

Second/Main floor:

Bedroom 1: Caregiver's bedroom contains their bed, a window, a dresser, a smoke detector, a TV, and a closet. There is access to the bathroom through the caregiver's room.

Bedroom 2: Ella's bedroom contains her lofted bed with a hangout underneath, her desk, a closet, a bookshelf, a window, and a smoke detector.

Bedroom 3: Liam's bedroom contains his lofted bed with the dog crate underneath, his desk, a closet, a window, and a smoke detector.

Downstairs/Ground level:

Bedroom 4: Available bedroom for the children contains two toddler beds, a closet, a lamp, a bookshelf, a window, and a toy chest. This writer discussed with Ronda and Will that they may consider adding a smoke detector to this bedroom, though there is one located in the hallway outside the room.

Ronda and Will anticipate seeing how this arrangement goes, if the children are placed in their care. They are open

Case 1:22-cv-22171-JEM   Document 275-2   Entered on FLSD Docket 01/14/2025   Page 19 of
195
Case 1:22-cv-22171-JEM   Document 259   Entered on FLSD Docket 12/17/2024   Page 30 of 40

to moving bedrooms around if the children need to be on the same floor as them. In the meantime, they may use baby monitors to monitor the children during naptime/at night.

The applicant(s) is not caring for children under the age of one; therefore, the safe sleep environment(s) was not observed, and education was not required. The applicant(s) agrees to complete education before accepting placement of a child(ren) under the age of one.

It was assessed that there are no weapons/ammunition in the home or on the property.

It was assessed that toxic materials are kept inaccessible when there is concern about inappropriate/unsafe access by children.

It was assessed that the applicant(s) has a plan for keeping children from accessing alcohol, nicotine, and marijuana.

It was assessed that all medications (including over-the-counter, vitamins, and herbal remedies) are inaccessible to children in Kinship placement. There is a plan in place to access life saving medication, if applicable.

There are pets or animals in the home or on the property.

Ronda and Will have four hypoallergenic dogs. All are reportedly up-to-date on vaccines. There is no history of aggression or biting from any of the dogs and they are reportedly great with children.

The home appears sanitary and without immediate safety concerns.

There are outbuildings on the property.

There is one shed located in the backyard. It contains various yard and gardening supplies and is kept locked when not in use.

It was assessed that potential hazards in the home or on the property will not affect the safety of children.

There are two fireplaces in the home which the family never uses. They understand that they must provide adult supervision if they do decide to use either fireplace in the future.

The applicant(s) has sufficient access to the necessary resources (schools, health services, and food).

**Occupation and Finances (Shared by Applicant A & B if applicable)**

Ronda is a stay-at-home parent and Will works full-time as a Director at The Partner Masters Monday through Friday.

Ronda is available for all childcare needs, should ██████████████ be placed in their care. The family has two personal vehicles with current vehicle insurance to transport the children to all appointments. They anticipate securing daycare/preschool for both children, should they be placed in their care, to help get ██████ ready for school and socialization for ██████.

The applicant does not have military experience.

It was assessed that the applicant(s) has sufficient income or other resources to meet their needs.

Ronda and Will are supported by Will's full-time job. A Financial Worksheet was received for the purpose of this home study assessment. The family has discretionary money left over after their expenses. They have discussed the possibility of Ronda returning to work in the future, if needed, to support the family. Ronda and Will understand that Iowa has requested an unlicensed home study, and they will not be eligible for the foster care reimbursement. They are prepared to meet the children's needs should they be placed in their care and understand that there will be additional, unexpected costs in caring for two additional children. In preparation, Ronda and Will started a Go Fund Me page to lean on their support system so they could purchase beds, car seats, clothes, toys, and household safety items.

Ronda and Will understand that adoption support benefits, at least in the state of Washington, are based on a negotiation process. They understand that adoption support is a benefits package based on the child's needs and is not guaranteed.

## References (Shared by Applicant A & B if applicable)

Three references were received on behalf of Ronda and Will. All three references are friends of the family and have known them for 2 to 12 years. References describe Ronda and Will as good people who think about the welfare of others and advocate for actions that make the world a better place. They are reported to be a compatible couple who care about their friends. They are described as responsible, kind, active, friendly, loving, caring, giving, and accountable. All references are in support of Ronda and Will being a short and long-term placement option for the children.

A collateral contact was made with the assigned Iowa social worker Taylor Dursky on 3/26/2024. Social worker Dursky has had minimal contact with the McNae family however they are reportedly good at communicating and appear to be able to set firm and healthy boundaries.

## Clearances

DCYF completes background checks for all household members age 16 or older, including individuals living on any part of the applicant's(s') property. DCYF may also complete background checks on individuals younger than 16 in situations where it may be warranted to ensure the safety of children. Background checks for adults age 18 and older include fingerprints through the Federal Bureau of Investigation and child abuse and neglect history checks of each state the adult individual has lived in the five years preceding their background application. Individuals age 16 or 17 who have lived outside of Washington State in the three years preceding their background application must complete fingerprints.

The background check decision is based on a review of the individual's background information compared to the DCYF Secretary's List of Crimes and Negative Actions. It may include a suitability assessment for crimes that are not federally disqualifying.

Every individual in the home or on the property, as defined above, must pass a background check. These individuals include:

| Name | Results | Date |
|---|---|---|
| Ronda McNae | Passed | 03/01/2024 |
| William McNae | Passed | 03/01/2024 |

During the background check process there were no concerning clearance issues identified outside of criminal history.

A Washington state child abuse and neglect check was completed for all household members. Ronda has no substantiated findings of child abuse or neglect. She is the minor victim named in 11 intakes. William has no substantiated findings of child abuse or neglect.

Case 1:22-cv-22171-JEM   Document 275-2   Entered on FLSD Docket 01/14/2025   Page 21 of
195
Case 1:22-cv-22171-JEM   Document 259   Entered on FLSD Docket 12/17/2024   Page 32 of 40

Ronda and Will received two Valid findings 7/22/2015 in violation of WAC 110-148-1465 and 110-148-1470 as a child in out-of-home care was sleeping in a tent in the crib. The tent was used for sleep training to prevent the child from regularly climbing out of the crib. It had been inappropriately approved by a case manager at the agency who licensed the McNae's. A Compliance Agreement was completed, and their foster care license remained open and in good standing.

## Legal Permanency (Shared by Applicant A & B if applicable)

It was assessed that the applicant(s) is capable of caring for children without the support of a case plan, once permanency is achieved. The applicant(s) is committed to caring for children in a safe, nurturing, and affirming way. The applicant(s) is capable and willing to address the financial, educational, health, and child-specific needs of children. This assessment is for the purpose of adoption.

Should something happen to Ronda and Will, Matt Mead (their children's Godfather) would care for any children in their care.

## Sources of Information / Core Concepts of Adoption

**The following sources of information were used in this home study assessment:**

Family Home Study or Reassessment Application (DCYF 10-354), Background Confirmation and Out of State Check (DCYF 15-460), Personal Information Form (DCYF 15-276), Applicant Medical Self Report (DCYF 13-001A), Emergency and Evacuation Plan (DCYF 16-204), Financial Worksheet (DCYF 14-452), Applicant Medical Report (Medical Provider) (DCYF 13-001), Reference Questionnaire (DCYF 15-286), Background Check Request / Decision (DCYF 09-131)

Valid government-issued photo identification (ID), Driver's license for people transporting children, Auto insurance for vehicles used to transport children, Training certificate(s), Income verification(s), Marriage certificate(s), Divorce decree(s)

Collaterals

**The following Core Concepts of Adoption were discussed with the applicant(s):**

☑ Concept of adoption/guardianship/long term foster care as a lifelong developmental process and commitment.
☑ The potential for the child to have feelings of identity confusion and loss regarding separation from the birth parents.
☑ The relevance of the child's relationship with siblings and the potential benefit to the child of providing for a continuing relationship and contact between the child and known siblings.
☑ Disclosure of the fact of adoption/guardianship/foster care to the child.
☑ The child's possible questions about birth parents and relatives.
☑ The relevance of the child's racial, ethnic, and cultural heritage. Race cannot be used in determining the fitness, character or suitability of an applicant.
☑ Permanency Planning Matrix Publication CWP_0088
☐ Not applicable for this assessment.

## Evaluation (Shared by Applicant A & B if applicable)

Washington state received an ICPC request from Iowa Department of Health and Human Services for a relative (unlicensed), adoption home study for Ronda and William (Will) McNae to be considered a placement option for Ronda's niece ███████████ (DOB 6/27/2019) and nephew ███████████ (DOB 4/8/2021). Ronda and Will were previously licensed foster parents with the state of Washington from 4/2/2015 to 11/2/2015. ██████ and ██████ came into care on 3/22/2023 and are currently placed in licensed care in Iowa.

Ronda and Will are raising two children of their own and were a placement option for a child in care in 2015 as

licensed foster parents. Ronda has also been a camp counselor, taught dance and cheer camps, worked as a nanny, taught high school bible study, and volunteered in the children's ministry at a local church. She and Will worked with children at an orphanage in Uganda. Will has experience caring for his nieces and nephews and coaching soccer. Ronda and Will have made themselves available for virtual visits with the children to get to know them better. They have sought out information about ████████████████ medical, educational, and mental health needs and have resources and connections to get the children into appropriate services, if needed. Ronda and Will have plans to help the children stay connected to safe and appropriate family members including their two older half-siblings. Due to their experience as foster parents, they have awareness and insight regarding transitions and some of the challenges that children face when moved from home to home. They have talked about potential impacts to their family and how best to approach it while preparing to lean on their supports for guidance, as needed.

Ronda and Will are open to being considered as a short and long-term placement option for ██████████████ They are prepared to meet the children's educational, medical, emotional, and financial needs.

The primary concerns and limitations that were disclosed during this home study assessment were that Ronda has experienced childhood and adult trauma and she has some medical conditions that impact her day-to-day functioning at times. Her primary care provider expressed in an Applicant Medical Report Form that caring for an additional two children may not be in Ronda's best interest at this time based on her health conditions. Throughout the home study assessment, Ronda was open and forthcoming about her trauma experiences. She demonstrated insight and understanding of her mental health and medical conditions. She has supports in place today such as her husband, her therapists, her primary care provider, and her chosen family. Her husband works from home and is available to provide care to the children if Ronda has medical or mental health needs that she needs to address. Ronda continues to engage in reading, ongoing education, training, and intensive sessions to work through what happened to her and strengthen her coping strategies. She takes medications prescribed by her primary care physician and is reported to be stable on those medications. Her therapists provided Applicant Mental Health Report Forms acknowledging the progress she has made over the years while she has been under their care. They both provided positive references in support of her being considered a placement option for ██████ and ██████ Additionally, three positive references were received for the purpose of this assessment, and all are in support of the McNae's being a placement option for the children. Ronda reports that her medical and mental health conditions are well-managed at this time. She has supports in place should she need assistance in caring for additional children.

Iowa requested a relative and adoption home study on this family. Ronda and William McNae are approved for placement and adoption of ██████████████ (DOB 6/27/2019) and ██████████████ (DOB 4/8/2021).

| Licensor Qualifications Statement | |
|---|---|
| I am an employee of the Department of Children, Youth, and Families (DCYF) or an employee of an agency licensed by DCYF as a child-placing agency (CPA). I am assigned to provide home study services, including the completion of pre-placement reports. I meet the required qualifications as defined in RCW 26.33.<br><br>I am the author of this report, know the contents, and believe the statements included to be true. The recommendation is made based on the information available to me at the time of the home study. Additional information may change my recommendation. | |
| Name of Worker<br>Lillie Scribner | Title<br>Home Study Specialist |
| Signature of Worker<br><br>*Lillie Scribner* | Date<br>04/03/2024 |

| Supervisor Statement | |
|---|---|
| | |

I have reviewed the contents, believe the statements included to be true and agree with the recommendations made based on the information available to me at the time of the home study. Additional information may change my recommendation.

| Name of Supervisor<br>MARIE HIRAYAMA | Title<br>Home Study Supervisor |
|---|---|
| Signature of Supervisor<br><br>*Marie Hirayama* | Date<br>04/03/2024 |

Case 1:22-cv-22171-JEM   Document 275-2   Entered on FLSD Docket 01/14/2025   Page 24 of
195
Case 1:22-cv-22171-JEM   Document 259   Entered on FLSD Docket 12/17/2024   Page 35 of 40

Document ID: 1790d507-d3ff-4a34-a748-0a1af46cfec5

# Signing History

- 2024-04-03T16:57:27.984-07:00: Lillie Scribner signed in the role of caseworker (ip: 147.55.7.167)
- 2024-04-03T17:04:22.477-07:00: MARIE HIRAYAMA signed in the role of supervisor (ip: 147.55.7.167)

Case 1:22-cv-22171-JEM   Document 275-2   Entered on FLSD Docket 01/14/2025   Page 25 of
195
Case 1:22-cv-22171-JEM   Document 259   Entered on FLSD Docket 12/17/2024   Page 36 of 40

# Exhibit B

## **DEFENDANT'S PRIVILEGE LOG**

Michael Fitzgerald and Yelany de Varona v. Ronda McNae and William McNae, Case No. 1:22-cv-22171-JEM

December 16, 2024

Defendant Ronda McNae, hereby files her privilege log, as follows:

| Document | Page/ Section | Description of Redaction | Reason for Redaction | Privilege |
|---|---|---|---|---|
| Home Study (DCYF 10-043) | 1-4 | Names and details of unrelated third-parties of children not involved in this case | Protects privacy of third-parties | FRCP 26 (c) Federal Privacy Act |
| Home Study (DCYF 10-043) | 6 | Medical Diagnosis and medication which is already on the record under seal **(MCNAE 004764- MCNAE 005381)** | Irrelevant to this case | HIPPA and general privacy principles |
| Home Study (DCYF 10-043) | 9-10 | Medical Information of unrelated party not listed in this case | Protects privacy of third-parties | HIPPA and general privacy principles |
| Home Study (DCYF 10-043) | 12 | Names and details of unrelated third-parties of children not involved in this case | Protects privacy of third-parties | FRCP 26 (c) Federal Privacy Act |
| Home Study (DCYF 10-043) | 15 | Names and details of unrelated third-parties of children not involved in this case | Protects privacy of third-parties | FRCP 26 (c) Federal Privacy Act |
| Home Study (DCYF 10-043) | 18 | Names and details of unrelated third-parties of children not involved in this case | Protects privacy of third-parties | FRCP 26 (c) Federal Privacy Act |
| Home Study (DCYF 10-043) | 20 | Names and details of unrelated third-parties of children not involved in this case | Protects privacy of third-parties | FRCP 26 (c) Federal Privacy Act |
| Home Study (DCYF 10-043) | 21 | Names and details of unrelated third-parties of children not involved in this case | Protects privacy of third-parties | FRCP 26 (c) Federal Privacy Act |

# Exhibit C

From: Ronda McNae <ronda.mcnae@gmail.com>
Sent: Tuesday, November 26, 2024 11:20:07 AM
To: Erin Ramar <emramar@youthlawcenter.org>; Ronda McNae <ronda.mcnae@gmail.com>
Subject: Request for Assistance and Declaration

Subject: Request for Assistance and Declaration.

Hi,

How are you? I hope this finds you well! Rowan has started school—can you believe it? Today is his first time riding the bus! It's only two hours, but it's such a great start. I even got to walk him onto the bus and buckle him in. How cute is that? I'll try not to cry, but I promise to take pictures!

I wanted to follow up to see if there's been any word from the Judge on the appeal. No rush—honestly, the extra time is perfectly fine on my end.

I also have a favor to ask. As you know, I've been the primary caregiver for the kids since June, and it's simply not wise for me to be away for something that isn't truly pertinent. In any ongoing litigation in Florida (the gift that keeps on giving), I've uncovered significant evidence that was intentionally withheld. This came to light after realizing my own counsel's refusal to investigate. Long story short, I'm now pro se, which has actually been much easier this time around.

Opposing counsel is now pushing for an in-person discovery hearing, despite this situation arising from their failures. I was hoping you could provide a declaration confirming that I'm the primary caregiver for the children and unable to travel across the country for something that can easily be handled remotely.

Additionally, if it's within your scope, it would be incredibly helpful to include observations about why the kids were placed with us and the stability we've provided. I'm hoping to avoid unnecessary disruptions, like a home study request. Even sharing your perspective on our family's ability to take in and care for the kids—while navigating this litigation and the denied protection order filed by the DiJulio family—would be valuable. Our character is being questioned, and many people don't understand the rigorous vetting process involved in stepping up for children like this.

Your support would mean so much, and I truly appreciate your time and effort on this. Let me know if this is something you can help with.

Warmly,

Ronda McNae

---

RE: Request for Assistance and Declaration 

Resch, Madeline (DCYF)                                                          Dec 3, 2024, 12:06 PM (12 days ago)    ☆   ☺   ↩   ⋮
To me, Madeline ▾    

Hi Ronda,

I just spoke with my supervisor about your email and request for assistance/a declaration. Unfortunately, we can't get involved in personal legal matters and we're limited in what we can do in what we can do in this dependency matter, as we are just providing out-of-state courtesy supervision and the dependency is under Iowa's jurisdiction. However, you are welcome to share your name study with whomever you'd like if you feel that this may be helpful in providing an overview of your role as foster parents. I'm sorry I can't be of more help!

Best,
Maddy

Maddy Resch, MSW, SSS3 | CFWS Permanency Unit
Department of Children, Youth, and Families
Division of Field Operations-Region 4
5600 E. Graham St. Seattle, WA 98118
Cell: 425-282-0712/Fax: 205-721-4108/Mailstop: UN N41-4
Pronouns: She/her

Washington State Department of
CHILDREN, YOUTH & FAMILIES

NOTE: My normal work hours are 7:30am-5:00pm, M-Th and olso Friday.

RE: Request for Assistance and Declaration



Erin Romar
to me, Randi

Hi Randi!

I'm so sorry for the delay in getting back to you. with the Holidays and a recent sickness, things have been nuts! How did Thanksgiving go with you guys?? Did the kids have fun?

I am so sorry that you're still dealing with this litigation and the fall out of everything that comes with it! How frustrating and probably demoralizing when you're just trying to do the right thing.

With that being said- because this in theory could make me a witness (if they wanted to) in that case if I were to provide a letter like that, I will need to speak to my boss about this. I'm going to forward your e-mail to her so that she can let me know if this is something I can or cannot do!

I'll keep you posted ASAP!

OH! Also, I'm looking at coming out in January to come visit and see how things are going. I'm thinking of coming in on the 16th, and visit on the 17th? That way I can meet with the school and see how things are going, meet with you guys, and the kids after school?

Best,

Erin E. Romar, CWLS
Attorney
Youth Law Center
300 Walnut Street, Suite 265
Des Moines, IA 50309
eerin@youthlawcenter.org
Cel: 515-402-4613
Office: (515) 244-1172 Ext. 4613
F: (515) 244-4370

# Declaration

# Exhibit B

B. Evidence of Opposing Counsel's Misconduct

- B-1 = Grant Gussin monitoring Defendant's Instagram account

- B -2 = The State Court Complaint filed against Will McNae improperly resurrects tort claims that were dismissed in the Federal Case under the Independent Tort Doctrine, thereby attempting to relitigate matters already resolved. The complaint further relies on five exhibits derived from the Federal Case, consisting of sensitive internal communications within Microsoft's HR and employee discussions, which were to be handled with discretion but have been weaponized against the party acting transparently.

- B-3 - Letter from ARAG detailing coverage for both State and Federal Cases

- B-4 - Email correspondence from Ms. Gussin regarding FRCP 26(e). Ms. Gussin called ARAG around this timeframe and the audio recording is in Defendant's custody.

- B-5 – ARAG Denial of Legal Coverage in William's State Case

- B-6 – 57.105 Letter Will McNae filed to Plaintiff Fitzgerald in FL State court, February 5, 2024, regarding improper pleading errors that were previously dismissed in Federal court (twice).

- B-7 – Plaintiff Fitzgerald's Amended Complaint (removed tort claims)

- B-8 – The timeline created by Ms. Gussin for use by Fitzgerald's expert, DiTimasso, contains multiple mischaracterizations and misstatements of material facts and evidence in this case. These inaccuracies not only mislead the court but also improperly influence the expert's analysis and conclusions.

- B-9 – The Protective Order agreed upon in this case

# Declaration

# Exhibit B-1



**Ronda McNae <rondamcnae@gmail.com>**                                 Tue, Jan 2, 11:07 AM

to Meredith, PEB@AssoulineBerlowe.com, bcc: Will

Meredith and Peter,

In recent weeks, I have observed an account under the name 'Grant Gussin' consistently viewing my Instagram stories. This prompted me to inquire directly with the account, questioning our acquaintance and the basis of their familiarity with me. Subsequently, the account ceased viewing my stories, raising further suspicion.

Following internal support with Instagram, it has come to my attention that this account is associated with your husband. Upon reviewing the American Bar Association's Model Rule 8.4 on Misconduct, I have discerned a clear connection and find the monitoring of my social media through your husband's account to be both dishonest and deceptive. It is equally disappointing to note that while there was time dedicated to scrutinizing my social media activities, my settlement offer has yet to receive even a basic acknowledgment of receipt.

Sincerely,

Ronda McNae

Tue, Jan 2, 11:28 AM

to me, Peter

Mrs. McNae:

I can assure you that my husband has NOT been monitoring your account. When you emailed him to ask how he knew you, he advised me of same and I told him to unfollow you (or whatever the Instagram term is). He was not aware that your profile had been popping up on his stories.

Meredith

**Meredith J. Gussin, Esq.**

**Litigation**

**Ronda McNae <rondamcnae@gmail.com>**                    Tue, Jan 2, 1:17 PM

to Meredith, Peter

Meredith,

Your statement is inaccurate and untrue. Instagram doesn't operate in that manner. My stories would not appear on his account, especially since his account is private, his account does not follow me, I do not follow him, nor do we have mutual friends. I confirmed this with an employee of Instagram/Meta (parent company) just a few minutes ago.

While "Grant Gussin" isn't following my account and never has, Mr. Gussin has viewed at least 13 stories dates ranging from
December 13th - December 29th which are visible in the 'who's watched your story' section. The timing was suspicious since it was days after my counsel had to withdraw from representation. I made sure to take a snapshot each time to prevent any doubt, if my character or integrity was called in question. This method is how I discovered Yelany's fake account when she persistently viewed my profile, a fact she later confessed to in her deposition.

Sincerely,

Ronda McNae

# Declaration Exhibit B-2

Filing # 185338888 E-Filed 11/02/2023 01:47:57 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO: _____

MICHAEL J. FITZGERALD, individually,

                    Plaintiff,

v.

WILLIAM MCNAE, individually,

                    Defendant.

_____/

## COMPLAINT

Plaintiff, MICHAEL J. FITZGERALD ("Fitzgerald" or "Plaintiff"), files this Complaint against Defendant, WILLIAM MCNAE ("McNae" or "Defendant"), and alleges:

1.      This is an action for damages arising out of Defendant's breach of a contract (the "Confidential Settlement Agreement") with Plaintiff Fitzgerald.  Fitzgerald also alleges tort claims, *in the alternative*, against Defendant in the event that the Confidential Settlement Agreement is deemed unenforceable or void.

## PARTIES, JURISDICTION AND VENUE

2.      Plaintiff Fitzgerald is a British citizen who resides in England.

3.      Defendant McNae is a United States citizen who is domiciled in Washington State.

4.      This Court has subject matter jurisdiction over this action because it involves an actual and ongoing controversy that exceeds $50,000 plus attorneys' fees and costs. In particular, the amount in controversy is at least $657,228.00 in economic damages due as a result of natural and consequential damages to Plaintiff as a result of Defendant's breaches of the contract at issue

ASSOULINE & BERLOWE, P.A.
Miami Tower • 100 SE Second Street, Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576

*Fitzgerald v. William McNae*
Case No. _____

in this case.

5.     This Court has personal jurisdiction over Defendant pursuant to Florida Statute §48.193 because he has breached a contract in this state by failing to perform acts required by the Confidential Settlement Agreement to be performed in this state and because he committed tortious acts within this State.  Furthermore, this Court has jurisdiction over Defendant pursuant to Florida Statute §685.102 because the Confidential Settlement Agreement has a Florida choice of law provision and Defendant has therefore agreed to submit to the jurisdiction of the courts of this state.

6.     Venue in this district is proper because the underlying events related to the Confidential Settlement Agreement occurred in Miami-Dade County, Florida, and Defendant agreed in the Confidential Settlement Agreement that Miami-Dade County, Florida was the exclusive venue for disputes arising out of the agreement.

7.     The Plaintiff has retained the law firm Assouline & Berlowe, P.A., and has agreed to pay the firm its reasonable attorneys' fees and costs in conjunction with representing the Plaintiff in this action.

8.     All conditions precedent to the maintenance of this action have occurred, have been performed, or have been waived.

## FACTS

9.     Fitzgerald and Defendant (along with Defendant's wife, Ronda McNae), both with the aid of qualified attorneys, entered into a Confidential Settlement Agreement on or about June 15, 2020.  A true and correct copy of the Confidential Settlement Agreement is attached hereto as **Exhibit A**.

10.     In accordance with the Confidential Settlement Agreement, Defendant and

ASSOULINE & BERLOWE, P.A.
Miami Tower • 100 SE Second Street, Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576

*Fitzgerald v. William McNae*

Case No. _____

Fitzgerald were required to keep the terms and conditions of the Confidential Settlement Agreement confidential.  <u>See</u> Exhibit A, ¶16.

11.     In accordance with the Confidential Settlement Agreement, Defendant was to have no contact with Fitzgerald's then-employer, SoftwareONE.  <u>See</u> Exhibit A, ¶4B.

12.     In accordance with the Confidential Settlement Agreement, Defendant was not supposed to speak or write about Fitzgerald, his nationality, his employer, his country of citizenship, his location of residence, his employer, his job function, his job title, his profession, or reference dates, locations or other persons present at any of the events related to the underlying dispute.  <u>See</u> Exhibit A, ¶4A.  The McNaes were also prohibited from referring to Fitzgerald indirectly.  <u>Id.</u>

13.     Under the Confidential Settlement Agreement, Fitzgerald paid a sum of money, and Fitzgerald and Defendant each released claims against one another. <u>See</u> Exhibit A, ¶¶3, 13.

14.     Under the Confidential Settlement Agreement, Defendant and Fitzgerald agreed not to disparage each other by written or oral word, gesture, or other means, nor would they make disparaging or negative comments about each other, to any person or entity.  <u>See</u> Exhibit A, ¶17.

15.     Fitzgerald has complied with all terms and conditions of the Confidential Settlement Agreement.

16.     On the contrary, Defendant breached several provisions of the Confidential Settlement Agreement by contacting SoftwareONE (Fitzgerald's then-employer) on July 15, 2022 and by contacting Microsoft (Defendant's employer who used to do business with SoftwareONE) on April 12, 2022; April 20, 2022; May 2, 2022 and July 13, 2022.  Defendant has also breached the Confidential Settlement Agreement by contacting others about the existence of the Confidential Settlement Agreement and by disparaging Fitzgerald to others.

**ASSOULINE & BERLOWE, P.A.**
Miami Tower • 100 SE Second Street, Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576

*Fitzgerald v. William McNae*
Case No. _____

17.     Defendant's communications constitute breaches of the following provisions of the Confidential Settlement Agreement:

- ¶4B: prohibition against contacting SoftwareONE

- ¶16: requirement to keep the terms and conditions of the Confidential Settlement Agreement confidential;

- ¶4A: prohibition from speaking or writing about Fitzgerald directly or indirectly, and

- ¶17: prohibition from disparaging Fitzgerald to others.

<u>See</u> Exhibit A.

18.     Plaintiff has been damaged as a result of Defendant's breaches both personally and professionally.

19.     Plaintiff has hired the undersigned law firm to prosecute its claim and is obligated to pay it a reasonable fee for its services. Pursuant to Paragraph 23 of the Confidential Settlement Agreement, Plaintiff is entitled to be reimbursed for his attorneys' fees and all costs incurred relating to said enforcement. <u>See</u> Exhibit A, ¶23.

## <u>COUNT I – BREACH OF CONTRACT</u>

20.     Plaintiff Fitzgerald adopts by reference, as if set out fully and completely in this Count, Paragraphs 1-19 of this Complaint.

21.     The Confidential Settlement Agreement is a binding contract under Florida law.

22.     Defendant breached the Confidential Settlement Agreement by:

A.      Not keeping the Confidential Settlement Agreement confidential as required;

B.      Contacting Fitzgerald's then-employer, SoftwareONE;

C.      Disclosing the existence of the Confidential Settlement Agreement to

4

*Fitzgerald v. William McNae*
Case No. _____

Fitzgerald's then-employer, SoftwareONE;

D.      Contacting Defendant's employer, Microsoft, and disclosing the existence of the Confidential Settlement Agreement and the underlying dispute to Microsoft;

E.      By referring to Fitzgerald directly by name and/or likeness, being, nationality, country of citizenship, location of residence, employer, job function, jot title, profession, or in reference to dates, locations, or other persons present;

F.      By disparaging, lying and intentionally seeking to harm Fitzgerald both professionally and personally by wrongfully and falsely accusing him of a crime to others; and

G.      By working in concert with his wife, Ronda McNae, to commit her breaches of the Confidential Settlement Agreement and her lies to Fitzgerald;

23.      Plaintiff has been damaged by Defendant's breaches of the Confidential Settlement Agreement. Such damages include the loss of Plaintiff's job at SoftwareONE due to Defendant's false accusations that Plaintiff assaulted Defendant's wife which led to a prolonged internal investigation into Fitzgerald at SoftwareONE. The internal investigation resulted in Fitzgerald not being able to work in his chosen profession, loss of business contacts and relationships, damage to his professional reputation, loss of stock options, and earned bonuses, among other things. These damages were natural and foreseeable consequences of Defendant's multiple breaches of the Confidential Settlement Agreement.

24.      Pursuant to Section 23 of the Confidential Settlement Agreement, Plaintiff is entitled to be reimbursed for his attorneys' fees and costs.

ASSOULINE & BERLOWE, P.A.
Miami Tower • 100 SE Second Street, Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576

*Fitzgerald v. William McNae*
Case No. _____

**WHEREFORE**, Plaintiff demands judgment against Defendant, William McNae, for compensatory damages in the amount of $657,228.00, plus post-judgment interest, and continuing until paid in full, attorneys' fees and costs, and for such other and further relief as this Court deems just and proper.

## COUNT II – ALTERNATIVE COUNT: LIBEL PER SE (STATEMENT 1)

25. Plaintiff Fitzgerald adopts by reference, as if set out fully and completely in this Count, Paragraphs 1-19 of this Complaint.

26. This count is brought *in the alternative* to Count I in the event that Defendant argues that the Confidential Settlement Agreement is void as against public policy or otherwise unenforceable. Plaintiff Fitzgerald asserts this count in the event the Court deems the Confidential Settlement Agreement void or otherwise unenforceable as against Defendant.

27. Defendant has engaged in ongoing, continuous, and malicious behavior in which he has repeatedly placed into the public domain false, malicious, and damaging information about Fitzgerald accusing Fitzgerald of sexually assaulting and raping his wife, Ronda McNae.

28. Defendant has been, at all times pertinent, an employee of Microsoft. Microsoft was a large global business partner with SoftwareONE in 2019 and 2019 when Fitzgerald was in contact with Defendant and his wife.

29. On April 12, 2022, Defendant contacted Chris Maulden and Ande Ferretti of Microsoft and referred to Fitzgerald indirectly and stated that Fitzgerald raped his wife. The letter states, in pertinent part:

*Fitzgerald v. William McNae*

Case No. _____

Because my sexual battery allegation involves my spouse, I do not believe it deserves any less attention to investigate the incident or uphold the violated Vendor Code of Conduct established with Partner organizations. As a victim of sexual battery, the lack of willingness by HR to demonstrate advocacy for an employee and their spouse, <u>when it was a result of a work relationship</u>, has been emotionally exhausting and damaging. A quick summary – the CIO of one of the largest global revenue billing partners took advantage of my work relationship to develop a trauma-based friendship with my family, which ultimately resulted in raping my wife and threatening me on a Redmond campus when I confronted him about criminal misconduct (reported to HR; also reported to Redmond Police Dept.). To be told by US HR that Microsoft has "zero liability" regarding this incident has haunted me for 2 years. Especially when I never reported this allegation as the fault of Microsoft – but asked for help since the relationship was so tightly connected to my work relationship.

[BATES MCNAE 1321-1323] (hereinafter referred to as "Statement 1").  A true and correct copy of Statement 1 is attached hereto as **Exhibit B**.

30.     Statement 1 is about Fitzgerald.

31.     Statement 1 is false.

32.     As a direct and proximate result of Defendant's libelous Statement 1, Fitzgerald has been damaged.

33.     Statement 1 is libel *per se* because the defamatory words Defendant used against Fitzgerald are meant to prejudice others regarding Fitzgerald's reputation, office, trade, business, or means of his livelihood.

34.     Statement 1 is libel *per se* because Statement 1 accuses Fitzgerald of committing a felonious sexual crime (i.e. rape).

35.     Statement 1 was intended to degrade Fitzgerald, bring him into ill repute, destroy others' confidence in his integrity, or to cause other injury.

36.     In relation to Statement 1, Defendant intentionally made numerous other statements that Fitzgerald raped Ronda McNae.

37.     Defendant had actual knowledge that Statement 1 was false and that making false statements like Statement 1 are wrong and likely to injure Fitzgerald.

38.     In Florida, rape and sexual assault are felony crimes.  In Florida, false statements

**ASSOULINE & BERLOWE, P.A.**
Miami Tower • 100 SE Second Street, Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576

indicating a person committed a felony constitute libel *per se*.

39.     Defendant made Statement 1 with the malicious intent to defame Fitzgerald.

40.     Statement 1 is unprivileged.

41.     As a direct result of Defendant's publication of Statement 1, Defendant naturally and proximately caused injury to Fitzgerald in his personal, social and business relations of life.

42.     The wrongs and injuries caused by a statement like Statement 1 are presumed and implied, and constitute libel *per se*.

43.     Statement 1 exposed Fitzgerald to distrust, hatred, contempt, ridicule and/or obloquy.

44.     Statement 1 caused others to avoid Fitzgerald, such as his former employer, SoftwareONE and its employees, as well as partnered companies.

45.     As a direct result of Defendant's Statement 1, Fitzgerald now feels ostracized both personally and professionally.

46.     As a direct result of Statement 1, Fitzgerald has not been permitted to work in his chosen career.

47.     As a consequence of Statement 1, Defendant damaged Fitzgerald in an amount in excess of the jurisdictional limits of this Court, which has been ascertained to be $657,228.00 in economic damages alone.

48.     Defendant's actions were willful, wanton, and intentional, and with malice or reckless indifference to Fitzgerald's rights, thus entitling Fitzgerald to damages in the form of compensatory damages pursuant to state law, to punish Defendant for his actions and to deter him, and others from such action in the future.

**WHEREFORE,** Plaintiff Michael Fitzgerald demands judgment against Defendant

**ASSOULINE & BERLOWE, P.A.**
Miami Tower • 100 SE Second Street, Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576

*Fitzgerald  v. William McNae*
Case No. _____

William McNae for compensatory damages in an amount in excess of the jurisdictional limits of this Court, plus post-judgment interest, and continuing until paid in full, and for such other relief as is deemed just and proper.

### COUNT III - ALTERNATIVE COUNT: LIBEL PER SE (STATEMENT 2)

49.     Plaintiff Fitzgerald adopts by reference, as if set out fully and completely in this Count, Paragraphs 1-19 of this Amended Complaint.

50.     This count is brought *in the alternative* to Count I in the event that Defendant argues that the Confidential Settlement Agreement is void as against public policy or otherwise unenforceable.  Plaintiff Fitzgerald asserts this count in the event the Court deems the Confidential Settlement Agreement void or otherwise unenforceable as against Defendant.

51.     Defendant has engaged in ongoing, continuous, and malicious behavior in which he has repeatedly placed into the public domain false, malicious, and damaging information about Fitzgerald accusing Fitzgerald of sexually assaulting and raping his wife, Ronda McNae.

52.     Defendant has been, at all times pertinent, an employee of Microsoft. Microsoft was a large global business partner with SoftwareONE in 2019 and 2019 when Fitzgerald was in contact with Defendant and his wife.

53.     On April 20, 2022, Defendant again contacted Chris Maulden of Microsoft stating that Fitzgerald preyed upon and assaulted his wife, Ronda McNae.  It states, in pertinent part:

> I have case notes and evidence to support why this is a workplace issue due to the first meeting taking place at a work event and the grooming behavior was enabled because of the work relationship.
> …
> Mike Fitzgerald abused his work relationship with me to prey and assault my wife and harass then threaten me assuming I would be too afraid to speak up.

[BATES MCNAE 1319-1320] (hereinafter referred to as "Statement 2").  A true and correct copy

*Fitzgerald  v. William McNae*
Case No. _____

of Statement 2 is attached hereto as **Exhibit C**.

54.     Statement 2 is about Fitzgerald.

55.     Statement 2 is false.

56.     As a direct and proximate result of Defendant's libelous Statement 2, Fitzgerald has been damaged.

57.     Statement 2 is libel *per se* because the defamatory words Defendant used against Fitzgerald are meant to prejudice others regarding Fitzgerald's reputation, office, trade, business, or means of his livelihood.

58.     Statement 2 is libel *per se* because Statement 2 accuses Fitzgerald of committing a felonious sexual crime (i.e. rape).

59.     Statement 2 was intended to degrade Fitzgerald, bring him into ill repute, destroy others' confidence in his integrity, or to cause other injury.

60.     In relation to Statement 2, Defendant intentionally made numerous other statements that Fitzgerald raped Ronda McNae.

61.     Defendant had actual knowledge that Statement 2 was false and that making false statements like Statement 2 are wrong and likely to injure Fitzgerald.

62.     In Florida, rape and sexual assault are felony crimes.  In Florida, false statements indicating a person committed a felony constitute libel *per se*.

63.     Defendant made Statement 2 with the malicious intent to defame Fitzgerald.

64.     Statement 2 is unprivileged.

65.     As a direct result of Defendant's publication of Statement 2, Defendant naturally and proximately caused injury to Fitzgerald in his personal, social and business relations of life.

66.     The wrongs and injuries caused by a statement like Statement 2 are presumed and

ASSOULINE & BERLOWE, P.A.
Miami Tower • 100 SE Second Street, Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576

*Fitzgerald v. William McNae*
Case No. _____

implied, and constitute libel *per se*.

67.     Statement 2 exposed Fitzgerald to distrust, hatred, contempt, ridicule and/or obloquy.

68.     Statement 2 caused others to avoid Fitzgerald, such as his former employer, SoftwareONE and its employees, as well as partnered companies.

69.     As a direct result of Defendant's Statement 2, Fitzgerald now feels ostracized both personally and professionally.

70.     As a direct result of Statement 2, Fitzgerald has not been permitted to work in his chosen career.

71.     As a consequence of Statement 2, Defendant damaged Fitzgerald in an amount in excess of the jurisdictional limits of this Court, which has been ascertained to be $657,228.00 in economic damages alone.

72.     Defendant's actions were willful, wanton, and intentional, and with malice or reckless indifference to Fitzgerald's rights, thus entitling Fitzgerald to damages in the form of compensatory damages pursuant to state law, to punish Defendant for his actions and to deter him, and others from such action in the future.

**WHEREFORE**, Plaintiff Michael Fitzgerald demands judgment against Defendant William McNae for compensatory damages in an amount in excess of the jurisdictional limits of this Court, plus post-judgment interest, and continuing until paid in full, and for such other relief as is deemed just and proper.

## COUNT IV - ALTERNATIVE COUNT: LIBEL PER SE (STATEMENT 3)

73.     Plaintiff Fitzgerald adopts by reference, as if set out fully and completely in this Count, Paragraphs 1-19 of this Amended Complaint.

11

*Fitzgerald v. William McNae*
Case No. _____

74.     This count is brought *in the alternative* to Count I in the event that Defendant argues that the Confidential Settlement Agreement is void as against public policy or otherwise unenforceable.  Plaintiff Fitzgerald asserts this count in the event the Court deems the Confidential Settlement Agreement void or otherwise unenforceable as against Defendant.

75.     Defendant has engaged in ongoing, continuous, and malicious behavior in which he has repeatedly placed into the public domain false, malicious, and damaging information about Fitzgerald accusing Fitzgerald of sexually assaulting and raping his wife, Ronda McNae.

76.     Defendant has been, at all times pertinent, an employee of Microsoft. Microsoft was a large global business partner with SoftwareONE in 2019 and 2019 when Fitzgerald was in contact with Defendant and his wife.

77.     On April 20, 2022, Defendant again contacted Chris Maulden of Microsoft stating that Fitzgerald preyed upon and assaulted his wife, Ronda McNae.  It states, in pertinent part:

78.     On May 2, 2022, W. McNae again contacted Chris Maulden of Microsoft as well as Leslie Pickering of Microsoft stating that Fitzgerald was a sexual predator that groomed and exploited his wife, Ronda McNae. It states, in pertinent part:

> While it may be a surprise to you, it's not a surprise to either my wife or myself. Predators have a script. They have a process. A grooming period. It's calculated and premeditated. The sad part, my wife even gathered evidence to show MS however no one from HR was open to follow up and look at what she had compiled.
>
> As an employee of MS, I am telling you, this man is a sexual predator that began grooming and exploiting my wife the moment he met her at a WORK EVENT and continued under the pretext of my work relationship. I fear for other female employees within our company that work alongside him and at this point the company continues to be a complicit bystander. The question I pose to Microsoft HR is "will you still claim "zero liability" once you learn more victims come forward?"

[BATES MCNAE 1317-1318] (hereinafter referred to as "Statement 3").  A true and correct copy of Statement 3 is attached hereto as **Exhibit D**.

79.     Statement 3 is about Fitzgerald.

80.     Statement 3 is false.

**ASSOULINE & BERLOWE, P.A.**
Miami Tower • 100 SE Second Street, Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576

*Fitzgerald v. William McNae*
Case No. _____

81.     As a direct and proximate result of Defendant's libelous Statement 3, Fitzgerald has been damaged.

82.     Statement 3 is libel *per se* because the defamatory words Defendant used against Fitzgerald are meant to prejudice others regarding Fitzgerald's reputation, office, trade, business, or means of his livelihood.

83.     Statement 3 is libel *per se* because Statement 3 accuses Fitzgerald of committing a felonious sexual crime (i.e. rape).

84.     Statement 3 was intended to degrade Fitzgerald, bring him into ill repute, destroy others' confidence in his integrity, or to cause other injury.

85.     In relation to Statement 3, Defendant intentionally made numerous other statements that Fitzgerald raped Ronda McNae.

86.     Defendant had actual knowledge that Statement 3 was false and that making false statements like Statement 3 are wrong and likely to injure Fitzgerald.

87.     In Florida, rape and sexual assault are felony crimes.  In Florida, false statements indicating a person committed a felony constitute libel *per se*.

88.     Defendant made Statement 3 with the malicious intent to defame Fitzgerald.

89.     Statement 3 is unprivileged.

90.     As a direct result of Defendant's publication of Statement 3, Defendant naturally and proximately caused injury to Fitzgerald in his personal, social and business relations of life.

91.     The wrongs and injuries caused by a statement like Statement 3 are presumed and implied, and constitute libel *per se*.

92.     Statement 3 exposed Fitzgerald to distrust, hatred, contempt, ridicule and/or obloquy.

13

*Fitzgerald v. William McNae*
Case No. _____

93.     Statement 3 caused others to avoid Fitzgerald, such as his former employer, SoftwareONE and its employees, as well as partnered companies.

94.     As a direct result of Defendant's Statement 3, Fitzgerald now feels ostracized both personally and professionally.

95.     As a direct result of Statement 3, Fitzgerald has not been permitted to work in his chosen career.

96.     As a consequence of Statement 3, Defendant damaged Fitzgerald in an amount in excess of the jurisdictional limits of this Court, which has been ascertained to be $657,228.00 in economic damages alone.

97.     Defendant's actions were willful, wanton, and intentional, and with malice or reckless indifference to Fitzgerald's rights, thus entitling Fitzgerald to damages in the form of compensatory damages pursuant to state law, to punish Defendant for his actions and to deter him, and others from such action in the future.

**WHEREFORE**, Plaintiff Michael Fitzgerald demands judgment against Defendant William McNae for compensatory damages in an amount in excess of the jurisdictional limits of this Court, plus post-judgment interest, and continuing until paid in full, and for such other relief as is deemed just and proper.

### COUNT V - ALTERNATIVE COUNT: LIBEL PER SE (STATEMENT 4)

98.     Plaintiff Fitzgerald adopts by reference, as if set out fully and completely in this Count, Paragraphs 1-19 of this Amended Complaint.

99.     This count is brought *in the alternative* to Count I in the event that Defendant argues that the Confidential Settlement Agreement is void as against public policy or otherwise unenforceable.  Plaintiff Fitzgerald asserts this count in the event the Court deems the Confidential

*Fitzgerald v. William McNae*
Case No. _____

Settlement Agreement void or otherwise unenforceable as against Defendant.

100.   Defendant has engaged in ongoing, continuous, and malicious behavior in which he has repeatedly placed into the public domain false, malicious, and damaging information about Fitzgerald accusing Fitzgerald of sexually assaulting and raping his wife, Ronda McNae.

101.   Defendant has been, at all times pertinent, an employee of Microsoft. Microsoft was a large global business partner with SoftwareONE in 2019 and 2019 when Fitzgerald was in contact with Defendant and his wife.

102.   On July 13, 2022, W. McNae again contacted Microsoft referring to Fitzgerald indirectly and accusing him of raping his wife, Ronda McNae.  The letter provides, in pertinent part:

> The CIO placed so much importance on joining him that when my flight couldn't arrive in time to join the dinner, I asked my wife to go in my place. I partially asked my wife to attend because I knew the CIO's girlfriend had also canceled her attendance at the last moment and I felt personally responsible to demonstrate support at the celebration.  This was not my family's first interaction with him; he had introduced his girlfriend to us and a friendship between the four of us had developed over the prior three months.  We felt the pressure of her canceled attendance and somehow believed we owed him to go in her place.  I was afraid of the negative repercussions towards me and Microsoft if we missed this event. My wife attended his dinner in my place, which ultimately resulted in her incapacitation.  While my wife was unable to give consent, the CIO sexually assaulted her.
>
> My wife bears the trauma and emotional scars from the rape, but I continue to battle ongoing mental health issues including anxiety and depression, as well as stress from continuing to support this Partner organization until I could no longer stand it and reported to my Manager four months after the assault.

[BATES MCNAE 1275-1277] (hereinafter referred to as "Statement 4"). A true and correct copy of Statement 4 is attached hereto as **Exhibit E**.

103.   Statement 4 is about Fitzgerald.

104.   Statement 4 is false.

105.   As a direct and proximate result of Defendant's libelous Statement 4, Fitzgerald

**ASSOULINE & BERLOWE, P.A.**
Miami Tower • 100 SE Second Street, Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576

*Fitzgerald  v. William McNae*
Case No. _____

has been damaged.

106.    Statement 4 is libel *per se* because the defamatory words Defendant used against Fitzgerald are meant to prejudice others regarding Fitzgerald's reputation, office, trade, business, or means of his livelihood.

107.    Statement 4 is libel *per se* because Statement 4 accuses Fitzgerald of committing a felonious sexual crime (i.e. rape).

108.    Statement 4 was intended to degrade Fitzgerald, bring him into ill repute, destroy others' confidence in his integrity, or to cause other injury.

109.    In relation to Statement 4, Defendant intentionally made numerous other statements that Fitzgerald raped Ronda McNae.

110.    Defendant had actual knowledge that Statement 4 was false and that making false statements like Statement 4 are wrong and likely to injure Fitzgerald.

111.    In Florida, rape and sexual assault are felony crimes.  In Florida, false statements indicating a person committed a felony constitute libel *per se*.

112.    Defendant made Statement 4 with the malicious intent to defame Fitzgerald.

113.    Statement 4 is unprivileged.

114.    As a direct result of Defendant's publication of Statement 4, Defendant naturally and proximately caused injury to Fitzgerald in his personal, social and business relations of life.

115.    The wrongs and injuries caused by a statement like Statement 4 are presumed and implied, and constitute libel *per se*.

116.    Statement 4 exposed Fitzgerald to distrust, hatred, contempt, ridicule and/or obloquy.

117.    Statement 4 caused others to avoid Fitzgerald, such as his former employer,

ASSOULINE & BERLOWE, P.A.
Miami Tower • 100 SE Second Street, Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576

*Fitzgerald v. William McNae*
Case No. _____

SoftwareONE and its employees, as well as partnered companies.

118.    As a direct result of Defendant's Statement 4, Fitzgerald now feels ostracized both personally and professionally.

119.    As a direct result of Statement 4, Fitzgerald has not been permitted to work in his chosen career.

120.    As a consequence of Statement 4, Defendant damaged Fitzgerald in an amount in excess of the jurisdictional limits of this Court, which has been ascertained to be $657,228.00 in economic damages alone.

121.    Defendant's actions were willful, wanton, and intentional, and with malice or reckless indifference to Fitzgerald's rights, thus entitling Fitzgerald to damages in the form of compensatory damages pursuant to state law, to punish Defendant for his actions and to deter him, and others from such action in the future.

**WHEREFORE**, Plaintiff Michael Fitzgerald demands judgment against Defendant William McNae for compensatory damages in an amount in excess of the jurisdictional limits of this Court, plus post-judgment interest, and continuing until paid in full, and for such other relief as is deemed just and proper.

## COUNT VI - ALTERNATIVE COUNT: LIBEL PER SE (STATEMENT 5)

122.    Plaintiff Fitzgerald adopts by reference, as if set out fully and completely in this Count, Paragraphs 1-19 of this Amended Complaint.

123.    This count is brought *in the alternative* to Count I in the event that Defendant argues that the Confidential Settlement Agreement is void as against public policy or otherwise unenforceable.  Plaintiff Fitzgerald asserts this count in the event the Court deems the Confidential Settlement Agreement void or otherwise unenforceable as against Defendant.

17

*Fitzgerald v. William McNae*
Case No. _____

124.    Defendant has engaged in ongoing, continuous, and malicious behavior in which he has repeatedly placed into the public domain false, malicious, and damaging information about Fitzgerald accusing Fitzgerald of sexually assaulting and raping his wife, Ronda McNae.

125.    Defendant has been, at all times pertinent, an employee of Microsoft. Microsoft was a large global business partner with SoftwareONE in 2019 and 2019 when Fitzgerald was in contact with Defendant and his wife.

126.    On July 15, 2022, W. McNae wrote a letter to John Wylie of John Wylie law, Jenny Martinez of Munck Wilson (outside counsel for SoftwareONE), and John Mayes of SoftwareONE in which he accused Fitzgerald of lying about the nature of his relationship with Ronda McNae. It stated, in pertinent part:

> Mr. Fitzgerald met my wife, Ronda, during a SoftwareONE evening event in July 2019. He leveraged his executive role beyond the relationship with me to justify developing a direct friendship with my wife. He paid for all travel & entertainment expenses for my family to join he and his girlfriend to celebrate the accomplishment of SoftwareONE's IPO. A "consensual affair" was fabricated by Mr. Fitzgerald to hide his actions which have been documented in the 3 police reports.

[BATES MCNAE 1353-1355] (hereinafter referred to as "Statement 5"). A true and correct copy of Statement 5 is attached hereto as **Exhibit F.**

127.    Statement 5 is about Fitzgerald.

128.    Statement 5 is false.

129.    As a direct and proximate result of Defendant's libelous Statement 5, Fitzgerald has been damaged.

130.    Statement 5 is libel *per se* because the defamatory words Defendant used against Fitzgerald are meant to prejudice others regarding Fitzgerald's reputation, office, trade, business, or means of his livelihood.

131.    Statement 5 is libel *per se* because Statement 4 accuses Fitzgerald of committing a felonious sexual crime (i.e. rape).

ASSOULINE & BERLOWE, P.A.
Miami Tower • 100 SE Second Street, Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576

*Fitzgerald v. William McNae*

Case No. _____

132.    Statement 5 was intended to degrade Fitzgerald, bring him into ill repute, destroy others' confidence in his integrity, or to cause other injury.

133.    In relation to Statement 5, Defendant intentionally made numerous other statements that Fitzgerald raped Ronda McNae.

134.    Defendant had actual knowledge that Statement 5 was false and that making false statements like Statement 4 are wrong and likely to injure Fitzgerald.

135.    In Florida, rape and sexual assault are felony crimes.  In Florida, false statements indicating a person committed a felony constitute libel *per se*.

136.    Defendant made Statement 5 with the malicious intent to defame Fitzgerald.

137.    Statement 5 is unprivileged.

138.    As a direct result of Defendant's publication of Statement 5, Defendant naturally and proximately caused injury to Fitzgerald in his personal, social and business relations of life.

139.    The wrongs and injuries caused by a statement like Statement 5 are presumed and implied, and constitute libel *per se*.

140.    Statement 5 exposed Fitzgerald to distrust, hatred, contempt, ridicule and/or obloquy.

141.    Statement 5 caused others to avoid Fitzgerald, such as his former employer, SoftwareONE and its employees, as well as partnered companies.

142.    As a direct result of Defendant's Statement 5, Fitzgerald now feels ostracized both personally and professionally.

143.    As a direct result of Statement 5, Fitzgerald has not been permitted to work in his chosen career.

144.    As a consequence of Statement 5, Defendant damaged Fitzgerald in an amount in

ASSOULINE & BERLOWE, P.A.
Miami Tower • 100 SE Second Street, Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576

*Fitzgerald v. William McNae*
Case No. _____

excess of the jurisdictional limits of this Court, which has been ascertained to be $657,228.00 in economic damages alone.

145.    Defendant's actions were willful, wanton, and intentional, and with malice or reckless indifference to Fitzgerald's rights, thus entitling Fitzgerald to damages in the form of compensatory damages pursuant to state law, to punish Defendant for his actions and to deter him, and others from such action in the future.

**WHEREFORE**, Plaintiff Michael Fitzgerald demands judgment against Defendant William McNae for compensatory damages in an amount in excess of the jurisdictional limits of this Court, plus post-judgment interest, and continuing until paid in full, and for such other relief as is deemed just and proper.

Date: November 2, 2023                       Respectfully submitted,

                                             **ASSOULINE & BERLOWE, P.A.**
                                             Miami Tower
                                             100 SE 2nd Street, Suite 3105
                                             Miami, Florida 33131
                                             Telephone: 305-567-5576
                                             Facsimile: 305-567-9343

                                             By:*/s/ Peter E. Berlowe*
                                             Peter E. Berlowe
                                             Florida Bar No. 143650
                                             peb@assoulineberlowe.com
                                             Meredith J. Gussin
                                             Florida Bar No. 0512303
                                             mjg@assoulineberlowe.com
                                             *Attorneys for Plaintiff Michael Fitzgerald*

EXHIBIT A

## Confidential Settlement Agreement

**THIS SETTLEMENT AGREEMENT** (the "Settlement Agreement" or the "Agreement") is made and entered this __15th__ day of June 2020, by and among MICHAEL J. FITZGERALD ("Fitzgerald"), RONDA MCNAE ("Ronda") and WILL MCNAE ("Will") with Ronda and Will collectively referred to as the "McNaes," and Fitzgerald, Ronda, and Will collectively referred to as the "Parties";

### RECITALS

**WHEREAS,** Ronda and Will are a married couple;

**WHEREAS,** Fitzgerald is a single male;

**WHEREAS,** the McNaes contend that Fitzgerald caused physical injury and mental injury to them in Miami-Dade County, Florida as a result of Fitzgerald's alleged sexual conduct towards Ronda;

**WHEREAS,** for purposes of avoiding the time and costly expenses associated with litigation, and in the interest of economic expediency, the Parties desire to reach a settlement of all claims between and among themselves; and,

**WHEREAS,** the parties wish to resolve all disputes between and among them;

**NOW THEREFORE** in consideration of the mutual covenants and promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to be legally bound by the following terms and conditions, which constitute full settlement of any and all disputes between them.

1.  **RECITALS.** The Parties acknowledge that the "WHEREAS" clauses preceding paragraph 1 are true and correct, and are incorporated herein as material parts of this Agreement.

2.  **NO ADMISSION OF LIABILITY.** The Parties agree to amicably settle all disputes between and among them. The Parties understand that this Agreement is in full and complete compromise of all disputed claims, both as to questions of liability and damages, including any claims for punitive damages, without an admission of liability or any wrongdoing by any of the Parties, any such liability or wrongdoing being expressly denied by each of the Parties.

3.  **CONSIDERATION.** In consideration of the execution of this Agreement and the promises herein contained, the Parties agree to the following:

    A.  <u>Payment of Settlement Funds.</u>    On or before June 19, 2020, Fitzgerald agrees to remit payment in the amount of Ninety-Seven Thousand Dollars and 00/100 cents ($97,000.00) to Ronda McNae and remit payment in the amount of Ten Thousand Dollars and 00/100 cents to Will McNae (collectively the "Settlement Funds"). The Settlement Funds to

Ronda's Initials: Will's Initials: Fitzgerald's Initials:

MCNAE 000001

Ronda McNae are paid in consideration of the physical and mental injuries she claims, and the settlement funds to Will McNae are in consideration of his loss of consortium claims due to the physical and mental injuries suffered by his wife Ronda. The Settlement Funds shall be remitted by wire to the Max Meyers Law PLLC Trust Account with the following wiring instructions:

MAX MEYERS LAW PLLC IOLTA TRUST ACCOUNT WIRE INTRUCTIONS.
Banner Bank - ABA Routing #████ 1076 and Account #████ 5818

**4.     NON-MONETARY TERMS.** The Parties agree to the following non-monetary terms:

A.     The McNaes shall remove any prior or current internet posts that reference Fitzgerald by name. The McNaes may speak or write generically about their life events, but in speaking or writing about their life events, the McNaes cannot refer to Fitzgerald's name, likeness, being, nationality, country of citizenship, location of residence, employer, job function, job title, profession, or reference to dates, locations, or other persons present. For instance, Ronda cannot name six people at an event, plus an unnamed person, so that the six people will know who the unnamed person is by process of elimination. Thus, it shall be a breach of this Agreement for the McNaes to indirectly refer to Fitzgerald in a way the McNaes could not do directly.

B.     The McNaes shall not contact Fitzgerald's employer. If Mr. Fitzgerald's employer contacts either of the McNaes, the McNaes shall respond, "the matter has been resolved and I cannot speak any more about it," or words to that effect.

C.     Notwithstanding the confidentiality provision in Section 16, below, the Parties may continue discuss the matter with their respective mental health professionals, but will advise the mental health professionals of this existence of this Agreement and those mental health professionals must follow this Agreement, as well.

D.     The Parties agree to minimize contact upon execution of this Agreement, and they agree to limit such contact as to be only such contact necessary to enforce the terms of this Agreement, with such contact preferably being by the Parties' respective attorneys.

**5.     REPRESENTATIONS AND WARRANTIES.** In making and executing this Agreement, the Parties represent, warrant and agree as follows:

A.     The Parties have had an opportunity to seek independent legal advice with respect to their rights and asserted rights arising out of the matters in controversy and with respect to the advisability of executing this Agreement.

B.     The Parties have made such investigation of all matters pertaining to this Agreement as they deem necessary, and do not rely on any statement, promise or representation by the other Parties hereto with respect to this matter.

**6.     NO CHALLENGE TO SETTLEMENT.** The Parties agree that they will take no action, including, but not limited to the institution of a lawsuit or administrative claim, to

Page 2 of 5

Ronda's Initials: _____   Will's Initials: _____   Fitzgerald's Initials: _____

MCNAE 000002

challenge any provision of this Agreement or regarding the original matter in controversy.

**7.    NO ADMISSION.**  Neither the negotiation nor the execution of this Agreement, nor any of its provisions, are to be construed as an admission by any of the Parties hereto, nor by their respective attorneys, or trustee regarding the truth of any matter alleged relating to the matter of controversy.

**8.    INTEGRATION.**    This Agreement constitutes a single, integrated written contract expressing the entire Agreement between the parties.  There are no other Agreements, written or oral, expressed or implied, between the parties, except as set forth in this Agreement.

**9.    SEVERABILITY.**    Should any part, term or provision of this Agreement be decided by the courts to be illegal, unenforceable or in conflict with any state or federal law or any other applicable law, the validity and enforceability of the remaining portions of this Agreement shall not be affected thereby.

**10.    DOCUMENT PREPARATION.**    If it becomes necessary for any reason to construe this Agreement as permitted by the Rules of Evidence of the State of Florida, this Agreement will be construed as being jointly prepared and written. The Parties agree that the terms and conditions contained herein have been negotiated, renegotiated and considered several times by the parties. The fact that one party or the other prepared the actual final draft of this Agreement shall not be construed as having created any ambiguity.  Should it become reasonably necessary for the parties to prepare additional documents to carry out the intent of this Agreement, each Party agrees to cooperate in the preparation, execution and delivery of same.

**11.    BINDING EFFECT.**  This Agreement shall be binding upon and inure to the benefit of the parties, and their respective successors, heirs, personal representatives and assigns.

**12.    NO WAIVER.**    No waiver of any breach of any term or provision of this Agreement shall be construed to be, nor shall be, a waiver of any other breach of this Agreement. No waiver shall be binding unless in writing and signed by the party waiving the breach.

**13.    MUTUAL GENERAL RELEASE.** The Parties agree that they each on their own behalf and on the behalf of any heirs, assigns, beneficiaries, past or future affiliates, shareholders, parents or subsidiaries, attorneys, sureties or insurers, employees, officers, directors, agents, trustees, and any other person or entity bearing a legal relationship as a predecessor or successor in interest and anyone claiming any rights derived from any of them, forever release, discharge, and hold each other and each other's past, present or future affiliates, shareholders, parents or subsidiaries, attorneys, sureties or insurers, employees, officers, directors, agents, and any entity bearing a legal relationship as predecessor or successor in interest, harmless of, and from, any all claims, causes of action, suits, debts, agreements, promises, demands, liabilities, contractual rights and/or obligations, or claims arising in tort, or of whatever nature, in law or in equity, arising out of, or related to, the direct claims asserted and any other claims that could be asserted, any counterclaims, any third-party claims, and any claims to attorneys' fees and cost, whether or not the claim was raised, or could have been raised. The Parties agree that this Release is not intended as an admission of any wrongdoing or liability on the part of any Party, and that this Release is not

Page 3 of 5

Ronda's Initials: _____  Will's Initials: _____  Fitzgerald's Initials: _____

MCNAE 000003

admissible as evidence in any proceeding as an admission of liability. The Parties warrant that they have not made any assignment of any right, claim, or cause of action covered by this Release to any other person, corporation or other legal entity.

**14. GOVERNING LAW.** This Agreement shall be deemed to be made and entered into in the State of Florida, and shall in all respects be interpreted, enforced and governed under the laws of Florida, without giving effect to the conflict of laws principals of Florida law. The Parties agree that venue for any litigation brought to enforce this Agreement shall lie exclusively in any court of competent jurisdiction in Miami-Dade County, Florida.

**15. EXECUTION.** This Agreement may be made effective by means of facsimile signatures executed on several identical counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**16. CONFIDENTIALITY.** The Parties warrant that they have not and will not disclose, communicate, disseminate and/or publicize, or cause or permit to be disclosed, communicated, disseminated or publicized the existence of or terms and conditions of this Agreement to any person, business, organization, corporation, association, governmental agency, except as follows: (1) to the extent necessary to report income to appropriate taxing authorities; (2) to their respective attorneys and accountants; (3) in response to requirements of law or a subpoena issued by a state or federal court or governmental agency, provided, however, that notice of receipt of such judicial order or subpoena immediately be communicated to counsel for the opposing party telephonically. The McNaes further acknowledge and agree that this provision is a material inducement to the Fitzgerald's agreement to pay the Settlement Funds. Therefore, the McNaes agree and acknowledge that any violation of this section or disclosure of any of the terms of the Settlement Agreement beyond the exceptions identified above in this section shall constitute a material breach of this Agreement.

**17. NON-DISPARAGEMENT.** The Parties agree that they will not disparage each other, by written or oral word, gesture, or any other means, nor will they make any disparaging or negative comments about each other, to any person or entity.

**18. NO FURTHER OBLIGATIONS.** The Parties agree that, aside from the obligations set forth in this Agreement, no party owes any other party any monies or benefits.

**19. BINDING NATURE OF AGREEMENT.** This Agreement shall be binding upon each of the Parties and upon their respective heirs, administrators, representatives, executors, successors and assigns, and shall inure to the benefit and/or detriment of each party and to their respective heirs, administrators, representatives, executors, successors and assigns.

**20. MODIFICATION OF AGREEMENT.** This Agreement may be amended, revoked, changed, or modified only upon written agreement executed by all Parties. No waiver of any provision of this Agreement will be valid unless it is in writing and signed by the party against whom such waiver is charged.

**21. SELECTIVE ENFORCEMENT.** The Parties agree that the failure of any party to enforce or exercise any right, condition, term or provision of this Agreement shall not be

Page 4 of 5

Ronda's Initials: _____ Will's Initials: _WM_ Fitzgerald's Initials: _____

MCNAE 000004

construed as or deemed to be a waiver or relinquishment thereof, and the same shall continue in full force and effect.

**22.     ENTIRE AGREEMENT.**  This Agreement sets forth the entire agreement between the Parties hereto, and fully supersedes any and all prior agreements or understandings between the Parties hereto pertaining to the subject matter hereof.

**23.     ATTORNEYS' FEES.**     In connection with any litigation arising out of this Agreement or in any way related to this Agreement, the prevailing party shall be entitled to recover all costs incurred including, but not limited to, its reasonable attorneys' fees at any level (trial, appeal, bankruptcy, administrative), including fees spent in litigation over entitlement or amount of such fees.

**24.     HEADINGS.**  The headings of the provisions herein are intended for convenient reference only, and the same shall not be, nor be deemed to be, interpretative of the contents of such provision.

**25.     COUNTERPARTS AND FACSIMILE SIGNATURES.**  This Agreement may be executed in two or more counterparts, each of which may be considered an original, and all of which together shall constitute one and the same document.  Facsimile or scanned copies of signature pages shall be treated as original signature pages.

**IN WITNESS WHEREOF**, this Agreement has been executed by the Parties as of the Effective Date.

_____   6-15-2020          _____   6-15-2020
Ronda McNae                    Date               Will McNae                      Date

_____   6-16-2020
Michael Fitzgerald             Date
Allan D. Lederman, Trustee

**Ronda's Initials:** ___  **Will's Initials:** ___  **Fitzgerald's Initials:** ___

MCNAE 000005

EXHIBIT B

# STATEMENT 1

**From:** Chris Maulden <chrismaulden@microsoft.com>
**Sent:** Tuesday, April 12, 2022 6:04 PM
**To:** Will McNae <will.mcnae@microsoft.com>
**Subject:** RE: Microsoft Corporation Shareholder Resolution Project

Thanks for responding, Will. I am out of the office tomorrow, and will connect with you on Thursday or Friday this week.

Regards,

Chris



Chris Maulden
Senior Employee Relations Manager Lead – Global
Employee Relations, Americas
chrismaulden@microsoft.com
(571) 778-6367

Find what you need on **HRWeb**

 Microsoft
***Please note I am in the Eastern Standard Time zone***

**Out of Office: 5/26/22-5/31/22**


**From:** Will McNae <will.mcnae@microsoft.com>
**Sent:** Tuesday, April 12, 2022 4:00 PM
**To:** Chris Maulden <chrismaulden@microsoft.com>
**Cc:** Ande Ferretti <anferret@microsoft.com>
**Subject:** FW: Microsoft Corporation Shareholder Resolution Project

Hello Chris,
Thank you for your voicemail touching base regarding a conversation you had with David Totten. I was in process of sending the below note to Ande based on a referral by Mr. Stevens at Arent Fox. I would welcome a discussion with you this week.
Regards,
Will


Hello Ande,

My name is Will, and I am an employee within the US GPS organization in a security solution architect role in David Totten's technical org. I am married to a wonderful woman, Ronda McNae, who is not an employee but unfortunately is at the center of this painful incident which I am sharing. I received your name from the Arent Fox attorney, Michael Stevens, after reaching out to their firm inquiring about the scope of the Shareholder Resolution Project services. I was provided your name when Mr. Stevens notified me that my incident was not in scope.

MCNAE 001321

I still hold on to hope that my experience from 2019 can positively affect change at Microsoft. **I am reaching out to you to find someone willing to hear the full story and request an in-person meeting.**

I would like an opportunity to share our experience from the past 2 years, provide updates from our efforts with law enforcement, and brainstorm actionable accountability and change. I'm not confident US HR (or CELA) fully understood our story when we reported in March 2020. I believe this based on the abrupt response I received from HR which did not ask for more information or prompt an investigation into my allegations. Upon receiving this response, I was left feeling alone and on our own to figure out how to hold an executive at a global partner organization accountable for his harmful actions towards my wife and me. I am thankful for a manager, director and CTO who were willing to listen and support our family as best they could with their limited resources and knowledge.

Since March 2020, I have reached out to multiple people across HR and CELA asking for help and advocacy. Specifically, advocacy and support would include an opportunity to establish a change in our internal HR systems when employees come forward to report sexual assault, rape, and harassment charges. For example, I was approached by a female teammate just yesterday asking what she needed to be aware of so that she would never be harmed in a way that my wife was with a Partner. That sad part is – I still don't know what to tell her about the legitimate workplace resources are available to us. She shared that she had previously felt harassed by a male co-worker but didn't report because of shame and lack of a safe reporting process. I do not want any teammate or colleague to experience our pain or hide in the dark because they were too ashamed to come forward.

Because my sexual battery allegation involves my spouse, I do not believe it deserves any less attention to investigate the incident or uphold the violated Vendor Code of Conduct established with Partner organizations. As a victim of sexual battery, the lack of willingness by HR to demonstrate advocacy for an employee and their spouse, when it was a result of a work relationship, has been emotionally exhausting and damaging. A quick summary – the CIO of one of the largest global revenue billing partners took advantage of my work relationship to develop a trauma-based friendship with my family, which ultimately resulted in raping my wife and threatening me on a Redmond campus when I confronted him about criminal misconduct (reported to HR; also reported to Redmond Police Dept.). To be told by US HR that Microsoft has "zero liability" regarding this incident has haunted me for 2 years. Especially when I never reported this allegation as the fault of Microsoft – but asked for help since the relationship was so tightly connected to my work relationship.

This past July I had reached a maximum frustration level with trying to politely ask for help from HR, so I wrote and submitted a complaint letter. Since that letter, I have spoken with HR and CELA, my wife and I have filed 3 police reports, and we have provided over 15 hours of in-person, sworn verbal and written statements to the Redmond, Miami, and San Francisco police departments who are investigating charges of sexual battery. It has been very difficult overcoming the challenges and fears to hold this executive accountable.

I am including excerpts from my letter to provide context (full letter attached). In the end, Microsoft may still hold firm with a posture of zero-liability and an unwillingness to take any proactive action – but I am trying to push for positive change based on my experience.

**Complaint Summary:**

Microsoft HR should have (and could have) done more to support and protect me as an employee. A formal investigation was not kicked off internally or externally, although I had substantial evidence to prove that multiple policies within the Partner/Vendor code of conduct had been violated, alongside

MCNAE 001322

potential criminal laws.

If we had been properly supported by Microsoft's resources when we made our HR report in March 2020, we would have been empowered to act differently to resolve this matter—pursuing criminal charges instead of waiting until 2021 to file a police report.  After a great deal of therapy (ongoing), my wife and I are better able to recognize our reactive, trauma-induced responses through those 8 months and the time since. In the darkest period, my wife and I were barely hanging on, living in cognitive dissonance while the individual continued to execute his power dynamic using manipulation, fear and gaslighting.  His predatory behavior took advantage of us, and his lies almost ripped our marriage apart, leading me down a dark path to suicidal thoughts during the holidays.

**Why formally complain now?**

Reporting this complaint now has not been an easy decision.  It would be easier to continue to be quiet and compliant, not ruffling feathers as this may also set me up for inspection or consequences for my actions in some way.  However, I felt it was essential to speak up about our current process and lack of systems to help employees report and gain support when it comes to topics of sexual assault, rape, and harassment.  HR needs a system in place that offers those who have been harmed on the job—or because of work-related relationships—well-trained, empathetic experts, and advocates to help through their time of crisis and trauma.  In hindsight, I wish I could have taken an extended period of time away from work, but I felt it was not appropriate based on the job requirements and expectations to avoid showing weakness.  My manager helped me take advantage of 6 weeks of Covid time off (June-July 2020), which helped greatly, and I am forever grateful to his empathy and patience – but even with this in mind, I broke up my time and returned to work halfway through to complete business planning and be present.

We reported these incidents to HR a month before Satya's April 2020 mail to all employees sharing updates about a new Employee Advocacy team being established for workplace sexual harassment.  I am unsure what would need to change to get the attention required—perhaps if I were more senior or female, HR would have done more to investigate these incidents, support me, call to check on my health, or inspect the violated vendor code of conduct policies.  Or, if I had taken my life in my darkest hour, would Microsoft have paid attention once the truth was uncovered that a work relationship caused enough harm to myself and marriage that I didn't see an alternative way out of a hostile work environment?  I raise this to point out the disconnect between what I believe is Microsoft's intent to be a supportive employer with zero tolerance for sexual assault and my own experience with HR's dismissiveness of my concerns.  I believe Microsoft needs and should do more to support and advocate for their employees regardless of gender, position, or technicality of "during work hours."

Regards,
Will

Will McNae
Partner Strategy Architect – Security, Compliance & Identity, US GPS
Security COE:  uspartnercoe@microsoft.com

EXHIBIT C

# STATEMENT 2

Will

**From:** Will McNae <will.mcnae@microsoft.com>
**Sent:** Wednesday, April 20, 2022 5:43 PM
**To:** Chris Maulden <chrismaulden@microsoft.com>
**Subject:** Re: Microsoft Corporation Shareholder Resolution Project

Chris,

I'm declining our phone call scheduled for Monday, instead I want to share a few thoughts.

In my April 12th email I specifically asked for an in-person meeting. Although not explicitly, I did ask for an opportunity to meet face to face during our phone call on April 15th.

After (roughly) two dozen phone calls with MS HR, CELA, and workplace investigations- I've remained at a standstill. There's been no forward positive movement, recourse, assistance, support, or consequence to the partner violating MS Partner Code of Conduct Agreement.

There were a few things you mentioned on our call that cause me to continue feeling dismissed and not heard which further supports my request for an in-person meeting to accomplish my goals:

You were more curious about my female co-worker's situation than asking probing questions to better learn about the harassment incident I encountered at Building 92. HR (STILL) never followed up with that particular incident to do any kind of internal investigation. I can't help but recognize the obvious gender conflict in this.

As I wrapped up sharing more details regarding the incident at building 92 where I stated that Mike Fitzgerald said to my face, during work hours, on work campus "I have given up drinking because I know if I was out at a bar and if someone were to set me off, I would destroy them".

I then asked you if that helped provide enough clarity and your response immediately following, "Yup that does. It pretty much aligns with what was in the Police report and gives some clarity, thank you. So I know you said you don't want to share with me any information about the co-worker who said they felt like they were or they experienced discrimination or harassment. I really want to revisit that".

Do you understand the disconnect? Or at least recognize how this continues to go sideways?
Regarding company resources and investigative policies, there was a 'misunderstanding of parameters' regarding my incident since it does not align to the criteria of a workplace issue. I believe the misunderstanding is on Microsoft's part. I have case notes and evidence to support why this is a workplace issue due to the first meeting taking place at a work event and the grooming behavior was enabled because of the work relationship. But again, no one from HR followed up with me to validate or verify. Instead, HR held onto third party heresy.

And finally, since this didn't involve Microsoft business, there is no obligation on Microsoft's part. Again, I do not agree with this.

My wife has been connected to Gretchen Carlson by a mutual friend. Gretchen has kindly taken Ronda under her wing. Gretchen unfortunately had been on the receiving end of sexual harassment/workplace harassment with Fox News. Her story is similar to my wife but I connect more with Gretchen regarding the broken systems within workplace investigations and HR. In transparency my wife was then introduced to a couple investigative reporters and has shared her story plus evidence proving these assaults were premeditated and calculated. Mike Fitzgerald

abused his work relationship with me to prey and assault my wife and harass then threaten me assuming I would be too afraid to speak up.

To close, I am requesting an in-person meeting so that I can properly discuss the following topics since the complexity still does not seem to be getting communicated:

1) Why was this incident not investigated and categorized as 'not involving Microsoft' and 'no harm done to the employee'?
2) Financial reimbursement for out-of-pocket counseling costs not covered by MS Cares which has been substantial on top of what we have to cover for legal costs; travel, childcare, and legal help.
3) Investigation into the broken Partner/Vendor Code of Conduct policies (specifically sexual assault/harassment and anti-corruption)
4) Short Term Disability Leave time not counting against me during the annual Rewards calculation since I took time to work on resolving this criminal case and will likely need to take more for the continued legal case.
5) Communication to SoftwareONE based on factual events regarding their CIO.
6) How we can create a victim's advocate program that supports victims? How can we move to reevaluate case by case? My wife isn't the first nor will she be the last on the receiving end of treatment life this but MS can't repeat what has been done to me and my family.

Please let me know whom I can be introduced to for a Redmond-based discussion. I am sharing additional parts of information so that your team can assess the magnitude of the work relationship damaging our personal relationships (below and attached).

Regards,
Will

Factual statements:

• Microsoft was made aware of allegations regarding SoftwareONE's CIO, Mike Fitzgerald, in February 2020 involving the Microsoft employee Will McNae and his wife, Ronda McNae.  Several SoftwareONE employees were made aware of such details, but an official report was not filed with John Mayes, Global HR.
• Due to the sexual assault and battery reports, which also included harassment on campus during work hours in February 2020, Microsoft removed our employee from the hostile work environment with SoftwareONE.
• Will's role at the time was Partner Technology Strategist.
• Ronda McNae first met Mr. Fitzgerald at a SoftwareONE event in Bellevue, WA in July 2019, when attending as a guest of Will McNae. As a result of getting to know Mr. Fitzgerald and his girlfriend, a friendship developed between July – November 2019.
• Microsoft has been made aware that the McNae's have filed Police reports in Miami, San Francisco, and Redmond.
• Microsoft's Partner/Vendor Code of Conduct was violated due to the allegation descriptions which involved sexual assault and battery, and anti-corruption, which do not uphold the representation of either company's code of conduct.
• Microsoft was informed that an NDA was signed between Mr. Fitzgerald and McNae's although Ronda McNae felt forced to sign under duress. Law enforcement communicated to the McNae's the NDA is not applicable considering it was established to conceal details of a crime and/or poor conduct.
• The effects of these allegations are still being felt by our employee while his wife Ronda McNae suffers with "Complex PTSD" symptoms that still affect her daily life.

EXHIBIT D

# STATEMENT 3

**Date : 5/2/2022 5:17:39 PM**
**From : "Will McNae"**
**To : "Chris Maulden" chrismaulden@microsoft.com**
**Cc : "Leslie Pickering" lesliep@microsoft.com**
**Subject : RE: Microsoft Corporation Shareholder Resolution Project**
**Attachment :**
**Microsoft_Partner_Code_of_Conduct_English.pdf;image002.png;image003.jpg;image004.jpg;ima**
**ge005.png;image006.png;image007.png;image008.png;**

Chris,
I also wanted to call out the **Professional Conduct** that is included in the Partner/Vendor Code of Conduct.  It is always actionable per our agreement with Partners.

## Professional Conduct

Microsoft Partners will conduct themselves in a professional manner at all times, helping Microsoft to create an inclusive, productive, respectful and professional environment, free from any forms of discrimination or harassment.

- **Inappropriate Language:** Microsoft Partners will not use any form of language which may be considered discriminatory, intimidating, harassing, threatening, abusive, sexually explicit, or otherwise offensive or inappropriate.

- **Treat Others with Fairness, Dignity and Respect:**  Microsoft will not tolerate, and Microsoft Partners must not engage in, any form of sexual or other harassment. Sexual harassment is unwelcome verbal or physical behavior based on sex and includes gender-based harassment of a person of the same gender.  Examples include unwelcome sexual advances or physical contact, sexual comments or inappropriate gender-based jokes, unwelcome romantic attention, offering a benefit or preferential treatment in exchange for sexual favors, sharing or displaying sexually explicit content and using sexually degrading words.  Other examples of harassment include comments, jokes or degrading words based on race, sex, national origin, religion, age, disability, gender identity or expression, marital status, medical condition, physical or mental disability, pregnancy, sexual orientation, political affiliation, union membership, veteran status or other protected characteristics or status.

- **Event Behavior:**  In any event sponsored or hosted by Microsoft or during which Microsoft Partners may interact with any Microsoft employees, agents, subcontractors or customers, regardless of location, Microsoft Partners must behave in a professional manner including responsible alcohol use and continued adherence to this Partner Code of Conduct.

Microsoft Partner Code of Conduct (2019)(English)                                                3

**From:** Will McNae
**Sent:** Monday, May 2, 2022 12:54 PM
**To:** Chris Maulden <chrismaulden@microsoft.com>
**Cc:** Leslie Pickering <lesliep@microsoft.com>

MCNAE 001317

**Subject:** RE: Microsoft Corporation Shareholder Resolution Project

Chris,

I am unable to respond to your last email due to restrictions – I wish to include my director on this thread.

In full transparency, your email has me a bit confused. Based on our phone conversation, you made no indication your role was to "further investigate" my case/HR report. Would you also be clear in your role and how this plays a part in my situation (besides researching benefits), please?

On our phone call you had stated, "*Our job is really to work with employees to navigate through concerns related to workplace behavior and policy violations*" and a reference to "the decision" being made by someone else.

Then, "*The misalignment is your situation doesn't fall within the parameters of being a workplace issue and is better handled by local authorities. If something happens in the workplace or in the course of work, that's where Microsoft has an obligation, we can actually get involved*".

Lastly, "*With the exception that occurred at the MS building, the other things that have occurred don't fall within MS's ability to have an impact.*"

Unfortunately, Microsoft continues to see my case and these crimes through a lens that works from a PR standpoint. The company couldn't be more wrong and off base. Oddly enough, my wife connected with a Special Agent from the FBI who helped crack the "Yosemite Murders" and in 2003 received the California Sexual Assault "Investigator of the year award". I decided to watch 20/20 to learn more about criminal profiling and how horrendus sex crimes are solved.

While it may be a surprise to you, it's not a surprise to either my wife or myself: Predators have a script. They have a process. A grooming period. It's calculated and premeditated. The sad part, my wife even gathered evidence to show MS however no one from HR was open to follow up and look at what she had compiled.

As an employee of MS, I am telling you, this man is a sexual predator that began grooming and exploiting my wife the moment he met her at a WORK EVENT and continued under the pretext of my work relationship. I fear for other female employees within our company that work alongside him and at this point the company continues to be a complicit bystander. The question I pose to Microsoft HR is "will you still claim "zero liability" once you learn more victims come forward?"

ASK: I am requesting an in-person meeting to continue this conversation and investigation. There should have already been an "in-person" follow-up discussion due to the nature and sensitivity of my report in 2020. I have had 2 years' worth of phone calls and I am confident that progress has not been made. Since I am a Redmond-based employee, meeting with a colleague of yours in one of the back-to-work buildings would make sense. I am willing to approach this with a line in the sand focused on going forward (and not on inspecting what was / wasn't done in the past).

You have a daughter. I have a daughter. We can't continue to turn a blind eye while women continue to be harmed otherwise, we miss the opportunity to make positive changes for them and potentially be looked at as complicit.

Sincerely,

MCNAE 001318

EXHIBIT E

# STATEMENT 4

To: Microsoft                                                                          July 13, 2021

I love working for Microsoft.  The people on my team are amazing, my manager and leadership team are empathetic, helping us achieve strategic results.  My LT recognizes me as a top performer and I consistently receive outstanding reviews and compensation awards.  I have been responsible for leading and influencing dozens of new technical solutions with Partners while helping one Partner add over $1billion in new customer revenues.  For all the pride and gratitude I have in my work at Microsoft, I am at a point where I can no longer stay silent.  I must formally make a complaint regarding Microsoft's dereliction of duty, which is at odds with the values Microsoft strives to represent and has resulted in significant harm to me and my family.

**Context:**
From 2018-2020, I worked closely with the CIO of a global software/services Partner.  This Partner represented a significant account and I was eager to build a positive relationship.  Ultimately, this individual took advantage of our unequal power dynamic to assault my wife and subject both of us to prolonged abuse and mistreatment over eight months.

I was responsible for influencing and winning technical mindshare in a heavily competitive environment against AWS and Google.  I felt deeply responsible for winning new business on our platforms and felt this individual's invitation to attend his IPO celebration weekend was imperative to maintain credibility, as well as bolster my influential relationship with him and their organization.  At the time, I was covering for the loss of my PDM who had been let go from Microsoft a month earlier.  Acting as both PTS and PDM induced enormous pressure to succeed and I was concerned about losing significant momentum if I were not present.

The CIO placed so much importance on joining him that when my flight couldn't arrive in time to join the dinner, I asked my wife to go in my place. I partially asked my wife to attend because I knew the CIO's girlfriend had also canceled her attendance at the last moment and I felt personally responsible to demonstrate support at the celebration.  This was not my family's first interaction with him; he had introduced his girlfriend to us and a friendship between the four of us had developed over the prior three months.  We felt the pressure of her canceled attendance and somehow believed we owed him to go in her place.  I was afraid of the negative repercussions towards me and Microsoft if we missed this event. My wife attended his dinner in my place, which ultimately resulted in her incapacitation.  While my wife was unable to give consent, the CIO sexually assaulted her.

My wife bears the trauma and emotional scars from the rape, but I continue to battle ongoing mental health issues including anxiety and depression, as well as stress from continuing to support this Partner organization until I could no longer stand it and reported to my Manager four months after the assault.

MCNAE 001275

**Complaint Summary:**

Microsoft HR should have (and could have) done more to support and protect me as an employee. A formal investigation was not kicked off internally or externally, although I had substantial evidence to prove that multiple policies within the Partner/Vendor code of conduct had been broken, alongside potential criminal laws.

If we had been properly supported by Microsoft's resources when we made our HR report in March 2020, we would have been empowered to act differently to resolve this matter—pursuing criminal charges instead of waiting until 2021 to file a police report.  After a great deal of therapy (ongoing), my wife and I are better able to recognize our reactive, trauma-induced responses through those 8 months and the time since. In the darkest period, my wife and I were barely hanging on, living in cognitive dissonance while the individual continued to execute his power dynamic using manipulation, fear and gaslighting.  His predatory behavior took advantage of us and his lies almost ripped our marriage apart, leading me down a dark path to suicidal thoughts during the holidays.

Because of the genuine relationship and deep level of trust established with my Manager, I felt brave enough in February 2020 to finally speak to him about these incidents.  He listened, asked questions, and with my permission contacted his Director regarding next steps.  Our Director was significantly empathetic and wanted to help as much as she could.  She followed the guidance of contacting HR on my behalf to ask for help.  She was provided what I believe was a scripted email to share with me stating Microsoft had "zero liability" in this matter.  There were no follow-up questions by HR/CELA to learn more about my situation.  No one contacted me directly for further details about my report. I believe HR too quickly made this decision based on secondhand conversations. My Manager and Director made the business decision to remove me from supporting this Partner and continued to check in with me frequently.

We provided an immense amount of detail to HR in March 2020 about this rape and sexual assault.  Unfortunately, HR chose to focus only on the rape incident and would not investigate the entirety of our allegations over the 8-month period communicating to us through my Director in writing "zero liability" since the rape happened to my wife and not me, the employee. Additionally, HR stated that it was out of scope because it didn't happen during work hours or at a work event as if the assault happened in a vacuum with no regard for the circumstances leading up to or following it.  We were left to fend for ourselves and fight this executive who had deep pockets and resources without the support of Microsoft, which was the basis for this relationship in the first place.  With an attorney's help, we were able to gain a resolution which covered counseling but forced us to sign an NDA in June 2020.

**Why formally complain now?**

I have been unable to fully comprehend how he had been using his importance and levels of influence to manipulate me and my wife using guilt, shame, gaslighting, fear of my job being terminated, and indirectly threatening me during a work event on our Redmond campus (unlawful harassment).  It is only by attending weekly counseling sessions, a week-long intensive marriage workshop, and a Trauma/Healing intensive workshop for my wife after her own suicidal

experience that 18 months later I can understand all of this.  When I inquired with HR in June 2021 asking about what had been documented in my HR or CELA file, it was to determine how open I could be discussing this matter post-NDA.  It is shocking to me that HR stated my file was empty.  Although there is email correspondence stating Microsoft had zero liability, it seems like I may not be able to prove we had a documented conversation with HR prior to June 15, 2020.  This is troubling especially since my management team followed protocols to report this to HR.

Reporting this complaint now has not been an easy decision.  It would be easier to continue to be quiet and compliant, not ruffling feathers as this may also set me up for inspection or consequences for my actions in some way.  However, I felt it was essential to speak up about our current process and lack of systems to help employees report and gain support when it comes to topics of sexual assault, rape, and harassment.  HR needs a system in place that offers those who have been harmed on the job—or because of work-related relationships—well-trained, empathetic experts, and advocates to help through their time of crisis and trauma.  In hindsight, I wish I could have taken an extended period of time off from work, but I felt it was not appropriate based on the job requirements and expectations to not show weakness.  My Manager helped me take advantage of the Covid time off, which helped greatly and I am forever grateful to his empathy and patience – but even with this in mind, I broke up my time and returned to work halfway through to complete business planning and be present.

We reported these incidents a month before Satya's April 2020 mail to all employees sharing updates about a new Employee Advocacy team being established for workplace sexual harassment.  I am unsure what would need to change to get the attention required—perhaps if I were more senior or female, HR would have done more to investigate these incidents, support me, call to check on my health, or inspect the broken vendor code of conduct policies.  Or, if I had taken my life in my darkest hour, would Microsoft have paid attention once the truth was uncovered that a work relationship caused enough harm to myself and marriage that I didn't see an alternative way out of a hostile work environment?  I raise this to point out the disconnect between what I believe is Microsoft's intent to be a supportive employer with zero tolerance for sexual assault and my own experience with HR's dismissiveness of my concerns.  I believe Microsoft needs and should do more to support and advocate for their employees regardless of gender, position, or technicality of being "during work hours."

I've been advised to file a complaint personally and directly with HR for formal documentation.

Sincerely,

Will McNae, Sr. Partner Technical Strategist – GPS, US, wimcnae@microsoft.com

MCNAE 001277

EXHIBIT F

# STATEMENT 5

Date : 7/15/2022 3:15:18 PM
From : "Will McNae"
To : "John Wylie" jww@johnwylielaw.com, "Jenny L. Martinez" jmartinez@munckwilson.com
Cc : "Mayes, John" John.Mayes@softwareone.com, "Ronda McNae" rondamcnae@gmail.com
Subject : RE: Release of NDA
Attachment : image001.png;image002.png;image003.png;image004.png;

Greetings Mr. Wylie and Ms. Martinez,

I am following up to help clarify several topics that, based on how I interpret the response below, will help explain and support why we have reached out to SoftwareONE.  I am sharing as a brief recap so that Ms. Martinez can have access to this information as we reach out in a posture of help.

We are not under any false pretense that SoftwareONE was included in the non-disclosure agreement.  The purpose for including the company was to provide an opportunity to influence doing the right thing. We have kept SoftwareONE updated as to progress and milestones with the hope of a response other than a defensive posturing.  Do I believe SoftwareONE directly did this to me and my wife? No.  Do I believe that one of your executives mis-used his role and mis-represented your brand during work hours and personal time?  Yes.

Mr. Fitzgerald met my wife, Ronda, during a SoftwareONE evening event in July 2019. He leveraged his executive role beyond the relationship with me to justify developing a direct friendship with my wife. He paid for all travel & entertainment expenses for my family to join he and his girlfriend to celebrate the accomplishment of SoftwareONE's IPO. A "consensual affair" was fabricated by Mr. Fitzgerald to hide his actions which have been documented in the 3 police reports.

Our goal is to continue supporting the criminal accountability process which started a year ago. Along our journey we have met significant leaders, advocates, and survivors of similar experiences. In the end, this was an opportunity to ask you to influence Mr. Fitzgerald to do the right thing, which is a worthy response in our opinion. It would keep the focus and attention on his actions which is what all of this is about.

For reference, I am including two data points:
SoftwareONE has it's own company policies which address anti-corruption and gifts:

**WE DO NOT TOLERATE CORRUPTION & BRIBERY**
Sometimes we all have to take a moment to consider our actions.

Extortion, bribery and corruption, including improper offers for payments to or from, or improper entertainment of employees or organizations are all unacceptable. **We will support all employees who may face losing a deal or an opportunity in order to avoid paying a bribe.** This includes accepting or giving improper payments from office holders, clients, business partners, suppliers or anyone to incite such behavior in order to achieve unfair advantages.

Please note that even making or accepting a promise for improper payments is deemed to be corrupt behavior, even if no payment is made in the end. If you are not sure prior to a meeting or event, don't go alone, bring along a fellow employee or your supervisor.

We do not accept any offers of improper payments.

**WE ACCEPT AND GIVE GIFTS ONLY IF APPROPRIATE**
Payments, benefits and gifts given to or by us to customers and third parties are a great way to build relationships, butwe all have a responsibility to follow the rules.

Any gift, payment or benefit given to you by one of our customers, partners or any third party that is appropriate and below CHF 100 does not require any pre-approval, unless you work in a subsidiary that has adjusted this threshold. You must gain approval to your leader if giving anything valued between 100 - 200 CHF. If you are unsure about anything you are being offered or if it exceeds 200 CHF, Click Here to Discover.

**Offering gifts, entertainment, or other business courtesies could be perceived as bribes.** Any items that are given to one of our third parties may require additional approvals. However, as a general rule please ensure that all gifts are infrequent, of reasonable value and are appropriate in the business situation. If you intend to give anything over CHF 100, please use the Gift or Invitation Disclosure tool.

Also, please be mindful of the fact that legislation in many countries considerably restrict the value of any gifts or invitations to be extended to public officials. If in doubt as to thresholds or as to who is considered a public official, please reach out to Legal & Compliance for advice or refer to our gift policy.

Microsoft has their own Partner Code of Conduct. I have included screenshots of the personal conduct section which addresses always acting professionally:

MCNAE 001353

Microsoft Partner Network

## Microsoft Partner Code of Conduct

Microsoft aspires to be more than just a good company – we want to be a great company. We are committed to our mission of **empowering every person and every organization on the planet to achieve more.** Achieving our mission isn't just about building innovative technology. Our mission reflects who we are as a company, how we manage our business internally, and how we work externally with customers, partners, governments, and suppliers.

## Professional Conduct

Microsoft Partners will conduct themselves in a professional manner at all times, helping Microsoft to create an inclusive, productive, respectful and professional environment, free from any forms of discrimination or harassment.

- **Inappropriate Language:** Microsoft Partners will not use any form of language which may be considered discriminatory, intimidating, harassing, threatening, abusive, sexually explicit, or otherwise offensive or inappropriate.

- **Treat Others with Fairness, Dignity and Respect:** Microsoft will not tolerate, and Microsoft Partners must not engage in, any form of sexual or other harassment. Sexual harassment is unwelcome verbal or physical behavior based on sex and includes gender-based harassment of a person of the same gender. Examples include unwelcome sexual advances or physical contact, sexual comments or inappropriate gender-based jokes, unwelcome romantic attention, offering a benefit or preferential treatment in exchange for sexual favors, sharing or displaying sexually explicit content and using sexually degrading words. Other examples of harassment include comments, jokes or degrading words based on race, sex, national origin, religion, age, disability, gender identity or expression, marital status, medical condition, physical or mental disability, pregnancy, sexual orientation, political affiliation, union membership, veteran status or other protected characteristics or status.

- **Event Behavior:** In any event sponsored or hosted by Microsoft or during which Microsoft Partners may interact with any Microsoft employees, agents, subcontractors or customers, regardless of location, Microsoft Partners must behave in a professional manner including responsible alcohol use and continued adherence to this Partner Code of Conduct.

Microsoft Partner Code of Conduct (2019)(English)                                                     3

We hope you can hear our purpose and intent.

Will

Will McNae
Partner Solution Architect – Security, Compliance & Identity, US GPS

MCNAE 001354

**From:** Ronda McNae <rondamcnae@gmail.com>
**Sent:** Friday, July 15, 2022 6:36 AM
**To:** John Wylie <jww@johnwylielaw.com>
**Cc:** Mayes, John <John.Mayes@softwareone.com>; Will McNae <will.mcnae@microsoft.com>; Jenny L. Martinez <jmartinez@munckwilson.com>
**Subject:** [EXTERNAL] Re: Release of NDA


Good morning,

I find it quite interesting that SoftwareONE stands behind "personal" failing to acknowledge the professional ties. A Executive used his position and work relationship for other motives. What's disheartening is the very fact Will and I spoke to a number of SoftwareONE employees prior to the agreement being signed. In fact, one employee begged to know "who" since she's also a female within the company worried about her own safety. Other individuals knew the extent, recognizing a work relationship was used to carry out this elaborate ordeal.

Was it ever communicated to you that I met Fitzgerald and roughly 60 of the employees at a work event put on by SoftwareONE? At this event, Fitzgerald shared details of his father that passed, past divorce, and showed pictures of his son? All false by the way. I shared with my husband and a Detective here in Seattle that Fitzgerald had been touching parts of my body in passing - too touchy for meeting me for the first time. I brushed it off thinking that was normal or he doesn't understand personal space. This was part of his process. Push the envelope to desensitize me to random touching.

As for your the second part of your email, I have documentation and the list of individuals we spoke to including written proof. No issue there.

SoftwareONE will do what it must to protect themselves, same here.

To add, I also have text messages where Fitzgerald speaks about telling Dieter what's going on. You see how absurd this is?

Ronda McNae

---

**From:** John Wylie <jww@johnwylielaw.com>
**Sent:** Friday, July 15, 2022 4:23 AM
**To:** Ronda McNae <rondamcnae@gmail.com>
>
**Subject:** Re: Release of NDA

*Ms. McNae-*

MCNAE 001355

# Declaration

# Exhibit B-3



**Legal Insurance**

**Sent via email to willmcnae@gmail.com**

November 20, 2023

ARAG®
500 Grand Avenue, Suite 100
Des Moines, IA· 50309
800-888-4184
515-246-8710 fax
ARAGlegal.com

William and Rhonda McNae
504 11th Place
Kirkland, WA 98033

RE:     **ARAG Case No. 3107432 – Defense of Civil Damage – Rhonda McNae**
          **ARAG Case No. 3266236 – Defense of Civil Damage – William McNae**
          **Member ID # 177202672170**

Dear William and Rhonda McNae:

ARAG is in receipt of William's request for coverage under your legal plan for defense of a new civil lawsuit, *Michael J. Fitzgerald v William McNae, In The Circuit Court of the 11th Judicial Circuit In And For Miami-Dade County, Florida, Circuit Civil Division, Case 2023-025855-CA-01.* Your plan provides paid in full coverage for attorney fees when using a Network Attorney. Any expenses incurred are your responsibility. If you elect to use a Non-Network attorney, then an Indemnity benefit is available where you will be reimbursed up to the benefit amount indicated in your plan for the defense of civil damages claims coverage. It is your responsibility to locate and retain an attorney. ARAG will not be assisting you in locating an attorney to handle this matter on your behalf.

With respect to the civil lawsuit *Michael J. Fitzgerald and Yaleny De Varona v. Rhonda McNae and William McNae, In The United States District Court Southern District of Florida, Miami Divisin, Case No. 1:22-cv-22171-JEM,* effective December 1, 2023, ARAG will no longer cover either of your Non-Network attorney fees for services being rendered in this lawsuit. For purposes of clarity, Brodsky Fotiu-Wojtowski, PLLC and Colson Hicks and Eidson, P.A. law firms are Non-Network Attorneys. If you are able to locate a Network Attorney who will accept your case, then your plan covers your Network Attorney fees as a paid in full benefit pursuant to the terms of your legal plan, with any expenses incurred being your responsibility. If you elect to use a Non-Network attorney, you are eligible to use your plan's Indemnity benefit. Again, ARAG will not be assisting you in locating an attorney to handle this matter on your behalf.

Sincerely,


ARAG Legal Department

# Declaration

# Exhibit B-4

# MS. GUSSIN SEEKING PRIVATE INFORMATION REGARDING LEGAL INSURANCE POLICY WITH ARAG LEGAL

**From:** Meredith J. Gussin <mjg@assoulineberlowe.com>
**Sent:** Tuesday, December 19, 2023 1:58 PM
**To:** Ronda McNae <rondamcnae@gmail.com>
**Cc:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Subject:** Federal Rule of Civil Procedure 26(e)

Dear Mrs. McNae,

Pursuant to Federal Rule of Civil Procedure 26(e), you have an ongoing obligation to supplement or correct prior disclosures or responses provided in this manner.  Your Supplemental Initial Disclosures dated October 4, 2022 indicate that you have an attorneys' fees insurance policy, which you provided to Plaintiffs at MCNAE 001718-001754. The policy period was January 1, 2022 to December 31, 2022.  Pursuant to your ongoing duty to supplement, please advise if your insurance policy was renewed for calendar year 2023 and if it has been renewed for calendar year 2024. If so, please provide us with copies of same.

Thank you,

**Meredith J. Gussin, Esq.**

**From:** Ronda McNae <rondamcnae@gmail.com>
**Sent:** Tuesday, December 19, 2023 5:07 PM
**To:** Meredith J. Gussin <mjg@assoulineberlowe.com>
**Cc:** Peter E. Berlowe <PEB@AssoulineBerlowe.com>
**Subject:** Re: Federal Rule of Civil Procedure 26(e)

Quick response - Yes, our insurance was renewed with the exact same coverage. I can let Will know this is needed and since he's the subscriber, I imagine his counsel will need to send this over.

-Ronda

## RE: Federal Rule of Civil Procedure 26(e)   Inbox ×

 

**Meredith J. Gussin** <mjg@assoulineberlowe.com>   Tue, Dec 19, 2023, 2:14 PM   ☆   ☺   ↩   ⋮

to me, Peter ▾

I appreciate your prompt response. Please forward copies of the 2023 and 2024 policy. You are a beneficiary of the policy and it is your duty to supplement, so it does not need to go through Ms. Casey.

Thank you-

**Meredith J. Gussin, Esq.**
**Litigation**

## Re: Federal Rule of Civil Procedure 26(e)  ⟫

**Ronda McNae** <rondamcnae@gmail.com>   Tue, Dec 19, 2023, 3:09 PM   ☆   ☺   ↩   ⋮

to Meredith, Peter ▾

The disclosures made with my prior counsel are complete and there is nothing to supplement. No additions or changes to our policy have been made. I understand I am only required to produce insurance policies "under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment." Fed. R. Civ. P. 26(a)(1)(A)(iv). Our ARAG policies do not satisfy this description. It's also my understanding this had been gratuitously provided.

-Ronda

# Declaration

# Exhibit B-5



**Legal Insurance**

<u>Sent via regular mail and email to willmcnae@gmail.com</u>

January 3, 2024

Mr. William McNae
504 11th Place
Kirkland, WA 98033

ARAG⁺
500 Grand Avenue, Suite 100
Des Moines, IA· 50309
800-888-4184
515-246-8710 fax
ARAGlegal.com

RE:    *Michael Fitzgerald v. William McNae*, Miami Dade County, Circuit Civil Div.
Our Insured:    **William McNae**
Certificate No.: C-10014
Member ID:    177202672170
Policy Term:    **January 1, 2023 through December 31, 2023**

Dear Mr. McNae:

ARAG Insurance Company hereby acknowledges receipt of a Complaint in an action brought or to be brought in the Circuit Court of Miami-Dade County in the action entitled, *"Michael Fitzgerald v. William McNae"* (the "Complaint"). We have been unable to identify a case number for this Complaint. You have tendered this Complaint to us for consideration of coverage under the above-referenced Legal Service Insurance Plan.

We now respectfully direct your attention to the following language of the insuring agreement of the Certificate referenced above (the "Certificate"):

*COVERAGE*

The Certificate provides that:
    *We will pay the attorneys fees of a **Network Attorney** for covered **legal services** provided to you resulting from an **insured event** which occurs after your **effective date** and while your **Certificate of Insurance** is in effect for the Legal Matters listed [in the policy].*

The Certificate also provides that:
    *You can select a **Non-Network Attorney** for covered **legal services** provided to you resulting in an **insured event** which occurs after your **effective date** and while your **Certificate of Insurance** is in effect, **we** will reimburse **you** for your attorneys fees for covered **legal services** up to the maximum amounts listed [in your policy].*

The Certificate further provides that *"[o]nly matters expressly listed are covered **benefits** and are paid as indicated below."*

The Certificate lists several available Legal Services benefits (the "Legal Services Benefits"), including *"Defense of Civil Damage Claims Legal Services"*. The Certificate defines this benefit as follows:

**Defense of Civil Damage Claims Legal services** *for an* **insured** *in defense against civil damage(s) claims, except claims involving the ownership or use of a motorized vehicle, claims which are covered by other insurance, or claims related to a felony charge.*

**Definitions**

The highlighted terms listed in above are defined terms in the Certificate and are defined in the Certificate as follows:

**Network Attorney** *"means an attorney with whom* **we** *have contracted to perform covered* **legal services** *in the United States for* **you** *and who has contracted with* **us** *to provide the specific covered* **legal services** *for which* **you** *are seeking assistance.*

**Insured Event** *is defined as "an event covered by this policy whose initiation date will be considered the earlier of the date (a) written notice of a* **legal dispute** *is ...received by you or ...(c) an attorney is hired by you."*

**Effective Date** *means "the date on which the* **policyholder** *enrolls the* **named insured** *and from which date premium has been paid for* **you***."*

**Certificate of Insurance or "Certificate"** *– the document provided by* **us** *to the* **named insured** *that describes the* **benefits** *and terms of the insurance policy.*

**Legal dispute** *means "means a disagreement between* **you** *and any other party regarding* **your** *legal rights."*

**Legal services** *means "time spent by your attorney and their office staff for your covered legal matters which does not include costs such as, but not limited to: filing fees, copy costs, mileage, title insurance, expert witnesses, mediator, home studies, transcriptionists, title search, and title abstracting."*

**Benefits** *are defined as "the Legal Coverages listed in...the benefits section of the Certificate of Insurance."*

**"We" "Us", and "Our"** *means ARAG Insurance Company.*

**"You"** *and* **"Your"** *means an insured*.

**EXCLUSIONS**

The Certificate outlines Exclusions from Legal Services coverage that ARAG Insurance Company is required to provide under the Certificate terms.  The Exclusions section provides that:

*We do not provide coverage for...*

*2. Legal Services arising out of a business interest, investment interests, employment matters, employee benefits, your role as an officer or director of an organization, and patents or copyrights.*

*3. Legal Services in class actions, punitive damages, personal injury, malpractice, court appeals or post judgments (settlement agreement signed by all parties, final binding arbitration, judgment issued by a court).*

*4. Legal Services deemed by us to be, in our reasonable belief you are not actively and reasonably pursuing resolution in your case."*

**Coverage Position**

It is the position of ARAG Insurance Company that, based on the information that you have provided to ARAG Insurance Company and as set forth in the Complaint, there is no coverage available to you for Legal Services Benefits under the Certificate for the claims outlined in Counts One through Six of the Complaint.

**Count One.**  It is the position of ARAG Insurance Company that, based on the information that you have provided to ARAG Insurance Company and as set forth in the Complaint, the claim outlined in Count One would be excluded from Legal Services Benefits coverage by Exclusion Two.  As noted above, Exclusion Two provides that ARAG Insurance Company excludes coverage for Legal Services Benefits for:

*2. Legal Services arising out of a business interest, investment interests, employment matters, employee benefits, **your** role as an officer or director of an organization, and patents or copyrights.*

It is the position of ARAG Insurance Company that, based on the information that you have provided and as set forth in the Complaint, Plaintiff's claims in Count One arise out of business interests involving Plaintiff and you, as an employee of Microsoft at the time of the claimed actions and communications, and Plaintiff, as an officer and representative of a Microsoft vendor, SoftwareONE, at the time of the claimed actions and communications. Count One would also be excluded because the claims made in Count One are related to employment matters arising out of workplace policies adopted and implemented by Microsoft, your former employer, along with communications among personnel and advisors of Microsoft, Software ONE and you.

It is also the position of ARAG Insurance Company that, based on the information that you have provided and as set forth in the Complaint, Plaintiff's claims in Count One arise out of a settlement agreement signed by all parties, including Plaintiff and you and would be excluded by Exclusion Three.  Exclusion Three excludes Legal Services Benefits coverage for:

*3. Legal Services in class actions, punitive damages, personal injury, malpractice, court appeals or post judgments (settlement agreement signed by all parties, final binding arbitration, judgment issued by a court).*

Plaintiff's claims in Count One arise from alleged breaches of a Confidential Settlement Agreement, dated June 15, 2020 among Plaintiff, Ronda McNae and you (the "Settlement Agreement").  The Settlement Agreement states that:

*WHEREAS, the McNaes contend that Fitzgerald caused physical injury and mental injury to them in Miami-Dade County, Florida as a result of Fitzgerald's alleged sexual conduct towards Ronda;*

*WHEREAS, for purposes of avoiding the time and costly expenses associated with litigation, and in the interest of economic expediency, the Parties desire to reach a settlement of all claims between and among themselves; and,*

*WHEREAS, the parties wish to resolve all disputes between and among them;*

Since the Settlement Agreement was entered into to resolve a personal injury dispute and is a settlement agreement signed by all parties, the Count One claims all involve a breach of the Settlement Agreement terms, the Certificate would exclude Legal Services Benefits coverage for Count One.

**Count Two Through Count Six.** It is the position of ARAG Insurance Company that, based on the information that you have provided to ARAG Insurance Company and as set forth in the Complaint, the claim outlined in Count Two through Count Six would be excluded from Legal Services Benefits coverage by Exclusion Two. As noted above, Exclusion Two provides that ARAG Insurance Company excludes coverage for Legal Services Benefits for:

*2. Legal Services arising out of a business interest, investment interests, employment matters, employee benefits, your role as an officer or director of an organization, and patents or copyrights.*

It is the position of ARAG Insurance Company that, based on the information that you have provided and as set forth in the Complaint, Plaintiff's claims in Count Two through Count Six arise out of business interests involving Plaintiff and you, as an employee of Microsoft at the time of the claimed actions and communications, and Plaintiff, as an officer and representative of a Microsoft vendor, SoftwareONE, at the time of the claimed actions and communications. Count Two through Count Six would also be excluded from Legal Services Benefits coverage because the claims made in these Counts are related to employment matters arising out of workplace policies adopted and implemented by Microsoft, your former employer, along with communications among personnel and advisors of Microsoft, Software ONE and you.

Additionally, ARAG Insurance Company reserves its rights with respect to determination of Legal Services Benefits coverage for Count Two through Count Six, based on the information that you have provided and as set forth in the Complaint, based on the availability of other insurance coverage. As noted above, Legal Services Benefits coverage for Defense of Civil Damage Claims Legal services is defined as:

***Defense of Civil Damage Claims Legal services*** *for an **insured** in defense against civil damage(s) claims, except claims involving the ownership or use of a motorized vehicle, claims which are covered by other insurance, or claims related to a felony charge.*

ARAG Insurance Company will not provide Legal Services Benefits coverage if the claims at issue "are covered by other insurance". The type of claims outlined in Count Two through Count Six are matters that may be covered by ordinary homeowners' insurance coverage. At this time, ARAG Insurance Company reserves its rights regarding the issue of whether this coverage benefit exception applies, pending any necessary additional investigation.

**Reservation of Rights.** Accordingly, we will not provide any Legal Service Benefits coverage for defense of allegations made against you as alleged in the Complaint. Your Certificate does not provide for indemnification for any claimed or determined damages or attorney's fees that you may incur because of this action. Through this reservation of rights, ARAG Insurance Company advises that any action taken by ARAG Insurance Company, its

agents, representatives or attorneys is not to be construed as nor does it constitute a waiver of any rights and/or defenses available to ARAG Insurance Company under the terms, conditions, provisions and exclusions of the above-referenced policy nor shall it bar ARAG Insurance Company from asserting at a later date, any rights or defenses that may be available now or in the future.

Our position relative to the coverage issues as described herein is based on the present allegations contained in the Complaint and on the facts as we know them. We are prepared to re-evaluate our position at any time there may be a material change in the allegations or in the facts.

Sincerely yours,

Jeff LeMay
Director, Customer Care and Claims

To the plan member: You are entitled to a full and fair review of a denied claim. You must submit a written request for review of your denied claim within 180 days of the date of this notice. Your request should include: date of request, printed name and address (and name and address of authorized representative if you have designated one), date of service in question and description of claim denied (claim number, if available). ARAG will provide a written response within 60 days of receipt of your request. Send your written request to: **ARAG Claims Center, 500 Grand Avenue, Suite 100, Des Moines, IA 50309.** If the decision on review is adverse and if you hve employer group coverage subject to ERISA, you have the right to bring a civil action under Section 502(1) of ERISA. Additional information regarding the review or appeal procedure is contained in your benefit plan document.

# Declaration

# Exhibit B-6

**IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**CIRCUIT CIVIL DIVISION**

**CASE NO: 2023-025855-CA-01**

DATE:  February 5, 2024

SUBJECT: SERVICE OF COURT DOCUMENT 2023-025855-CA-01

PURPOSE: Florida Statute § 57.105

TO:   Plaintiff Michael Fitzgerald and Counsel Peter Berlowe and Meredith Gussin.

  William McNae, self-represented pro se litigant, is seeking sanctions under section 57.105 [1]. Mr. McNae demands the plaintiff withdraw their complaint. Plaintiff Fitzgerald has a 21-day period, known as the "safe harbor" period, to withdraw the baseless tort claims.

  The federal court held twice already that these tort claims are entirely duplicative of the breach of contract claim and therefore barred by the independent tort claims doctrine. Plaintiff has made the same pleading errors that the federal court seized upon in its prior ruling: in addition to alleging the same facts and conduct, he continues to affirm the existence of the contract and alleges the facts making up the breach of contract, then incorporates by reference those allegations in each tort claim. Because Plaintiff has twice been told that those precise tort claims are barred by the independent tort claims doctrine, the pleading is frivolous and meritless. Additionally, the court previously rejected Plaintiff's contention that the tort claims can be alleged in the alternative.

---

[1] 1. Robinson v. Alutiq-Mele, LLC
United States District Court, S.D. Florida.March 30, 2009643 F.Supp.2d 13422009 WL 2424653
"...3. Section 57.105. Florida Statute section 57.105 provides for the award of a reasonable attorneys' fee against both the losing party and his counsel on any claim or defense that the losing party or his counsel knew was not supported by material facts or was not supported by existing law. Fla. Stat. S 57.105(1). Like Rule 11, section 57.105 contains a safe harbor provision that requires that "(a) motion by a party seeking sanctions under this section must be served but may not be filed with or presented to the court unless, within 21 days after service of the motion, the challenged paper, claim defense, contention, allegation, or denial is not withdrawn or appropriately corrected." Fla. Stat. S 57.105(4)."

If, after 21 days, the Plaintiff has not withdrawn the claim, Mr. McNae will file a motion with the court seeking sanctions under § 57.105, including costs and fees.

Regards,

William McNae

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via email upon all parties listed on the Service List below, on February 5, 2024.

### SERVICE LIST

Peter E. Berlowe, Esq.
Meredith Gussin, Esq.
Assouline & Berlowe, P.A.
Miami Tower
100 SE 2nd Street, Suite 3105
Miami, FL 33131
Tel: 305-567-5576
Fax: 305-567-9343
peb@assoulineberlowe.com
mjg@assoulineberlowe.com
*Counsel for Plaintiffs*

Stephanie Casey, Esq.
COLSON HICKS EIDSON, PA
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Tel: 305-476-7400
Fax: 305-476-7444
scasey@colson.com
*Counsel for William McNae in Federal Court case (only)*

By: *William McNae*
William McNae
Pro se Defendant

2

# Declaration

# Exhibit B-7

Filing # 191884957 E-Filed 02/13/2024 04:22:34 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO: 2023-025855-CA-01

MICHAEL J. FITZGERALD, individually,

                    Plaintiff,

v.

WILLIAM MCNAE, individually,

                    Defendant.

_____/

## AMENDED COMPLAINT (Amendment as of Right)

Plaintiff, MICHAEL J. FITZGERALD ("Fitzgerald" or "Plaintiff"), files this Amended Complaint against Defendant, WILLIAM MCNAE ("McNae" or "Defendant"), and alleges:

1.      This is an action for damages arising out of Defendant's breach of a contract (the "Confidential Settlement Agreement") with Plaintiff Fitzgerald.[1]

## PARTIES, JURISDICTION AND VENUE

2.      Plaintiff Fitzgerald is a British citizen who resides in England.

3.      Defendant McNae is a United States citizen who is domiciled in Washington State.

4.      This Court has subject matter jurisdiction over this action because it involves an actual and ongoing controversy that exceeds $50,000 plus attorneys' fees and costs. In particular, the amount in controversy is at least $657,228.00 in economic damages due as a result of natural and consequential damages to Plaintiff as a result of Defendant's breaches of the contract at issue

---

[1] Plaintiff reserves the right to reassert his defamation and tort claims in the event that the Confidential Settlement Agreement at issue is deemed unenforceable and/or void by this Court.

ASSOULINE & BERLOWE, P.A.
Miami Tower • 100 SE Second Street, Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576

*Fitzgerald v. William McNae*
Case No. 2023-025855-CA-01

in this case.

5.     This Court has personal jurisdiction over Defendant pursuant to Florida Statute §48.193 because he has breached a contract in this state by failing to perform acts required by the Confidential Settlement Agreement to be performed in this state.   Furthermore, this Court has jurisdiction over Defendant pursuant to Florida Statute §685.102 because the Confidential Settlement Agreement has a Florida choice of law provision and Defendant has therefore agreed to submit to the jurisdiction of the courts of this state.

6.     Venue in this district is proper because the underlying events related to the Confidential Settlement Agreement occurred in Miami-Dade County, Florida, and Defendant agreed in the Confidential Settlement Agreement that Miami-Dade County, Florida was the exclusive venue for disputes arising out of the agreement.

7.     The Plaintiff has retained the law firm Assouline & Berlowe, P.A., and has agreed to pay the firm its reasonable attorneys' fees and costs in conjunction with representing the Plaintiff in this action.

8.     All conditions precedent to the maintenance of this action have occurred, have been performed, or have been waived.

## FACTS

9.     Fitzgerald and Defendant (along with Defendant's wife, Ronda McNae), both with the aid of qualified attorneys, entered into a Confidential Settlement Agreement on or about June 15, 2020.  A true and correct copy of the Confidential Settlement Agreement is attached hereto as **Exhibit A**.

10.     In accordance with the Confidential Settlement Agreement, Defendant and Fitzgerald were required to keep the terms and conditions of the Confidential Settlement

**ASSOULINE & BERLOWE, P.A.**
Miami Tower • 100 SE Second Street, Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576

*Fitzgerald v. William McNae*
Case No. 2023-025855-CA-01

Agreement confidential.  See Exhibit A, ¶16.

11.     In accordance with the Confidential Settlement Agreement, Defendant was to have no contact with Fitzgerald's then-employer, SoftwareONE.  See Exhibit A, ¶4B.

12.     In accordance with the Confidential Settlement Agreement, Defendant was not supposed to speak or write about Fitzgerald, his nationality, his employer, his country of citizenship, his location of residence, his employer, his job function, his job title, his profession, or reference dates, locations or other persons present at any of the events related to the underlying dispute. See Exhibit A, ¶4A.  Defendant was also prohibited from referring to Fitzgerald indirectly. Id.

13.     Under the Confidential Settlement Agreement, Fitzgerald paid a sum of money to Defendant, and Fitzgerald and Defendant each released claims against one another.  See Exhibit A, ¶¶3, 13.

14.     Under the Confidential Settlement Agreement, Defendant and Fitzgerald agreed not to disparage each other by written or oral word, gesture, or other means, nor would they make disparaging or negative comments about each other, to any person or entity.  See Exhibit A, ¶17.

15.     Fitzgerald has complied with all terms and conditions of the Confidential Settlement Agreement.

16.     Defendant breached several provisions of the Confidential Settlement Agreement by contacting SoftwareONE (Fitzgerald's then-employer) on July 15, 2022 and by contacting Microsoft (Defendant's employer who used to do business with SoftwareONE) on April 12, 2022; April 20, 2022; May 2, 2022 and July 13, 2022.  Defendant also breached the Confidential Settlement Agreement by contacting others about the existence of the Confidential Settlement Agreement and by disparaging Fitzgerald to others.

ASSOULINE & BERLOWE, P.A.
Miami Tower • 100 SE Second Street, Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576

*Fitzgerald v. William McNae*
Case No. 2023-025855-CA-01

17.     Defendant's communications constitute breaches of the following provisions of the Confidential Settlement Agreement:

- ¶4B: prohibition against contacting SoftwareONE;

- ¶16: requirement to keep the terms and conditions of the Confidential Settlement Agreement confidential;

- ¶4A: prohibition from speaking or writing about Fitzgerald directly or indirectly, and,

- ¶17: prohibition from disparaging Fitzgerald to others.

See Exhibit A.

18.     Plaintiff has been damaged as a result of Defendant's breaches both personally and professionally.

19.     Plaintiff has hired the undersigned law firm to prosecute its claim and is obligated to pay it a reasonable fee for its services. Pursuant to Paragraph 23 of the Confidential Settlement Agreement, Plaintiff is entitled to be reimbursed for his attorneys' fees and all costs incurred relating to said enforcement. See Exhibit A, ¶23.

## COUNT I – BREACH OF CONTRACT

20.     Plaintiff Fitzgerald adopts by reference, as if set out fully and completely in this Count, Paragraphs 1-19 of this Complaint.

21.     The Confidential Settlement Agreement is a binding contract under Florida law.

22.     Defendant breached the Confidential Settlement Agreement by:

A.     Not keeping the Confidential Settlement Agreement confidential as required;

B.     Contacting Fitzgerald's then-employer, SoftwareONE;

C.     Disclosing the existence of the Confidential Settlement Agreement to

4

**ASSOULINE & BERLOWE, P.A.**
Miami Tower • 100 SE Second Street, Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576

Fitzgerald's then-employer, SoftwareONE;

D.    Contacting Defendant's employer, Microsoft, and disclosing the existence of the Confidential Settlement Agreement and the underlying dispute to Microsoft;

E.    By referring to Fitzgerald directly by name and/or likeness, being, nationality, country of citizenship, location of residence, employer, job function, jot title, profession, or in reference to dates, locations, or other persons present;

F.    By disparaging, lying and intentionally seeking to harm Fitzgerald both professionally and personally by wrongfully and falsely accusing him of a crime to others; and

G.    By working in concert with his wife, Ronda McNae, to commit her breaches of the Confidential Settlement Agreement and her lies to Fitzgerald;

23.    Plaintiff has been damaged by Defendant's breaches of the Confidential Settlement Agreement. Such damages include the loss of Plaintiff's job at SoftwareONE due to Defendant's false accusations that Plaintiff assaulted Defendant's wife which led to a prolonged internal investigation into Fitzgerald at SoftwareONE.  The internal investigation resulted in Fitzgerald not being able to work in his chosen profession, loss of business contacts and relationships, damage to his professional reputation, loss of stock options, and earned bonuses, among other things. These damages were natural and foreseeable consequences of Defendant's multiple breaches of the Confidential Settlement Agreement.

24.    Pursuant to Section 23 of the Confidential Settlement Agreement, Plaintiff is entitled to be reimbursed for his attorneys' fees and costs.

**ASSOULINE & BERLOWE, P.A.**
Miami Tower • 100 SE Second Street, Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576

*Fitzgerald v. William McNae*
Case No. 2023-025855-CA-01

**WHEREFORE**, Plaintiff demands judgment against Defendant, William McNae, for compensatory damages in the amount of $657,228.00, plus post-judgment interest, and continuing until paid in full, attorneys' fees and costs, and for such other and further relief as this Court deems just and proper.

Date: February 13, 2024                     Respectfully submitted,

**ASSOULINE & BERLOWE, P.A.**
Miami Tower
100 SE 2nd Street, Suite 3105
Miami, Florida 33131
Telephone: 305-567-5576
Facsimile: 305-567-9343

By:*/s/ Peter E. Berlowe*
Peter E. Berlowe
Florida Bar No. 143650
peb@assoulineberlowe.com
Meredith J. Gussin
Florida Bar No. 0512303
mjg@assoulineberlowe.com
*Attorneys for Plaintiff Michael Fitzgerald*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via email upon all parties listed on the Service List below on this 13th day of February 2024.

By:      */s/ Meredith J. Gussin*
Meredith J. Gussin

## SERVICE LIST

William McNae
504 11th Place
Kirkland, WA 98033
prose.wmcnae@gmail.com

EXHIBIT A

### Confidential Settlement Agreement

**THIS SETTLEMENT AGREEMENT** (the "Settlement Agreement" or the "Agreement") is made and entered this __15th__ day of June 2020, by and among MICHAEL J. FITZGERALD ("Fitzgerald"), RONDA MCNAE ("Ronda") and WILL MCNAE ("Will") with Ronda and Will collectively referred to as the "McNaes," and Fitzgerald, Ronda, and Will collectively referred to as the "Parties";

### RECITALS

**WHEREAS,** Ronda and Will are a married couple;

**WHEREAS,** Fitzgerald is a single male;

**WHEREAS,** the McNaes contend that Fitzgerald caused physical injury and mental injury to them in Miami-Dade County, Florida as a result of Fitzgerald's alleged sexual conduct towards Ronda;

**WHEREAS,** for purposes of avoiding the time and costly expenses associated with litigation, and in the interest of economic expediency, the Parties desire to reach a settlement of all claims between and among themselves; and,

**WHEREAS,** the parties wish to resolve all disputes between and among them;

**NOW THEREFORE** in consideration of the mutual covenants and promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to be legally bound by the following terms and conditions, which constitute full settlement of any and all disputes between them.

1. **RECITALS.** The Parties acknowledge that the "WHEREAS" clauses preceding paragraph 1 are true and correct, and are incorporated herein as material parts of this Agreement.

2. **NO ADMISSION OF LIABILITY.** The Parties agree to amicably settle all disputes between and among them. The Parties understand that this Agreement is in full and complete compromise of all disputed claims, both as to questions of liability and damages, including any claims for punitive damages, without an admission of liability or any wrongdoing by any of the Parties, any such liability or wrongdoing being expressly denied by each of the Parties.

3. **CONSIDERATION.** In consideration of the execution of this Agreement and the promises herein contained, the Parties agree to the following:

    A. <u>Payment of Settlement Funds.</u>  On or before June 19, 2020, Fitzgerald agrees to remit payment in the amount of Ninety-Seven Thousand Dollars and 00/100 cents ($97,000.00) to Ronda McNae and remit payment in the amount of Ten Thousand Dollars and 00/100 cents to Will McNae (collectively the "Settlement Funds"). The Settlement Funds to

Ronda's Initials: _____  Will's Initials: _____  Fitzgerald's Initials: _____

MCNAE 000001

Ronda McNae are paid in consideration of the physical and mental injuries she claims, and the settlement funds to Will McNae are in consideration of his loss of consortium claims due to the physical and mental injuries suffered by his wife Ronda. The Settlement Funds shall be remitted by wire to the Max Meyers Law PLLC Trust Account with the following wiring instructions:

> MAX MEYERS LAW PLLC IOLTA TRUST ACCOUNT WIRE INTRUCTIONS.
> Banner Bank - ABA Routing #██████1076 and Account #██████5818

    **4.**    **NON-MONETARY TERMS.** The Parties agree to the following non-monetary terms:

        A.    The McNaes shall remove any prior or current internet posts that reference Fitzgerald by name. The McNaes may speak or write generically about their life events, but in speaking or writing about their life events, the McNaes cannot refer to Fitzgerald's name, likeness, being, nationality, country of citizenship, location of residence, employer, job function, job title, profession, or reference to dates, locations, or other persons present. For instance, Ronda cannot name six people at an event, plus and unnamed person, so that the six people will know who the unnamed person is by process of elimination. Thus, it shall be a breach of this Agreement for the McNaes to indirectly refer to Fitzgerald in a way the McNaes could not do directly.

        B.    The McNaes shall not contact Fitzgerald's employer. If Mr. Fitzgerald's employer contacts either of the McNaes, the McNaes shall respond, "the matter has been resolved and I cannot speak any more about it," or words to that effect.

        C.    Notwithstanding the confidentiality provision in Section 16, below, the Parties may continue discuss the matter with their respective mental health professionals, but will advise the mental health professionals of this existence of this Agreement and those mental health professionals must follow this Agreement, as well.

        D.    The Parties agree to minimize contact upon execution of this Agreement, and they agree to limit such contact as to be only such contact necessary to enforce the terms of this Agreement, with such contact preferably being by the Parties' respective attorneys.

    **5.**    **REPRESENTATIONS AND WARRANTIES.** In making and executing this Agreement, the Parties represent, warrant and agree as follows:

        A.    The Parties have had an opportunity to seek independent legal advice with respect to their rights and asserted rights arising out of the matters in controversy and with respect to the advisability of executing this Agreement.

        B.    The Parties have made such investigation of all matters pertaining to this Agreement as they deem necessary, and do not rely on any statement, promise or representation by the other Parties hereto with respect to this matter.

    **6.**    **NO CHALLENGE TO SETTLEMENT.** The Parties agree that they will take no action, including, but not limited to the institution of a lawsuit or administrative claim, to

Ronda's Initials: _____    Will's Initials: _____    Fitzgerald's Initials: _____

MCNAE 000002

challenge any provision of this Agreement or regarding the original matter in controversy.

**7.    NO ADMISSION.**  Neither the negotiation nor the execution of this Agreement, nor any of its provisions, are to be construed as an admission by any of the Parties hereto, nor by their respective attorneys, or trustee regarding the truth of any matter alleged relating to the matter of controversy.

**8.    INTEGRATION.**    This Agreement constitutes a single, integrated written contract expressing the entire Agreement between the parties.  There are no other Agreements, written or oral, expressed or implied, between the parties, except as set forth in this Agreement.

**9.    SEVERABILITY.**    Should any part, term or provision of this Agreement be decided by the courts to be illegal, unenforceable or in conflict with any state or federal law or any other applicable law, the validity and enforceability of the remaining portions of this Agreement shall not be affected thereby.

**10.    DOCUMENT PREPARATION.**    If it becomes necessary for any reason to construe this Agreement as permitted by the Rules of Evidence of the State of Florida, this Agreement will be construed as being jointly prepared and written. The Parties agree that the terms and conditions contained herein have been negotiated, renegotiated and considered several times by the parties. The fact that one party or the other prepared the actual final draft of this Agreement shall not be construed as having created any ambiguity.  Should it become reasonably necessary for the parties to prepare additional documents to carry out the intent of this Agreement, each Party agrees to cooperate in the preparation, execution and delivery of same.

**11.    BINDING EFFECT.**  This Agreement shall be binding upon and inure to the benefit of the parties, and their respective successors, heirs, personal representatives and assigns.

**12.    NO WAIVER.**    No waiver of any breach of any term or provision of this Agreement shall be construed to be, nor shall be, a waiver of any other breach of this Agreement. No waiver shall be binding unless in writing and signed by the party waiving the breach.

**13.    MUTUAL GENERAL RELEASE.**  The Parties agree that they each on their own behalf and on the behalf of any heirs, assigns, beneficiaries, past or future affiliates, shareholders, parents or subsidiaries, attorneys, sureties or insurers, employees, officers, directors, agents, trustees, and any other person or entity bearing a legal relationship as a predecessor or successor in interest and anyone claiming any rights derived from any of them, forever release, discharge, and hold each other and each other's past, present or future affiliates, shareholders, parents or subsidiaries, attorneys, sureties or insurers, employees, officers, directors, agents, and any entity bearing a legal relationship as predecessor or successor in interest, harmless of, and from, any all claims, causes of action, suits, debts, agreements, promises, demands, liabilities, contractual rights and/or obligations, or claims arising in tort, or of whatever nature, in law or in equity, arising out of, or related to, the direct claims asserted and any other claims that could be asserted, any counterclaims, any third-party claims, and any claims to attorneys' fees and cost, whether or not the claim was raised, or could have been raised. The Parties agree that this Release is not intended as an admission of any wrongdoing or liability on the part of any Party, and that this Release is not

Ronda's Initials: _____  Will's Initials: _____  Fitzgerald's Initials: _____

MCNAE 000003

admissible as evidence in any proceeding as an admission of liability. The Parties warrant that they have not made any assignment of any right, claim, or cause of action covered by this Release to any other person, corporation or other legal entity.

**14. GOVERNING LAW.** This Agreement shall be deemed to be made and entered into in the State of Florida, and shall in all respects be interpreted, enforced and governed under the laws of Florida, without giving effect to the conflict of laws principals of Florida law. The Parties agree that venue for any litigation brought to enforce this Agreement shall lie exclusively in any court of competent jurisdiction in Miami-Dade County, Florida.

**15. EXECUTION.** This Agreement may be made effective by means of facsimile signatures executed on several identical counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**16. CONFIDENTIALITY.** The Parties warrant that they have not and will not disclose, communicate, disseminate and/or publicize, or cause or permit to be disclosed, communicated, disseminated or publicized the existence of or terms and conditions of this Agreement to any person, business, organization, corporation, association, governmental agency, except as follows: (1) to the extent necessary to report income to appropriate taxing authorities; (2) to their respective attorneys and accountants; (3) in response to requirements of law or a subpoena issued by a state or federal court or governmental agency, provided, however, that notice of receipt of such judicial order or subpoena immediately be communicated to counsel for the opposing party telephonically. The McNaes further acknowledge and agree that this provision is a material inducement to the Fitzgerald's agreement to pay the Settlement Funds. Therefore, the McNaes agree and acknowledge that any violation of this section or disclosure of any of the terms of the Settlement Agreement beyond the exceptions identified above in this section shall constitute a material breach of this Agreement.

**17. NON-DISPARAGEMENT.** The Parties agree that they will not disparage each other, by written or oral word, gesture, or any other means, nor will they make any disparaging or negative comments about each other, to any person or entity.

**18. NO FURTHER OBLIGATIONS.** The Parties agree that, aside from the obligations set forth in this Agreement, no party owes any other party any monies or benefits.

**19. BINDING NATURE OF AGREEMENT.** This Agreement shall be binding upon each of the Parties and upon their respective heirs, administrators, representatives, executors, successors and assigns, and shall inure to the benefit and/or detriment of each party and to their respective heirs, administrators, representatives, executors, successors and assigns.

**20. MODIFICATION OF AGREEMENT.** This Agreement may be amended, revoked, changed, or modified only upon written agreement executed by all Parties. No waiver of any provision of this Agreement will be valid unless it is in writing and signed by the party against whom such waiver is charged.

**21. SELECTIVE ENFORCEMENT.** The Parties agree that the failure of any party to enforce or exercise any right, condition, term or provision of this Agreement shall not be

Ronda's Initials: _____ Will's Initials: _____ Fitzgerald's Initials: _____

MCNAE 000004

construed as or deemed to be a waiver or relinquishment thereof, and the same shall continue in full force and effect.

**22.    ENTIRE AGREEMENT.**   This Agreement sets forth the entire agreement between the Parties hereto, and fully supersedes any and all prior agreements or understandings between the Parties hereto pertaining to the subject matter hereof.

**23.    ATTORNEYS' FEES.**     In connection with any litigation arising out of this Agreement or in any way related to this Agreement, the prevailing party shall be entitled to recover all costs incurred including, but not limited to, its reasonable attorneys' fees at any level (trial, appeal, bankruptcy, administrative), including fees spent in litigation over entitlement or amount of such fees.

**24.    HEADINGS.** The headings of the provisions herein are intended for convenient reference only, and the same shall not be, nor deemed to be, interpretative of the contents of such provision.

**25.    COUNTERPARTS AND FACSIMILE SIGNATURES.** This Agreement may be executed in two or more counterparts, each of which may be considered an original, and all of which together shall constitute one and the same document.  Facsimile or scanned copies of signature pages shall be treated as original signature pages.

**IN WITNESS WHEREOF**, this Agreement has been executed by the Parties as of the Effective Date.

_____    6-15-2020        _____    6-15-2020
Ronda McNae                Date             Will McNae                 Date


_____    6-16-2020
Michael Fitzgerald         Date
Allan D. Lederman, Trustee

Ronda's Initials: ___   Will's Initials: _WM_   Fitzgerald's Initials: ___

MCNAE 000005

# Declaration

# Exhibit B-8

This timeline from the Plaintiff's expert witness, DiTomasso (Exhibit 173), reflects inaccuracies and omissions that are critical to the context of the case. Specifically:

1. **Misrepresentation of Events**:
   - The timeline claims that I reported to the police before signing the settlement agreement, which is factually incorrect. My police reports in Miami and San Francisco were filed after the settlement agreement, contrary to the claims made in this exhibit.
   - The timeline omits essential context about why reporting was delayed, including systemic barriers, emotional trauma, and manipulation by Plaintiff Michael Fitzgerald.

2. **Self-Serving Narrative by Opposing Counsel**:
   - Counsel's reliance on this incomplete timeline demonstrates a clear attempt to create a narrative favorable to her client while disregarding the factual truth. The timeline's inaccuracies serve counsel's strategy to discredit my credibility and manipulate the Court into perceiving delayed reporting as inconsistent or opportunistic.

3. **Key Missing Information**:
   - The timeline omits critical details about Fitzgerald's manipulation, coercion, and the psychological toll of his actions, which delayed my ability to report the assaults to law enforcement.
   - It also fails to include the details of my therapy, where my assault was confirmed, and the events that led to my understanding of the assaults' impact.

4. **Counsel's Use of This Timeline**:
   - This timeline has been weaponized by opposing counsel to frame my delayed reporting as a credibility issue, despite the fact that the delay is consistent with the experiences of trauma survivors. Counsel uses this as part of a broader strategy to undermine my claims and cast doubt on the validity of my experiences.

I respectfully request that the Court recognize the inaccuracies in this timeline and consider the omitted context when evaluating the credibility of Plaintiffs' claims and the tactics employed by opposing counsel.

MJG Notes 9/27/2022

**Fitzgerald/McNae Timeline and Summary of McNae production**

7/2019: Ronda meets Mike

8/2019: meet again in Seattle

8/2019: trip to Tulum with Mike and Patrice

9/2019: Mike stayed with Ronda and Will for 2 nights

10/18/2019: Miami for Software One's IPO and first sexual affair

11/2-4/2019: Mike and Ronda meet in San Francisco and have second sexual affair

11/5/2019: Ronda emails Mike about their "relationship"

11/15/2019: Ronda tells Will about affair

12/2019: Ronda attends "healing" workshop/admits Will's idea that there was no consent and she should file charges

2/2020: Ronda claims she is pregnant, begins to communicate with Mike claiming he needs to buy her a "push" present, new clothes, pay for her therapy, marriage counseling, etc. Start negotiating amount that he is going to pay her

2/29/20: Ronda states that her therapist confirms she was assaulted by Mike

2/2020- 3/2020: Ronda texts extensively with Patrice and Yaleny; admits lied about being pregnant and wants Mike to pay for her therapy and couples counseling

4/2020: Ronda files police reports in Miami and SF

4/15/2020: Ronda hires Max Meyers Esq.

6/19/2020 : Parties enter Settlement Agreement

Various Instagram posts, emails to Microsoft and Software One, articles on Medium.Com in breach of settlement agreement

7/11/2022 : Ronda emails PEB to rescind settlement agreement

7/14/2022: Complaint filed against McNae for breach of settlement agreement

THEORY: Sexless marriage; fell for the idea of Mike and the promises he gave her, but after SF when he distanced himself, she became depressed and introspective, started to question her already strained marriage. Her and Will became separated, she went to intensive therapy. After that, Will suggested that the affair sounded like the Stanford Rape Case and suggested that if she was so drunk in Miami and didn't even recall sleeping with him (Will), how could she give consent to Mike. She expresses this

1



**EXHIBIT**

**DiTomasso 173**

7/11/23  LWS

theory to Mike, Patrice and Yaleny to "build" her case, has her therapist confirm it was assault in/around February 2020; negotiates with Mike for him to pay for her and Will's therapy, enter contract and he pays. During the following time, they try to file claims with Microsoft to no avail. What happened after that they are now going public? What is she looking for? Fame? Regret does not equal rape.

# Declaration

# Exhibit B-9

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

Case No. **1:22-cv-22171-JEM**

**MICHAEL J. FITZGERALD,**
**individually,**

                    **Plaintiff,**

**v.**

**RONDA MCNAE, individually,**

                    **Defendant.**

_____/

## PLAINTIFF'S NOTICE OF HEARING

      **PLEASE TAKE NOTICE** that the undersigned has set for hearing before **Honorable Judge Jacqueline Becerra,** at James Lawrence King Federal Justice Building, 99 N.E 4th Street, 10th Floor, Miami, Florida 33132 on **Wednesday, October 19, 2022, at 11:00 a.m.** the parties' dispute regarding Defendant's Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action to: Microsoft Corporation and SoftwareOne, Inc.

*Fitzgerald vs. McNae*
**CASE NO: 1:22-cv-22171-JEM**

### Certificate of Good Faith Conference

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movant has conferred with all parties affected by the relief sought in this motion in a good faith effort to resolve the issues but has been unable to resolve the issues.

Dated: October 17, 2022                              Respectfully submitted,

**ASSOULINE & BERLOWE, P.A.**
Miami Tower
100 SE 2nd Street, Suite 3105
Miami, Florida 33131
Telephone: 305-567-5576
Facsimile: 305-567-9343

By: */s/ Peter E. Berlowe*
**Peter E. Berlowe**
**Florida Bar No. 143650**
peb@assoulineberlowe.com
*Attorneys for Plaintiff Michael J. Fitzgerald*

ASSOULINE & BERLOWE, P.A.
Miami Tower, 100 S.E. 2nd St., Suite 3105, Miami, Florida 33131 • Telephone: (305) 567-5576 • Facsimile: (305) 567-9343

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. **1:22-cv-22171-JEM**

**MICHAEL J. FITZGERALD,**
**individually,**

                              **Plaintiff,**

**v.**

**RONDA MCNAE, individually,**

                              **Defendant.**

_____/

**[PROPOSED]**
**ORDER QUASHING DEFENDANT MCNAE'S**
**SUBPOENAS TO MICROSOFT CORP. AND SOFTWAREONE, INC.**

**THIS MATTER came** before this court on October 19, 2022 on the parties' dispute regarding Defendant, Ronda McNae's Subpoenas to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action to Microsoft Corporation and SoftwareOne, Inc.

This Court, having reviewed the subpoenas, having heard argument of counsel, having reviewed the file in this matter, and being otherwise duly advised in the premises, hereby

ORDERS AND ADJUDGES as follows:

1.      This Action is a one count Complaint filed on July 14, 2022 by Plaintiff Michael J. Fitzgerald against Defendant Ronda McNae for breach of a Confidential Settlement Agreement [DE 1]. The Confidential Settlement Agreement was entered on or around June 15, 2020.

2.      Defendant has not yet filed an answer or affirmative defenses in this case. A Motion to Dismiss was filed on August 5, 2022 [DE 6]. Defendant claims that Plaintiff has

Case 1:22-cv-22171-JEM   Document 16-1   Entered on FLSD Docket 10/18/2022   Page 2 of 3

*Fitzgerald vs. McNae*
**CASE NO: 1:22-cv-22171-JEM**

failed to state a cause of action for breach of contract. The Court has not yet ruled on Defendant's Motion to Dismiss.

3.      On September 21, 2022, Defendant issued two non-party subpoenas in this matter. The first was issued against Microsoft Corporation, the employer of Defendant's husband. The second subpoena was issued against SoftwareOne, Inc. on the erroneous assumption that SoftwareOne, Inc. was Plaintiff's employer.

4.      SoftwareOne, Inc. is a Wisconsin, United States based software entity that is a subsidiary of SoftwareONE Holdings, AG, a Switzerland based software company. Plaintiff's employer is SoftwareOne UK, Ltd., a United Kingdom based subsidiary of SoftwareOne Holdings, AG.

5.      Therefore, SoftwareOne, Inc. has no connection to this matter at all.

6.      Additionally, as argued by Plaintiff, much of the information sought by Defendant in both the Microsoft Corp. subpoena and the SoftwareOne, Inc. subpoena are irrelevant information not within the scope of the parties' action.

7.      The bulk of both subpoenas are brought solely for the purposes of harassment and part of a fishing expedition to potentially bring a counterclaim against Plaintiff. The subject of Defendant's potential counterclaim was a dispute which was settled by the parties prior to, and which culminated in, the entry of the Confidential Settlement Agreement that is the heart of this matter.

8.      Accordingly, because the documents being sought by Defendant are not relevant to the instant matter, they must be quashed in large part. Moreover, many of the documents Defendant is seeking are protected by the laws of the United Kingdom's Data Protection Act of 2018.

*Fitzgerald vs. McNae*
**CASE NO: 1:22-cv-22171-JEM**

9.    All document requests in Defendant's subpoena to Microsoft Corp. are quashed with the exception of document request number 5.

10.    All document requests in Defendant's subpoena to SoftwareOne, Inc. are quashed with the exception of document requests numbers 1 and 17.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida on this _____ day of October, 2022.

_____
HONORABLE JACQUELINE BECERRA

Copies to: Counsel of Record

3

# Declaration

# Exhibit C

# B F W

## BRODSKY FOTIU-WOJTOWICZ

September 9, 2022

**VIA ELECTRONIC MAIL**
ARAG Legal Insurance
Special Referral Claims
500 Grand Avenue, Suite 100
Des Moines, IA 50309
srclaims@ARAGlegal.com

**RE:   McNae, Ronda advs Michael Fitzgerald**

To Whom It May Concern:

I am in receipt of your email dated September 9, 2022 requesting information to complete your review of our claim.  Please see our response to your requests below.

**Copy of the court filed Complaint:**     Enclosed with this letter.

**Current status of the legal matter:**  This past month we filed and fully briefed a Motion to Dismiss or for More Definite Statement, and have conducted basic legal research regarding the claims, defenses, and potential exposure to the clients in the case. We also conducted our joint discovery conference and worked with the client to gather documents and identify witnesses for our Federal Court Rule 26(a) Initial Disclosures.

**Next anticipated steps towards resolution:**  Discovery is just commencing and we anticipate serving Request for Production, Interrogatories, and third-party subpoenas this month.  Once initial discovery is exchanged we have raised the possibility of an early mediation with opposing counsel – but that will depend on what the evidence exchanged reveals.

If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me at any time.

Sincerely,

Alaina Fotiu-Wojtowicz

AFW/hs
Enclosures

ALAINA FOTIU-WOJTOWICZ, ESQ.
WWW.BFWLEGAL.COM
ALAINA@BFWLEGAL.COM

200 SE 1ST STREET, SUITE 400
MIAMI, FLORIDA 33131
T. 305-503-5054  F. 786-749-7644

**BFW**

BRODSKY FOTIU-WOJTOWICZ

October 4, 2022

**VIA ELECTRONIC MAIL**
ARAG Legal Insurance
Special Referral Claims
500 Grand Avenue, Suite 100
Des Moines, IA 50309
srclaims@ARAGlegal.com

RE: **McNae, Ronda advs Michael Fitzgerald**

To Whom It May Concern:

In order to facilitate your review of our claim, please see our update on the progress of this case below.

**Current status of the legal matter:** This past month we completed our Initial Disclosures and rolled out an initial document production of 1,758 pages. We also requested and obtained Defendant's counseling invoices and records reviewed an additional 277 pages for production in October. We also propounded initial discovery on the Plaintiff directed to both liability and damages and drafted and served subpoenas on Microsoft Corporation and SoftwareONE, Inc., Defendant's husband's employer and Plaintiff's employer, respectively. We also conducted additional research regarding Florida's consent laws.

**Next anticipated steps towards resolution:** We anticipate receiving documents responsive to our discovery requests and our third-party subpoenas within the next 30-60 days. At that point we will be better able to evaluate both liability and damages and determine whether an early mediation would be productive.

If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me at any time.

Sincerely,

Alaina Fotiu-Wojtowicz

AFW/hs

ALAINA FOTIU-WOJTOWICZ, ESQ.
WWW.BFWLEGAL.COM
ALAINA@BFWLEGAL.COM

200 SE 1ST STREET, SUITE 400
MIAMI, FLORIDA 33131
T. 305-503-5054 F. 786-749-7644



## BRODSKY FOTIU-WOJTOWICZ

November 3, 2022

**VIA ELECTRONIC MAIL**
ARAG Legal Insurance
Special Referral Claims
500 Grand Avenue, Suite 100
Des Moines, IA 50309
srclaims@ARAGlegal.com

RE:   **McNae, Ronda advs Michael Fitzgerald**

To Whom It May Concern:

In order to facilitate your review of our claim, please see our update on the progress of this case below.

**Current status of the legal matter:**  This month was largely a month of paper discovery.  We obtained documents responsive to our Request for Production, met and conferred regarding third party subpoenas and Plaintiff's objections to our RFPs and had our first discovery hearing before the Magistrate Judge.  We continue to review and organize the relatively large volume of documents produced in the case as well as to research the relevant legal issues and potential defenses.

**Next anticipated steps towards resolution:**  We anticipate receiving some outstanding documents responsive to our discovery requests and our third-party subpoenas within the next 30-60 days.  At that point we will be better able to evaluate both liability and damages and determine whether an early mediation would be productive.  In the discovery we obtained thus far, however, there are messages indicating that the Plaintiff himself is taking a very aggressive position with respect to this case.  As a result, I do not believe an early resolution is likely.  We will, however, continue to explore the possibility of resolution at all points.

If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me at any time.

Sincerely,

Alaina Fotiu-Wojtowicz

AFW/hs

ALAINA FOTIU-WOJTOWICZ, ESQ.
WWW.BFWLEGAL.COM
ALAINA@BFWLEGAL.COM

200 SE 1ST STREET, SUITE 400
MIAMI, FLORIDA 33131
T. 305-503-5054 F. 786-749-7644

## B F W

### BRODSKY FOTIU-WOJTOWICZ

December 1, 2022

**VIA ELECTRONIC MAIL**
ARAG Legal Insurance
Special Referral Claims
500 Grand Avenue, Suite 100
Des Moines, IA 50309
srclaims@ARAGlegal.com

**RE:   McNae, Ronda advs Michael Fitzgerald**

To Whom It May Concern:

In order to facilitate your review of our invoice, please see our update on the progress of this case below.

**Current status of the legal matter:**  Document discovery is ongoing.  This month we finished negotiating the terms of the protective order and a foreign data privacy order to facilitate the production of documents from some of the third parties we subpoenaed. We also sent out an additional third-party subpoena, and began responding to rather broad and objectionable discovery requests served by the Plaintiff.

**Next anticipated steps towards resolution:**  We are still awaiting a ruling from the Court on our simple Motion to Dismiss, which prevents the case from proceeding to the next phase.  Once we respond to Plaintiff's discovery and obtain the documents responsive to our third-party discovery requests we will proceed to begin taking depositions.  While we remain interested in attempting to resolve this matter, at this time counsel for the Plaintiff is pushing forward aggressively.

We need to engage counsel in Wisconsin and Washington to enforce some or all of the out-of-state subpoenas we served on Microsoft and SotwareONE.  The documents sought in these subpoenas are critical to our ability to effectively defend against this case. My office has contacted ARAG to request approval to do so under the terms of the policy. However we have not received a response and the lack of response is now beginning to impact our ability to effectively move this case forward towards resolution.  We would appreciate a response to this inquiry as quickly as possible.  As you may know, in Federal Court in the Southern District of Florida the deadlines set by the Court are generally not flexible and time is always of the essence.

ALAINA FOTIU-WOJTOWICZ, ESQ.
WWW.BFWLEGAL.COM
ALAINA@BFWLEGAL.COM

200 SE 1ST STREET, SUITE 400
MIAMI, FLORIDA 33131
T. 305-503-5054 F. 786-749-7644

ARAG LEGAL INSURANCE
DECEMBER 1, 2022
PAGE 2

If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me at any time.

Sincerely,

Alaina Fotiu-Wojtowicz

AFW/hs

# B F W

## BRODSKY FOTIU-WOJTOWICZ

January 9, 2023

**VIA ELECTRONIC MAIL**
ARAG Legal Insurance
Special Referral Claims
500 Grand Avenue, Suite 100
Des Moines, IA 50309
srclaims@ARAGlegal.com
Teresa.Hoisington@ARAGlegal.com

RE:   **McNae, Ronda advs Michael Fitzgerald**

To Whom It May Concern:

In order to facilitate your review of our invoice, please see our update on the progress of this case below.

**Current status of the legal matter:**  This month, Fitzgerald obtained leave to file an Amended Complaint asserting numerous tort counts against Mrs. McNae in addition to the breach of contract claim.  The Amended Complaint also adds Fitzgerald's wife as a consortium Plaintiff and brings breach of contract claims and tort claims against William McNae.  Although we opposed leave, the Court granted leave over our objection.  The Amended Complaint dramatically expands the scope of this case.  A copy of the Amended Complaint is attached for your easy reference.

**Next anticipated steps towards resolution:**  We are continuing to pursue discovery both to contest liability as well as to show that Plaintiff has not suffered the damages he claims as a result of Mrs. McNae's conduct.  New discovery is now being sought as a result of the expanded scope of the case.  We have also begun to set fact witness depositions in January and February and to interview potential expert witnesses.

The Plaintiff is taking the position that there can be no resolution unless Mrs. McNae publicly states that he did not sexually assault her.  Mrs. McNae refuses to say this because it is not the truth.  It is difficult to see a path to resolution given the positions of the Parties at this point but I continue to hope that the positions will soften as we proceed through discovery.

ALAINA FOTIU-WOJTOWICZ, ESQ.
WWW.BFWLEGAL.COM
ALAINA@BFWLEGAL.COM

200 SE 1ST STREET, SUITE 400
MIAMI, FLORIDA 33131
T. 305-503-5054 F. 786-749-7644

ARAG LEGAL INSURANCE
JANUARY 9, 2023
PAGE 2

    If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me at any time.

Sincerely,

Alaina Fotiu-Wojtowicz

AFW/hs

# BFW

## BRODSKY FOTIU-WOJTOWICZ

February 2, 2023

**VIA ELECTRONIC MAIL**
ARAG Legal Insurance
Special Referral Claims
500 Grand Avenue, Suite 100
Des Moines, IA 50309
srclaims@ARAGlegal.com
Teresa.Hoisington@ARAGlegal.com

RE:   **McNae, Ronda advs Michael Fitzgerald**

To Whom It May Concern:

In order to facilitate your review of our invoice, please see our update on the progress of this case below.

**Current status of the legal matter:**  At the end of last month, the Court granted the Plaintiff leave to Amend the Complaint to add two new parties and twenty new counts, which primarily sound in tort.  We filed a Motion to Dismiss jointly with William McNae because the arguments for dismissal overlapped significantly.  We also propounded discovery directed toward the new party and the new claims and prepared for and defended the first deposition taken by Plaintiffs in the case (David Carpenter – William McNae's brother).

We also continued to gather discovery from third party sources and amended some of our discovery responses to avoid motion practice or a hearing before the Magistrate Judge.  We obtained the first production in response to our subpoena to Microsoft (Mr. McNae's employer) and also agreed on search terms for our subpoena to SoftwareONE (Plaintiff's employer).

**Next anticipated steps towards resolution:**  The new claims raised in the Amended Complaint are broad and inflammatory.  Through the Motion to Dismiss and the new discovery we propounded we are hoping to narrow the issues and make the case more amenable to resolution.  The Parties on both sides, however, maintain the absolute righteousness of their positions on the very sensitive and personal issues raised in the case and it is difficult to see a clear path to resolution at this time.  Moreover, it is my understanding that the Defendants simply do not have the funds to pay the size of the monetary award Plaintiffs are currently seeking.

ALAINA FOTIU-WOJTOWICZ, ESQ.
WWW.BFWLEGAL.COM
ALAINA@BFWLEGAL.COM

200 SE 1ST STREET, SUITE 400
MIAMI, FLORIDA 33131
T. 305-503-5054 F. 786-749-7644

ARAG LEGAL INSURANCE
FEBRUARY 2, 2023
PAGE 2

   If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me at any time.

Sincerely,

Alaina Fotiu-Wojtowicz

AFW/hs



## BRODSKY FOTIU-WOJTOWICZ

March 6, 2023

**VIA ELECTRONIC MAIL**
ARAG Legal Insurance
Special Referral Claims
500 Grand Avenue, Suite 100
Des Moines, IA 50309
srclaims@ARAGlegal.com
Teresa.Hoisington@ARAGlegal.com

RE:  **McNae, Ronda advs Michael Fitzgerald**

To Whom It May Concern:

In order to facilitate your review of our invoice, please see our update on the progress of this case below.

**Current status of the legal matter:**  The case is in the heat of discovery now and Plaintiff Michael Fitzgerald's deposition was taken March 3, 2023. Additional depositions are set to take place in March. Thus, the month of February was spent organizing and pulling the key case documents for use at deposition, preparing for those depositions, and requesting supplemental documents and information that we determined was missing. My office created a timeline of the key documents for use at all depositions (and ultimately at trial if necessary), which was shared with counsel for William McNae pursuant to a joint defense agreement. We also completed briefing the motion to dismiss, which is now fully briefed and ripe for disposition.

**Next anticipated steps towards resolution:**  A ruling on the pending motion to dismiss the amended complaint could help to narrow the issues for trial or make the resolution of the case outside the context of a trial more likely. As I mentioned in my last letter, however, the Parties on both sides continue to maintain the absolute righteousness of their positions on the very sensitive and personal issues raised in the case and it is difficult to see a clear path to resolution at this time. Moreover, Defendants simply do not have the funds to pay the size of the monetary award Plaintiffs are currently seeking.

If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me at any time.

Sincerely,

Alaina Fotiu-Wojtowicz

AFW/hs

ALAINA FOTIU-WOJTOWICZ, ESQ.
WWW.BFWLEGAL.COM
ALAINA@BFWLEGAL.COM

200 SE 1ST STREET, SUITE 400
MIAMI, FLORIDA 33131
T. 305-503-5054 F. 786-749-7644



## BRODSKY FOTIU-WOJTOWICZ

April 5, 2023

**VIA ELECTRONIC MAIL**
ARAG Legal Insurance
Special Referral Claims
500 Grand Avenue, Suite 100
Des Moines, IA 50309
srclaims@ARAGlegal.com
Teresa.Hoisington@ARAGlegal.com

      **RE:   McNae, Ronda advs Michael Fitzgerald**

To Whom It May Concern:

      In order to facilitate your review of our invoice, please see our update on the progress of this case below.

      **Current status of the legal matter:**  The case is in the heart of discovery and the Plaintiff was deposed this month over the course of two days as was one other fact witness.  Thousands of pages of additional documents have been produced by parties and non-parties, and four additional witnesses are set for deposition in April.  We have also begun to engage expert witnesses as expert witness disclosures are due in May. We continue to await a resolution of the Motion to Dismiss, which is ripe for disposition by the Court.

      **Next anticipated steps towards resolution:**   While there has been some discussion of settlement this month, as I mentioned in my last several letters, the Parties on both sides continue to maintain the absolute righteousness of their positions on the very sensitive and personal issues raised in the case and it is difficult to see a clear path to resolution at this time.  This month Plaintiffs have indicated a willingness to resolve the case on relatively favorable monetary term. They are insisting, however, that Mrs. McNae issue a public statement that she was not sexually assaulted by Mr. Fitzgerald, which she states would be a lie and so she refuses to agree to this non-monetary term.

      If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me at any time.

      Sincerely,

      Alaina Fotiu-Wojtowicz

AFW/hs

ALAINA FOTIU-WOJTOWICZ, ESQ.
WWW.BFWLEGAL.COM
ALAINA@BFWLEGAL.COM

200 SE 1ST STREET, SUITE 400
MIAMI, FLORIDA 33131
T. 305-503-5054 F. 786-749-7644



## BRODSKY FOTIU-WOJTOWICZ

May 2, 2023

**VIA ELECTRONIC MAIL**
ARAG Legal Insurance
Special Referral Claims
500 Grand Avenue, Suite 100
Des Moines, IA 50309
srclaims@ARAGlegal.com
Teresa.Hoisington@ARAGlegal.com

**RE:   McNae, Ronda advs Michael Fitzgerald**

To Whom It May Concern:

In order to facilitate your review of our invoice, please see our update on the progress of this case below.

**Current status of the legal matter:**   The case continues through the heart of discovery.  This month we had the depositions of three of the four named parties.  Now all parties have been deposed.  We also had the deposition of a third-party witness who was present the evening of the sexual assault.  We also had a second discovery hearing before the Magistrate Judge, sent out a variety of third-party subpoenas, sent follow-up discovery to the Plaintiffs, and began scheduling additional third-party witness depositions.  We have also begun the process of engaging expert witnesses and working on their disclosures, which are due in May.

**Next anticipated steps towards resolution:**   While there has been some additional discussions about settlement this month, and a specific discussion regarding the type of mediator that may be able to broker a resolution of this case, as I mentioned in my last several letters, it is still difficult to see a clear path to resolution at this time. This month Plaintiffs renewed their willingness to resolve the case on favorable monetary terms. They continue to insist, however, on a statement to "clear Mr. Fitzgerald's name", and Mrs. McNae, understandably, refuses to lie and deny her sexual assault.

If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me at any time.

Sincerely,

Alaina Fotiu-Wojtowicz

AFW/hs

ALAINA FOTIU-WOJTOWICZ, ESQ.
WWW.BFWLEGAL.COM
ALAINA@BFWLEGAL.COM

200 SE 1ST STREET, SUITE 400
MIAMI, FLORIDA 33131
T. 305-503-5054 F. 786-749-7644

## BFW

### BRODSKY FOTIU-WOJTOWICZ

June 2, 2023

<u>VIA ELECTRONIC MAIL</u>
ARAG Legal Insurance
Special Referral Claims
500 Grand Avenue, Suite 100
Des Moines, IA 50309
srclaims@ARAGlegal.com
Teresa.Hoisington@ARAGlegal.com

RE:   **McNae, Ronda advs Michael Fitzgerald**

To Whom It May Concern:

In order to facilitate your review of our invoice, please see our update on the progress of this case below.

**Current status of the legal matter:**  The case continues through the heart of discovery.  This month I traveled to Seattle to take the depositions of two fact witnesses that offered sworn declarations in favor of the Plaintiffs' position, and had a zoom deposition of another fact witness.  There are now only a few outstanding fact witness depositions and expert witness discovery has commenced.  Mrs. McNae completed her expert witness disclosures this month and we are in the process of scheduling expert depositions to take place in June and July.  The discovery cut-off is currently set for July 15, 2023 with trial set for November.  We also had a third discovery hearing before the Magistrate Judge where we successfully quashed a third-party subpoena and pushed back against some of the irrelevant discovery sought by the Plaintiffs in this matter.  We also have continued to seek additional paper discovery from the Plaintiffs and other non-parties, have continued to respond to additional paper discovery requests from the Plaintiffs, and have continued to research Mrs. McNae's potential factual and legal defenses and other legal issues as we continue to prepare our case for the summary judgment phase as well as for trial.

**Next anticipated steps towards resolution:**  We continue to await a ruling on Defendants' Motion to Dismiss, which has now been pending and ripe for over ninety (90) days.  A favorable ruling on this Motion could potentially narrow the issues and make the case easier to resolve.  While there have been some additional abstract discussions about settlement this month, the Plaintiff has taken affirmative steps to involve himself in unrelated litigation involving the McNaes in order to make life more difficult for them, which will again make the case even more difficult to resolve.  The fundamental disagreement regarding the truth of Mrs. McNae's sexual assault allegations continues to be the focus of the settlement discussions, which continues to make it difficult to see a clear path to resolution at this time.

ALAINA FOTIU-WOJTOWICZ, ESQ.
WWW.BFWLEGAL.COM
ALAINA@BFWLEGAL.COM

200 SE 1ST STREET, SUITE 400
MIAMI, FLORIDA 33131
T. 305-503-5054 F. 786-749-7644

ARAG LEGAL INSURANCE
JUNE 2, 2023
PAGE 2

If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me at any time.

Sincerely,

Alaina Fotiu-Wojtowicz

AFW/hs

**BFW**

BRODSKY FOTIU-WOJTOWICZ

July 5, 2023

<u>VIA ELECTRONIC MAIL</u>
ARAG Legal Insurance
Special Referral Claims
500 Grand Avenue, Suite 100
Des Moines, IA 50309
srclaims@ARAGlegal.com
Teresa.Hoisington@ARAGlegal.com

RE:   McNae, Ronda advs Michael Fitzgerald

To Whom It May Concern:

In order to facilitate your review of our invoice, please see our update on the progress of this case below.

**Current status of the legal matter:**  The current discovery cut-off for all discovery, including expert witness discovery, is July 28, 2023 so we continue through the heart of fact discovery and have commenced expert witness discovery.  This month we had the deposition of an additional fact witness as well as the deposition of Plaintiff's economic damages expert.  We engaged a rebuttal expert witness to opine on Plaintiff Fitzgerald's non-economic damages and we made our rebuttal expert witness disclosures.  The remaining fact and expert witness depositions are set for July.  We also continue to propound and respond to paper discovery and the Defendants jointly briefed the issue of non-party SoftwareONE's assertion of the common interest privilege before the Magistrate Judge and are awaiting a ruling on this issue.

**Next anticipated steps towards resolution:**  We continue to await a ruling on Defendants' Motion to Dismiss, which has now been pending and ripe for four months.  Plaintiffs' counsel filed a Notice to the Court reminding Judge Martinez that the Motion had been pending for more than ninety (90) days, but there is no real indication that a ruling is forthcoming. A favorable ruling on this Motion could potentially narrow the issues and make the case easier to resolve.  There continued to be abstract discussions about settlement in June, but the fundamental disagreement regarding the truth of Mrs. McNae's sexual assault allegations continues to be the focus of the settlement discussions, which continues to make it difficult to see a clear path to resolution at this time.

ALAINA FOTIU-WOJTOWICZ, ESQ.                    200 SE 1ST STREET, SUITE 400
WWW.BFWLEGAL.COM                                            MIAMI, FLORIDA 33131
ALAINA@BFWLEGAL.COM                                  T. 305-503-5054 F. 786-749-7644

ARAG LEGAL INSURANCE
JULY 5, 2023
PAGE 2

If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me at any time.

Sincerely,

Alaina Fotiu-Wojtowicz

AFW/hs



**Legal Insurance**

<u>**Sent via email to heather@bfwlegal.com and scasey@colson.com**</u>

July 26, 2023

Alaina Fotiu-Wojtowicz
200 SE 1st Street, Suite 400
Miami, FL 33131

ARAG®
500 Grand Avenue, Suite 100
Des Moines, IA· 50309
800-888-4184
515-246-8710 fax
ARAGlegal.com

Stephanie Casey
255 Alhambra Circle, Penthouse
Miami, FL 33134

**RE:** **ARAG Case No. 3107432 – Defense of Civil Damage Claims (Ronda McNae)**
**ARAG Case No. 3266236 – Defense of Civil Damage Claims (William McNae)**
**Michael J. Fitzgerald and Yaleny De Varona v. Ronda McNae and William McNae, U.S. District Court,**
**Southern District of Florida, Miami Division, Case No. 1:22-cv-22171-JEM**

Dear Counsel:

ARAG is wondering if the parties would be interested in participating in mediation in Florida in an effort to resolve the above-referenced legal matters as well as save attorney fees and costs. We would appreciate you contacting your respective clients, as well as opposing counsel, to see if they are receptive to the request for mediation.

If the parties are agreeable to mediation, ARAG will pay for the following:

- Once the parties determine who they would like to serve as the mediator, please inform ARAG and we will contact the mediator and enter into an agreement whereby ARAG will pay the mediator for their fees and costs. ARAG will pay up to two (2) consecutive days of mediation. The mediator and the parties can then select a date that works for all.
- If the mediation will not occur at the mediator's office or at one of the law firms, ARAG will pay the reasonable cost for a place to conduct the mediation.
- Your attorney fees to attend the mediation are covered under your fee agreement with ARAG.
- As the McNaes reside in the state of Washington, ARAG will pay reasonable expenses for them to attend the mediation, i.e., airfare, hotel, cab fare, meals if you believe an in-person mediation gives the highest likelihood for success.

We appreciate your consideration of ARAG's request for mediation. Please let me know whether or not the parties wish to pursue mediation.

Sincerely,

Ann Cosimano
General Counsel
Ann.Cosimano@ARAGlegal.com

BFW

BRODSKY FOTIU-WOJTOWICZ

July 31, 2023

<u>VIA ELECTRONIC MAIL</u>
Ms. Ann Cosimano, General Counsel
ARAG Legal Insurance
500 Grand Avenue, Suite 100
Des Moines, IA 50309
Ann.Cosimano@ARAGlegal.com
Teresa.Hoisington@ARAGlegal.com

RE:   **ARAG Case No. 3107432 – Defense of Civil Damage Claims (Ronda McNae)**
**ARAG Case No. 3266236 – Defense of Civil Damage Claims (William McNae)**
**Michael J. Fitzgerald and Yaleny De Varona v. Ronda McNae and William McNae, U.S. District Court, Southern District of Florida, Miami Division, Case No. 1:22-cv-22171-JEMFitzgerald**

Ms. Cosimano:

I write in response to your letter dated July 26, 2023 regarding ARAG's request for mediation in this case.

The Parties have agreed to participate in a zoom mediation scheduled for Wednesday, September 13, 2023, at 9:00 a.m., with mediator Sarah Clasby Engel.  Ms. Engel's contact information is as follows:

The Engel Firm
200 SE 15th Road, Unit 12C
Miami, FL 33129
305-906-2224
Sarah@engel-firm.com

Sandi Pena, Ms. Engle's Office Administrator, can also be reached at the same address and phone number, and her e-mail is: Sandi@engel-firm.com.  I have let her know that ARAG may be reaching out to coordinate payment. The mediation will take place by zoom, by agreement of the Parties, so there will not be any travel costs associated with the mediation.

ALAINA FOTIU-WOJTOWICZ, ESQ.                                    200 SE 1ST STREET, SUITE 400
WWW.BFWLEGAL.COM                                                        MIAMI, FLORIDA 33131
ALAINA@BFWLEGAL.COM                                          T. 305-503-5054 F. 786-749-7644

MS. COSIMANO
JULY 31, 2023
PAGE 2

If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me at any time.

Sincerely,

Alaina Fotiu-Wojtowicz

AFW/hs

Cc: Stephanie Casey (via email only: scasey@colson.com)



**BRODSKY FOTIU-WOJTOWICZ**

August 1, 2023

<u>**VIA ELECTRONIC MAIL**</u>
ARAG Legal Insurance
Special Referral Claims
500 Grand Avenue, Suite 100
Des Moines, IA 50309
srclaims@ARAGlegal.com
Teresa.Hoisington@ARAGlegal.com

     **RE:  McNae, Ronda advs Michael Fitzgerald**

To Whom It May Concern:

     In order to facilitate your review of our invoice, please see our update on the progress of this case below.

     **Current status of the legal matter:**  Fact and expert discovery closed on July 28, 2023, so this was a busy month of taking depositions, preserving the testimony of our out-of-state witnesses, pressing for the production of the last remaining documents, and ensuring that we had complied with all of our discovery obligations.  We continue to await a ruling on our motion to dismiss, but it is unclear whether we will get a ruling in advance of the current summary judgment deadline, which is set for August 18, 2023.

     **Next anticipated steps towards resolution:**  Summary judgment and Daubert motions and due in August, which should help frame the issues for our upcoming mediation in September and trial in December.  The hold-up in settlement negotiations continue to be non-monetary, rather than monetary terms.

     If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me at any time.

     Sincerely,

     Alaina Fotiu-Wojtowicz

AFW/hs

ALAINA FOTIU-WOJTOWICZ, ESQ.            200 SE 1ST STREET, SUITE 400
WWW.BFWLEGAL.COM                   MIAMI, FLORIDA 33131
ALAINA@BFWLEGAL.COM            T. 305-503-5054 F. 786-749-7644

# BFW

## BRODSKY FOTIU-WOJTOWICZ

September 7, 2023

**VIA ELECTRONIC MAIL**
ARAG Legal Insurance
Special Referral Claims
500 Grand Avenue, Suite 100
Des Moines, IA 50309
srclaims@ARAGlegal.com
Teresa.Hoisington@ARAGlegal.com

      RE:  **McNae, Ronda advs Michael Fitzgerald**

To Whom It May Concern:

In order to facilitate your review of our invoice, please see our update on the progress of this case below.

**Current status of the legal matter:** On August 2, 2023, the Court granted our Motion to Dismiss all of the tort claims against Mrs. McNae, without prejudice. Plaintiffs immediately moved the Court for leave to amend in order to replead the tort claims in the alternative, and Mrs. McNae has opposed that motion. We are hopeful that we will prevail in defending against a second amended complaint and that the case will proceed as merely a breach of contract claim against Mrs. McNae. While we were in the process of preparing summary judgment and *Daubert* motions, the Court granted an extension of time to file such motions until after the Court rules on the motion for leave to amend, to avoid unnecessary briefing.

**Next anticipated steps towards resolution:** As you know, we are set for a mediation next week on September 13, 2023. The Court's ruling significantly narrowed the issues remaining for trial, however, there is still uncertainty as to which claims will be moving forward given the pending motion for leave to amend. While we are preparing for mediation and are hopeful for a successful outcome, as each of these letters has advised, the hold-up in settlement negotiations continues to be the non-monetary terms related to the very emotionally charged issues raised in this case.

If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me at any time.

Sincerely,

Alaina Fotiu-Wojtowicz

AFW/hs

ALAINA FOTIU-WOJTOWICZ, ESQ.
WWW.BFWLEGAL.COM
ALAINA@BFWLEGAL.COM

200 SE 1ST STREET, SUITE 400
MIAMI, FLORIDA 33131
T. 305-503-5054 F. 786-749-7644



## BRODSKY FOTIU-WOJTOWICZ

October 5, 2023

<u>**VIA ELECTRONIC MAIL**</u>
ARAG Legal Insurance
Special Referral Claims
500 Grand Avenue, Suite 100
Des Moines, IA 50309
srclaims@ARAGlegal.com
Teresa.Hoisington@ARAGlegal.com

RE:   **McNae, Ronda advs Michael Fitzgerald**

To Whom It May Concern:

In order to facilitate your review of our invoice, please see our update on the progress of this case below.

**Current status of the legal matter:** The status of the  case is essentially unchanged since last month except for the fact that we completed mediation in September. Our mediator was excellent and tenacious, but the parties' positions in this case are not driven by typical financial motivations so we were not able to obtain a resolution of the case – although we did make some meaningful progress.

**Next anticipated steps towards resolution:** The Court has essentially stayed the case until there is a ruling on the pending Motion for Leave to Amend the Complaint to add back in Plaintiffs' tort claims. Once those issues are resolved, we will have a short time period to get the case at issue, complete *Daubert* motions, summary judgment briefing, motions *in limine*, and to prepare the case for trial.  Although we will continue to explore the potential to resolve the case, it appears likely that the case may need to be prepared and taken through trial.

If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me at any time.

Sincerely,

Alaina Fotiu-Wojtowicz

AFW/hs

ALAINA FOTIU-WOJTOWICZ, ESQ.
WWW.BFWLEGAL.COM
ALAINA@BFWLEGAL.COM

200 SE 1ST STREET, SUITE 400
MIAMI, FLORIDA 33131
T. 305-503-5054 F. 786-749-7644



## BRODSKY FOTIU-WOJTOWICZ

November 7, 2023

**VIA ELECTRONIC MAIL**
ARAG Legal Insurance
Special Referral Claims
500 Grand Avenue, Suite 100
Des Moines, IA 50309
srclaims@ARAGlegal.com
Teresa.Hoisington@ARAGlegal.com

RE:   **McNae, Ronda advs Michael Fitzgerald**

To Whom It May Concern:

In order to facilitate your review of our invoice, please see our update on the progress of this case below.

**Current status of the legal matter:** This month the Court denied Plaintiffs' Motion for leave to amend the complaint to renew the previously dismissed tort claims. A copy of the Court's Order is attached. We were also forced to brief a Motion to Strike our Amended Exhibit List. The Court entered an Amended Scheduling Order, which sets trial for February, 2024.

**Next anticipated steps towards resolution:** This month we will need to file our Answer, Affirmative Defenses, and Counter-Claim and begin to file and respond to dispositive, *Daubert*, and pre-trial motions. Because the claims brought by Yelany De Varona were completely dismissed, we also plan to file a Motion for Fees and Costs based upon a proposal for settlement we sent her early on in the case.

At this point numerous avenues to attempt to resolve this case have failed and we will need to begin preparing to try this case.

If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me at any time.

Sincerely,

Alaina Fotiu-Wojtowicz

AFW/hs
enclosures

ALAINA FOTIU-WOJTOWICZ, ESQ.
WWW.BFWLEGAL.COM
ALAINA@BFWLEGAL.COM

200 SE 1ST STREET, SUITE 400
MIAMI, FLORIDA 33131
T. 305-503-5054 F. 786-749-7644



**Legal Insurance**

**Sent via email to <ins>heather@bfwlegal.com</ins>**

November 20, 2023

ARAG®
500 Grand Avenue, Suite 100
Des Moines, IA· 50309
800-888-4184
515-246-8710 fax
ARAGlegal.com

Alaina Fotiu-Wojtowicz
Brodsky Fotiu-Wojtowicz, PLLC
200 SE 1ˢᵗ Street, Suite 400
Miami, FL 33131

RE:     **ARAG Case No. 3107432-003; Michael *Fitzgerald v. Rhonda McNae, U.S. District Court Southern
District of Florida, Miami Division, Case No. 1:22-cv-22171-JEM***

Dear Alaina Fotiu-Wojtowicz:

On July 28, 2022, you entered into a Fee Agreement – Hourly Rate ("Agreement") with ARAG to provide legal
services to Rhonda McNae in the above-referenced legal matter.

Item 8 of the Agreement states, "Either party may terminate this Agreement effective immediately for any reason
or no reason at any time providing written notice to the other party." Effective immediately, ARAG hereby elects
to enforce said provision of the Agreement terminating ARAG's obligation to pay your legal fees for Rhonda
McNae in connection with ARAG Case No. 3107432-003.

ARAG will pay for legal services provided until December 1, 2023, or until withdrawal of representation is
complete, whichever is earlier.

Respectfully,

ARAG Legal Department



**Legal Insurance**

**Sent via email to willmcnae@gmail.com**

November 20, 2023

ARAG®
500 Grand Avenue, Suite 100
Des Moines, IA· 50309
800-888-4184
515-246-8710 fax
ARAGlegal.com

William and Rhonda McNae
504 11th Place
Kirkland, WA 98033

**RE:    ARAG Case No. 3107432 – Defense of Civil Damage – Rhonda McNae**
**ARAG Case No. 3266236 – Defense of Civil Damage – William McNae**
**Member ID # 177202672170**

Dear William and Rhonda McNae:

ARAG is in receipt of William's request for coverage under your legal plan for defense of a new civil lawsuit, *Michael J. Fitzgerald v William McNae, In The Circuit Court of the 11th Judicial Circuit In And For Miami-Dade County, Florida, Circuit Civil Division, Case 2023-025855-CA-01.* Your plan provides paid in full coverage for attorney fees when using a Network Attorney. Any expenses incurred are your responsibility. If you elect to use a Non-Network attorney, then an Indemnity benefit is available where you will be reimbursed up to the benefit amount indicated in your plan for the defense of civil damages claims coverage. It is your responsibility to locate and retain an attorney. ARAG will not be assisting you in locating an attorney to handle this matter on your behalf.

With respect to the civil lawsuit *Michael J. Fitzgerald and Yaleny De Varona v. Rhonda McNae and William McNae, In The United States District Court Southern District of Florida, Miami Divisin, Case No. 1:22-cv-22171-JEM,* effective December 1, 2023, ARAG will no longer cover either of your Non-Network attorney fees for services being rendered in this lawsuit. For purposes of clarity, Brodsky Fotiu-Wojtowski, PLLC and Colson Hicks and Eidson, P.A. law firms are Non-Network Attorneys. If you are able to locate a Network Attorney who will accept your case, then your plan covers your Network Attorney fees as a paid in full benefit pursuant to the terms of your legal plan, with any expenses incurred being your responsibility. If you elect to use a Non-Network attorney, you are eligible to use your plan's Indemnity benefit. Again, ARAG will not be assisting you in locating an attorney to handle this matter on your behalf.

Sincerely,


ARAG Legal Department

**BFW**

BRODSKY FOTIU-WOJTOWICZ

November 30, 2023

**VIA ELECTRONIC MAIL**
ARAG Legal Insurance
ARAG Legal Department
500 Grand Avenue, Suite 100
Des Moines, IA 50309
legal@araglegal.com

RE:   **McNae, Ronda advs Michael Fitzgerald**

To Whom It May Concern:

Alaina Fotiu-Wojtowicz, of Brodsky Fotiu-Wojtowicz, PLLC ("BFW"), is in receipt of your letter dated November 20, 2023 wherein ARAG terminates the Fee Agreement – Hourly Rate between BFW and ARAG effective July 28, 2022, pursuant to Section 8 of that Agreement. Stephanie Casey, of Colson Hicks Eidson ("CHE"), is in receipt of your letter dated November 20, 2023 wherein ARAG terminates the Fee Agreement – Hourly Rate between CHE and ARAG effective January 11, 2023, pursuant to Section 8 of that Agreement.

We acknowledge receipt of these letters, which terminate your insureds' counsel, without prior notice and without cause, less than three months before the currently scheduled trial date, with ten (10) calendar days-notice during the Thanksgiving Holiday week. BFW and CHE are in the process of wrapping up our work to ensure a smooth transition to an ARAG Network Attorney. As you indicate in your letter to the McNaes dated November 21, 2023, the McNaes continue to be covered by their ARAG Insurance Policy, which provides coverage for this claim. Indeed, in its letter, ARAG states:

If you are able to locate a Network Attorney who will accept your case, then your plan covers your Network Attorney fees as a paid in full benefit pursuant to the terms of your legal plan, with any expenses incurred being your responsibility.

The McNaes have in fact located a number of Network Attorneys interested in accepting their case. However, when those attorneys contacted ARAG, ARAG either refused to provide the necessary information for the attorneys to evaluate or accept the representation or provided information contrary to the plain language of the McNae's insurance policy. For example, Network Attorney Richard Gomez is still waiting for a return call from a supervisor to move forward with his potential engagement agreement with ARAG. Network Attorney Anthony Murphy was not able to get an answer from ARAG

ALAINA FOTIU-WOJTOWICZ, ESQ.
WWW.BFWLEGAL.COM
ALAINA@BFWLEGAL.COM

200 SE 1ST STREET, SUITE 400
MIAMI, FLORIDA 33131
T. 305-503-5054 F. 786-749-7644

with respect to what the fee structure would be should he accept the representation. And finally, Network Attorney Leah Mayersohn was told that she would only be paid $1,800 for the representation, which is flatly contradicted by the plain language of the McNaes' insurance policy and ARAG's letter to the McNaes dated November 21, 2023. At least six additional Network Attorneys contacted ARAG with the McNaes' CaseAssist number for Mrs. McNae with questions about taking on the representation.

Thus, it appears that there is no shortage of interest from ARAG Network Attorneys with respect to representing the McNaes. Rather, it appears that ARAG is failing to act in good faith to fulfil its obligations under the McNaes' insurance policy to provide coverage for the full cost of representation by a Network Attorney. Indeed, it appears that ARAG is actively taking actions to prevent a Network Attorney from accepting the representation of the McNaes. The McNaes request that ARAG immediately comply with its obligations under the McNaes' insurance policy and provide the information requested by Network Attorneys that the McNaes have located that are willing to assist them with their cases.

Should the McNaes suffer any adverse consequences as a result of ARAG's failure to comply with its obligations under the McNaes' insurance policy, ARAG will be responsible either for any fees paid by the McNaes that should have been covered under the policy, or, if they are unable to obtain or afford substitute counsel, for any adverse judgment that is entered against them as a result of being denied the coverage promised to them under the ARAG policy.

Please immediately advise as to the steps ARAG intends to take in order to ensure that the McNaes are provided with the benefits they contracted and paid for under their ARAG insurance policy before our Fee Agreements terminate on December 1, 2023.

Sincerely,

Alaina Fotiu-Wojtowicz

Stephanie Casey

**BFW**

BRODSKY FOTIU-WOJTOWICZ

December 7, 2023

<u>**VIA ELECTRONIC MAIL**</u>
ARAG Legal Insurance
ARAG Legal Department
500 Grand Avenue, Suite 100
Des Moines, IA 50309
legal@araglegal.com
srclaims@ARAGlegal.com

   **RE:** **McNae, Ronda advs Michael Fitzgerald**

To Whom It May Concern:

  I am in receipt of your letter to Mrs. McNae which states that other than mediation, ARAG has "no record of any other reasonable efforts that you have participated in to resolve the above-referenced case and all related matters." This statement is patently false. I have kept ARAG up-to-date on a monthly basis regarding our ongoing settlement negotiations with Plaintiffs' counsel, Plaintiffs' aggressive settlement position throughout the case, and Mrs. McNae's inability to make a significant monetary contribution to any potential settlement. A copy of each of my letters to ARAG Legal Department is attached.

  For example, on November 3, 2022, I first advised ARAG that the Plaintiff was taking a "very aggressive position with respect to this case." And on January 9, 2023, I reported settlement discussions to ARAG as follows:

   The Plaintiff is taking the position that there can be no resolution unless Mrs. McNae publicly states that he did not sexually assault her. Mrs. McNae refuses to say this because it is not the truth. It is difficult to see a path to resolution given the positions of the Parties at this point but I continue to hope that the positions will soften as we proceed through discovery.

This basic position, as well as the fact that "Defendants simply do not have the funds to pay the size of the monetary award Plaintiffs are currently seeking", was reiterated in my letters dated February 2, 2023 and March 6, 2023.

  On April 5, 2023, I advised ARAG of additional settlement negotiations that I had with Plaintiffs' counsel, as follows:

   This month Plaintiffs have indicated a willingness to resolve the case on relatively favorable monetary term[s]. They are insisting, however, that Mrs. McNae issue a public statement that she was not sexually assaulted by Mr.

ALAINA FOTIU-WOJTOWICZ, ESQ.      200 SE 1ST STREET, SUITE 400
WWW.BFWLEGAL.COM          MIAMI, FLORIDA 33131
ALAINA@BFWLEGAL.COM         T. 305-503-5054 F. 786-749-7644

Fitzgerald, which she states would be a lie so she refuses to agree to this non-monetary term.

In my letter dated May 2, 2023, I reported additional settlement discussions as follows:

> While there has been some additional discussions about settlement this month, and a specific discussion regarding the type of mediator that may be able to broker a resolution of this case, as I mentioned in my last several letters, it is still difficult to see a clear path to resolution tat this time. This month Plaintiffs renewed their willingness to resolve the case on favorable monetary terms. They continue to insist, however, on a statement to "clear Mr. Firzgerald's name", and Mrs. McNae, understandably, refuses to lie and deny her sexual assault.

On June 2, 2023, I advised of additional settlement discussions and reported again that "[t]he fundamental disagreement regarding the truth of Mrs. McNae's sexual assault allegations continues to be the focus of the settlement discussions, which continues to make it difficult to see a clear party to resolution at this time." Additional similar settlement negotiations were reported in my July 5, 2023 letter, and on August 1, 2023, I reported that "[t]he hold-up in settlement negotiations continue to be non-monetary, rather than monetary terms."

On October 5, 2023, I reported that all Parties participated in mediation and that we made "some meaningful progress" but were not able to come to a resolution. And on November 7, 2023 I reported that "numerous avenues to attempt to resolve this case have failed . . . ."

That ARAG would make such a clearly false statement to Mrs. McNae about the communications related to settlement attempts in this case only further reinforces that ARAG is in fact acting in bad faith in refusing to honor its obligations under Mrs. McNae's ARAG policy. Indeed, ARAG seems to be looking for any excuse to avoid abiding by its contractual obligations to Mrs. McNae.

Throughout this case we have engaged in ongoing, good-faith settlement negotiations to attempt a reasonable resolution of this case. This is all that is required by Mrs. McNae's insurance policy. Certainly it cannot be ARAG's position that its policy-holders are required to agree to whatever unreasonable terms the opposing party insists upon, simply so ARAG can avoid paying the legal fees its policy holders are entitled to under its policies. Similarly, it cannot be ARAG's position that its policy-holders are required to engage in coerced, false speech when necessary to resolve a case, simply so ARAG can avoid paying the legal fees its policy holders are entitled to under its policies.

ARAG LEGAL INSURANCE
DECEMBER 7, 2023
PAGE 3

You note that you contacted each of the Network Attorneys who had indicated they would represent Mr. and Mrs. McNae and "they indicated they were unable to assist you under the terms of ARAG's contract with them." To allow Mrs. McNae to find the substitute counsel to which he is entitled, we request that you provide Mr. McNae with a copy of the standard fee agreement, fee schedule, or other "contract" you claim to have presented to those Network Attorneys. Please also provide any written communications with those attorneys.

Mrs. McNae again renews her request that ARAG honor its good faith obligations to her as an active policy holder in good standing. ARAG is currently in clear violation of those obligations. To the extent Mrs. McNae suffers damages as a result of ARAG's bad faith, ARAG will be responsible for those damages.

Sincerely,

Alaina Fotiu-Wojtowicz

AFW/hs

**B F W**

BRODSKY FOTIU-WOJTOWICZ

January 5, 2024

<u>VIA ELECTRONIC MAIL</u>
ARAG Legal Insurance
Special Referral Claims
500 Grand Avenue, Suite 100
Des Moines, IA 50309
srclaims@ARAGlegal.com
Teresa.Hoisington@ARAGlegal.com

RE:   McNae, Ronda advs Michael Fitzgerald

To Whom It May Concern:

In order to facilitate your review of our invoice, please see our update on the progress of this case below.

By letter dated November 20, 2023, ARAG terminated the Fee Agreement – Hourly Rate ("Agreement") pursuant to which the undersigned and her firm were "Network Attorneys" under the terms of the McNae's ARAG Policy.[1] Section 7 of the Agreement, however, states that "Attorney will not withdraw from representation until they take reasonable steps to avoid prejudice to the rights of Plan Member." The Agreement further provides that "This entire Section 7 shall survive termination of the Agreement."

Because ARAG terminated the Agreement in the middle of active settlement negotiations, it would have been impossible to withdraw on the short notice provided by ARAG without prejudice to Mrs. McNae. As a result, we were forced, pursuant to the Agreement and our ethical obligations, to stay on as counsel through December 13, 2023, when the Court ultimately granted BFW's Motion to Withdraw. Since that date BFW has provided Mrs. McNae with its entire file so that Mrs. McNae's new ARAG Network Attorney, which Mrs. McNae is plainly entitled to under the terms of her ARAG Policy, has everything he or she needs to continue the successful defense of this case.

Because the services provided from December 1, 2023 through December 13, 2023 were required by the explicit terms of the Agreement, ARAG is responsible to pay those fees. As you can see from our detailed time records, the limited services provided

---

[1]    Pursuant to the McNaes' ARAG Policy, "Network Attorney" is defined as "an attorney with whom **we** have contracted to perform covered **legal service** in the United States for **you** and who has contracted with **us** to provide the specific covered legal services for which **you** are seeking assistance." ARAG contracted with BFW to provide covered legal services to Ronda McNae. As such, we were plainly Network Attorneys throughout the scope of our representation.

ALAINA FOTIU-WOJTOWICZ, ESQ.
WWW.BFWLEGAL.COM
ALAINA@BFWLEGAL.COM

200 SE 1ST STREET, SUITE 400
MIAMI, FLORIDA 33131
T. 305-503-5054 F. 786-749-7644

ARAG LEGAL INSURANCE
JANUARY 5, 2024
PAGE 2

during this time frame were provided to avoid disruption to ongoing settlement negotiations and to avoid prejudice to Mrs. McNae.

If you have any questions regarding the responses provided herein or require any additional information, please do not hesitate to contact me.

Sincerely,

Alaina Fotiu-Wojtowicz

AFW/hs
enclosures

# Declaration

# Exhibit D

# Declaration

# Exhibit D-1

September 13, 2024

Dear Arag,

I am writing to formally request the addition of an outside attorney to my legal team due to significant concerns regarding a conflict of interest regarding Richard Gomez representing both Will McNae and myself in our respective cases.

Here are the main reasons for my concern:

**1. Diverging Interests:**

• Different Defendants, Different Cases: Will and I are involved in separate lawsuits—mine in federal court and his in Florida state court. Our legal strategies, defenses, or goals may differ significantly, which could pose challenges for Richard Gomez in fully advocating for one of us without undermining the other.

• Settlement or Litigation Strategy: If Will and I have different approaches to settlement or litigation, Richard could find himself having to choose between conflicting strategies, preventing him from offering undivided loyalty and representation to either of us.

**2. Confidential Information:**

• Shared Confidential Information: Since Richard represents both Will and me, there's a risk that information disclosed by one of us could inadvertently be used against the other in future legal proceedings.

• Attorney-Client Privilege: Handling confidential information for both clients could jeopardize attorney-client privilege, particularly if there's a risk of cross-sharing sensitive information.

**3. Inconsistent Legal Theories or Defenses:**

• Incompatible Defenses: Our defenses may conflict. For example, if one of us presents a defense that implies culpability for the other, Richard would be unable to defend both of us zealously.

• Liability Shifting: In situations where blame may be shifted between defendants, Richard could be put in a position where he's unable to properly advocate for both Will and me.

**4. Fiduciary Duty and Full Loyalty:**

• Conflicted Loyalty: Richard owes a duty of loyalty to each of us, but it may be impossible to fulfill this duty equally in both cases. His obligations to one of us could limit his ability to act in the best interest of the other.

• Independent Legal Advice: Will and I both need independent legal advice to ensure our best interests are fully represented. Dual representation can prevent each of us from receiving unbiased guidance on important decisions, like whether to settle, appeal, or pursue specific legal strategies.

**5. Impact of One Case on the Other:**

• Judicial Impact: Outcomes or rulings in one case could impact the other. Richard may find it difficult to address potential negative consequences for one client without harming the interests of the other.

• Public Perception and Legal Risk: Adverse rulings in Will's case could negatively affect my federal case, and Richard could be perceived as failing to protect the full interests of one or both of us.

**6. Settlement Negotiations:**

• Conflicting Settlement Negotiations: If settlement discussions arise, Will and I may have different positions on settling our cases. Richard could be placed in a difficult position trying to negotiate on behalf of both of us without compromising one person's interests.

• Potential for Uneven Advocacy: There's a risk that Richard might prioritize one client over the other during negotiations, especially if one settlement benefits one of us more than the other.

**7. Consent and Full Disclosure:**

• Failure to Obtain Informed Consent: Even if Will and I initially consented to Richard representing both of us, the complexities of the two cases have changed which could lead to potential conflicts. The goal is to avoid any breach of legal ethics by having separate counsel.

**8. Potential for Future Conflict:**

• Changing Dynamics: As the lawsuits progress, potential conflicts that may not have been apparent at the outset could emerge. If our interests diverge further, it may become impossible for Richard to continue representing both of us fairly.

• Representation at Appeal: Should either Will or I pursue an appeal, our interests may diverge even more, making it even more difficult for Richard to represent both of us.

I am requesting you to bring on new counsel, specifically Walter Bernard, who is already familiar with my case and has agreed to assist, taking it on at his standard hourly rate of ████. Given the complexities of my case and the limited time to prepare for trial or secure a settlement that protects my interests, it's critical that Walter's fee reflects the work required.

My interests in this case are separate from Will's, which has moved to state court, and I believe this further justifies the need for independent representation. Walter is working with local counsel in the Southern District of Florida, who would assist with his pro hac vice admission. Walter Bernard's ARAG Attorney ID ████████████████████

Please let me know the next steps.

Sincerely,

Ronda McNae

# Declaration

# Exhibit D-2

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:22-cv-22171-JEM

MICHAEL FITZGERALD,
individually, and YELANY DE VARONA,
individually,

          Plaintiffs,

v.

RONDA MCNAE, individually, and
WILLIAM MCNAE, individually,

          Defendants.

_____/

**DECLARATION OF WILLIAM MCNAE IN SUPPORT OF DEFENDANT RONDA
MCNAE'S CONVERSATION WITH PRIOR COUNSEL RICHARD GOMEZ**

I, **William McNae**, declare as follows:

1. My name is William McNae. I am over 18 years of age and competent to testify to the
   matters stated herein. I make this declaration based on personal knowledge and
   observation.

2. On September 4, 2024, I participated in a conference call with Richard Gomez, the
   attorney representing my wife, Ronda McNae, in this Federal litigation, and myself in the
   State court litigation which Plaintiff has sued me in for the same legal matters they were
   denied in this Federal litigation.

3. During the call, Mr. Gomez shifted from topics pertinent to my case and informed Ronda
   that he intended to drop her sole affirmative defense of duress.

4.  When Ronda questioned this decision, Mr. Gomez failed to provide a clear explanation or strategic reasoning. He only responded, "*Your decision needs to match my decision, which is to drop duress.*"

5.  Mr. Gomez had no apparent knowledge of the testimony of Ronda's expert witnesses, including Dr. James Hopper, Sarah Dellinger, Brock Weedman, and Dr. James Bhaskar. He appeared to disregard the importance of this evidence and did not make the effort to order the deposition transcripts in preparation for trial.

6.  Throughout the conversation, Mr. Gomez seemed disengaged and unwilling to consider Ronda's concerns or her preferences for trial strategy.

7.  Subsequent to this call, Ronda discovered that Mr. Gomez had billed fewer than 60 hours for his representation of her for a period of roughly six months, raising concerns about the adequacy and diligence of his preparation.

8.  Shortly after Ronda confronted Mr. Gomez about her dissatisfaction with his approach and his lack of preparation, he withdrew from representing her.

9.  Based on these observations, I believe Mr. Gomez's actions significantly impaired Ronda's ability to adequately prepare her defense, leaving her without the necessary legal support and undermining her legal strategy.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 6, 2024 in Kirkland, WA.

**Signature**: _____

**Name**: Will McNae

# Declaration

# Exhibit D-3

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:22-cv-22171-JEM

MICHAEL FITZGERALD,
individually, and YELANY DE VARONA,
individually,

                    Plaintiffs,

v.

RONDA MCNAE, individually, and
WILLIAM MCNAE, individually,

                    Defendants.

_____/

**DECLARATION OF RONDA MCNAE IN SUPPORT OF THE TELEPHONIC PHONE
CONVERSATION WITH PRIOR COUNSEL RICHARD GOMEZ**

Regarding September 4, 2024 Call with Mr. Gomez

I, **Ronda McNae**, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the

following is true and correct:

1. I, Ronda McNae, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the
   following is true and correct:

2. Ineffective Representation by Mr. Gomez and Prejudice to My Case: On September 4,
   2024, during a call with Mr. Gomez, his actions and advice demonstrated ineffective
   representation that irreparably prejudiced my ability to defend this case.

3. I am the Defendant in the above-captioned matter and submit this declaration in support
   of my Motion to Reopen Discovery on a Limited Basis.

4. On September 4, 2024, at approximately 4:00 PM, I participated in a phone call with my prior counsel, Richard Gomez, and William McNae. Mr. Gomez began the conversation by stating, "I need to talk to the both of you at the same time. Ronda, I want you to think about this and sleep on it." He then stated, "Your decision needs to match my decision … to drop duress."

5. Mr. Gomez made these statements without reading through my prior counseling reports, my treating therapist's deposition, or my medical records, all of which are critical to understanding the coercion I experienced and its impact on my decision-making.

6. Mr. Gomez provided no legal or strategic justification for dropping my duress defense, which is critical to addressing the coercion I experienced and its impact on my decision-making.

7. Mr. Gomez's statement pressured me to abandon a valid and essential defense, causing substantial prejudice to my ability to present a full and fair case.

8. I repeatedly requested billing invoices from Mr. Gomez to understand the work performed on my case, but he refused to provide them. I ultimately obtained these invoices only after contacting ARAG and submitting a formal request.

9. Based on the invoices I received, Mr. Gomez billed a total of **62.9 hours** for work performed on my case from February 2024, when he was retained, until his withdrawal in September 2024. This equates to fewer than 8 hours per month on average, despite the complexity of my case and the fact that trial was set for November 2024.

10. Mr. Gomez did not order critical deposition transcripts, leaving me to obtain and expedite them at significant cost after his withdrawal. This delay disrupted my ability to use this material for pretrial preparation and motions.

11. Mr. Gomez failed to file a Motion for Summary Judgment on my behalf, despite billing time on June 21, 2024, for "review and strategy" related to summary judgment. We had numerous conversations to prepare for my MSJ. This failure denied me the opportunity to seek dismissal of the claims against me or narrow issues for trial.

12. According to my Verizon phone records, I spent **9 hours and 3 minutes** on phone calls with Mr. Gomez between March and September 2024. His invoices, however, reflect limited billing for phone conferences, creating a discrepancy in his recordkeeping.

13. During July 2024, a critical month for trial preparation, Mr. Gomez billed only **0.6 hours**, primarily for minor administrative tasks. His lack of engagement during this time significantly impacted my ability to prepare for trial.

14. Mr. Gomez's overall lack of preparation and failure to perform necessary tasks, such as obtaining deposition transcripts, pursuing critical discovery, and filing essential motions, has caused irreparable harm to my ability to present a full and fair defense.

15. I have repeatedly requested my complete case file from Mr. Gomez, but he has not provided it to date. This failure has further hindered my ability to rectify the deficiencies created by his ineffective representation.

16. Based on these issues and the harm caused to my case, I respectfully request the Court to reopen discovery on a limited basis to address the significant procedural and evidentiary gaps resulting from Mr. Gomez's representation.

17. I declare under penalty of perjury that the foregoing is true and correct.

18. Dated: December 17, 2024.

By:

**Ronda McNae**

# Declaration

# Exhibit E

# Declaration

# Exhibit E-1

Fitz agreement


So I did this as a shared document so that you can add comments as you like, and then we can go back and forward until we are happy with what is written. At which point I will send it to you;

Our agreement

1.      I want to ultimately stay friends, discuss things openly and honestly. However I will respect your personal and private life, any relationships you have and your family life. I will communicate with you directly at an agreed schedule or plan if you wish to do so. As I expect you do with me also.

2.      I will stand by you; you should decide to keep the baby or decide to do anything else. I will not push you to make any decisions in your pregnancy, life or otherwise. I will support you where I can as a friend.


3.      We will agree communications on how we talk about the situation, beyond the two of us. Including our immediate families and friends. It sounded to me like you wanted to do this based on an Non Disclosure Agreement (NDA), which I will also support. You can think about this and if that is what you want to do, I will ask a lawyer to create it for us at my expense


4.      I will agree a financial situation with you up front, we can discuss amounts on the 16th of this month. We will agree how much and timing for me to support you and the cost of the pregnancy. I would expect it to include;
    1. Treatment and healthcare curing pregnancy
    2. Costs associated with the baby for a prescribed period of time e.g. clothing, health etc
    3. Costs of clothing for you
    4. Any other expenses we agree
    5.
5.      If you want me to sign a legal agreement or turn this into a contract, I will do that with a lawyer and cover the expense. As long as you are happy with the agreement first.


6.      If you want to get back together with will, I will respect that situation and respect any communications that you want to agree with me. I will not interfere in your family life.


7.      If you decide you want to keep the baby; as you discussed I will stay away from the birth certificate process. In case that you want to have the baby as part of your family with will.


CONFIDENTIAL            MCNAE 003269

8.      If you want Will to be the father of the baby, I will support that process. As long as we agree to the other elements of our agreement amicably I would also agree to not communicate it to anyone else should you want me to do so.

9.      if you want to stop talking to me, we will agree some for of formal communications up front before i do so.

10.  I would not claim to be family, a father or connected to your child if you decide to carry on with your marriage. If not, we discuss what the outcome is together.

This is where I got to so far. Can you add some of your thoughts

CONFIDENTIAL                    MCNAE 003270

# Declaration

# Exhibit E-2

| Will McNae | +1 425-941-7374 | 10/21/2019 14:17 | Thank you for carving out as much time as you did with us |
| MF | +1 786-858-5212 | 10/21/2019 14:17 | I was broken this morning |
| Ronda McNac [Number Unknown] | | 10/21/2019 14:18 | Broken? |
| MF | +1 786-858-5212 | 10/21/2019 14:19 | Exhausted |
| MF | +1 786-858-5212 | 10/21/2019 14:19 | It's why I bailed and went home last night |
| Ronda McNac [Number Unknown] | | 10/21/2019 14:19 | Oh yeah totally forgot about that |
| Ronda McNac [Number Unknown] | | 10/21/2019 14:19 | NOT |
| Will McNae | +1 425-941-7374 | 10/21/2019 14:24 | The brother sister bickering is a tv reality show all by itself |
| MF | +1 786-858-5212 | 10/21/2019 14:27 | Oh I didn't know you could have a memory when you're close to an alcohol seizure |
| Will McNae | +1 425-941-7374 | 10/21/2019 14:27 | That is hilarious |
| Will McNae | +1 425-941-7374 | 10/21/2019 14:33 | Possibly funniest quote all weekend |
| Ronda McNac [Number Unknown] | | 10/21/2019 14:34 | I quit both of you brotherhusbands |
| Ronda McNac [Number Unknown] | | 10/21/2019 14:34 | I will work on my tolerance ok |
| Ronda McNac [Number Unknown] | | 10/21/2019 14:37 | Jk I don't think I should drink anymore |
| Will McNae | +1 425-941-7374 | 10/21/2019 14:38 | I think you said that leaving Tulum |
| Ronda McNac [Number Unknown] | | 10/21/2019 14:38 | Same same |
| MF | +1 786-858-5212 | 10/21/2019 14:47 | Haha I love when you get drunk I'm suddenly the devil |
| Ronda McNac [Number Unknown] | | 10/21/2019 14:49 | You said it- not me |
| | | | |
| Will McNae | +1 425-941-7374 | 10/21/2019 16:35 | Just about stayed another night in Miami! ðŸ¨ missed the gate change notification but did get on last |
| Will McNae | +1 425-941-7374 | 10/21/2019 16:36 | Literally my worst travel fear... all bins full and I'm carrying two suitcases looking for space! |
| MF | +1 786-858-5212 | 10/21/2019 16:37 | At least you made it. Always space for you guys here if you missed it |
| Ronda McNac [Number Unknown] | | 10/23/2019 10:51 | https://www.facebook.com/LmaoMommy/videos/1178556722289222?sfns=mo |
| Ronda McNac [Number Unknown] | | 10/23/2019 10:51 | I'm legit going to hell after watching this |
| MF | +1 786-858-5212 | 10/24/2019 12:46 | Tick tock, tick tock |
| Will McNae | +1 425-941-7374 | 10/24/2019 12:46 | The mouse ran up the clock |
| MF | +1 786-858-5212 | 10/24/2019 12:47 | <image> |
| MF | +1 786-858-5212 | 10/24/2019 12:47 | <image> |
| Ronda McNac [Number Unknown] | | 10/24/2019 12:47 | ðŸ¦ ðŸ¼â€Ci ĵ |
| Will McNae | +1 425-941-7374 | 10/24/2019 12:47 | Today or tomorrow? |
| MF | +1 786-858-5212 | 10/24/2019 12:47 | Tomorrow |
| MF | +1 786-858-5212 | 10/24/2019 12:47 | On my way to Zurich now |
| MF | +1 786-858-5212 | 10/24/2019 12:48 | The monkey is definitely me |
| Will McNae | +1 425-941-7374 | 10/24/2019 12:48 | You have my address right?  Deposit acct numbers? |
| MF | +1 786-858-5212 | 10/24/2019 12:49 | Haha.. |
| MF | +1 786-858-5212 | 10/24/2019 23:21 | <image> |
| MF | +1 786-858-5212 | 10/24/2019 23:21 | Don't send on ha |
| Will McNae | +1 425-941-7374 | 10/24/2019 23:25 | That's cool |
| Ronda McNac [Number Unknown] | | 10/26/2019 18:26 | <image> |
| Ronda McNac [Number Unknown] | | 10/26/2019 18:26 | Nasty |

MCNAE 003467

# Declaration

# Exhibit E-3



7:31

+1 (786) 858-5212

word.

Delivered

I was very vulnerable with Will and I will be with you. I have to talk to Yelany on my own when I'm ready but I'm not ready. I told you I'm trying to do the right thing since I started my counseling. I don't want any more pain for anyone. I can't live my life wanting to throw up and on egg shells all of the time. So I'm happy to meet you both tomorrow night and be open. I just told Will I will try and do the right thing and I will. But I have to fix some things for myself too

So as I said before. I'll support counseling, stick to my commitments for you both and will never cause any more pain. I realize I have my issues and I'm trying to fix myself one step at a time

I have to move forward with my life in a positive light and not create any more messes for myself or anyone else. I'm trying to do that.. I don't expect anyone to fix things for me. I also want you and will to move forward positively

iMessage

Pay

004561

4:37                     **.ıll** LTE 🔋

🐷

+1 (786) 858-5212 ›

Hence why I wanted to talk to you one to one

To be vulnerable

I spoke to will openly, and I'll do the same with you both

I'm not causing any more pain for both groups

I'm not trying to cause anyone any problems

I'm trying to make good decisions

And be vulnerable

Look, I'm not trying to make your life a living hell. Will and I just wanted the truth and we could never count on you to tell us. I have questioned everything since the night in Miami... (rightfully so in many respects) Yelany asked me a few questions in return. This is why living in truth 💯 the time is always best.... otherwise everyone in your life will question your integrity and word.

Delivered

iMessage

**Pay**

004559



004547



1:41

+1 (786) 858-5212 >

Honestly, I don't know what good can come with even all of us sitting down to talk. I feel you took advantage of me in Miami while I was drunk... then fed me lies of being together...

And I've been trying so hard to understand you to your core but I can't. There's just too many lies

Ok I understand that you don't want to talk

But To be clear I did not take advantage of you. We both drank that night and I was in the same boat as you were

Ah I meant Will feels

I did not feed you lies about caring about you. You said to me you could never speak to me anymore if I wasn't to follow through with you. I wanted you to be happy and I cared for you

So I'm sorry I went through with it but I wanted you to be happy

iMessage

004557



1:27

+1 (786) 858-5212 >

Just left my counselors office. Meeting with you alone isn't wise given my current emotional state. She offered her mediating the conversation otherwise you, will, and myself can find a time together

Ok. Of course I understand that and everything is completely up to you

To be open. I really wanted to just go and say hi to will but I don't want to upset him so I haven't and I've left him alone

And I also just really wanted to apologize to you face to face in private. I felt it was right to do

But maybe I record you a video 🤷‍♂️

What are you even sorry for?

Delivered

Causing pain, not being open and vulnerable, not facing up to you both earlier, not supporting you even as a friend

I'm sorry I ran away and hid a little. I should have been better

iMessage

# Declaration

# Exhibit E-4



7:30

2 People >

Hi will and Ronda. I have been open and vulnerable with Will today as I'm sick to the stomach and I can't take any more of this pain. I didn't and don't have an appetite to hurt either of you. I want you both to be happy and I want to try and have a positive impact with my life and move forward, while fixing myself. I will stick to my agreement of paying for your counseling Ronda and I will offer to pay for your joint counseling if you allow me some time to save some money. I want to make the right decisions in my life, I need tome to repair myself and work on that. I have suggested to Will that if my role at softwareone is too much for us both than I will consider moving from softwareone. That is all I have ever worked for so I would like you both to think about that before deciding if you want me to do it. I have no desire to see you both unhappy, I'm sorry for what I have caused. If you want to sit and talk to me I will do it, but pls be aware I cannot take any more pain now. I have to stop it or I'm going to be passed the point of repair. Ronda, I can only imagine you feel worse and I'm sorry for that. Mike

iMessage



004567

# Declaration

# Exhibit F

# Declaration

# Exhibit F-1

## AFFIDAVIT OF YELANY DE VARONA

STATE OF FLORIDA          )
COUNTY OF MIAMI DADE          )

**BEFORE ME**, the undersigned authority, personally appeared the Affiant, and upon being duly sworn, deposes and says:

1.    My name is Yelany de Varona.  My date of birth is September 16, 1985 and I reside at 1585 Bay Dr., Miami Beach, FL 33141 with my spouse Michael J. Fitzgerald.    We have been married since December 12, 2020.

2.    I learned of Ronda McNae in 2018 and I subsequently developed a cordial relationship with her in February 2020.    Ronda and I frequently communicated and on several occasions prior to my marriage she discussed an intimate relationship she had with Michael.  On more than one occasion, Ronda also advised me that she lied to Michael about being pregnant with his child.  Furthermore, at no time did Ronda ever state to me that Michael raped, assaulted or committed any unlawful act against her.

3.    I am making this statement under oath of my own free will and after careful consideration.  No one has made any threats or promises, directly or indirectly, in order to make me give this statement or to influence my decision.

Under penalties of perjury, I declare that I have read the foregoing affidavit and the facts stated in it are true.

_____
Yelany de Varona

SWORN TO AND SUBSCRIBED before me this  5th  day of May 2022 by Yelany de Varona, who I personally knew or  who  has  produced  Florida  Driver's  License

YEL000078

\# _DTGS- 160 85 8562_ as identification and who did take an oath.

_____

Notary Public

S E A L

Printed Name: _Megan Lauren Conrad_

My                 Commission                 Expires:

_April 12, 2024_

MEGAN LAUREN CONRAD
Commission # GG 968703
Expires April 12, 2024
Bonded Thru Budget Notary Services

- 2 -

YEL000079

# Declaration

# Exhibit F-2

**May 5, 2022 – Yelany De Verona executed an Affidavit and submitted to the Miami Beach Police Department. In paragraph 2, Yelany states:**

> *" On more than one occasion, Ronda also advised me that she lied to Michael Fitzgerald about being pregnant with his child."*

**Yelany De Varona** actively participated in discussing and even suggesting narratives surrounding a pregnancy lie. The evidence does not support Yelany's claim that she was merely a passive party or that Ronda McNae solely initiated or advised such conduct. Here's the analysis:

**Evidence from the Conversation:**

1. **Yelany's Active Suggestions:**
   - **Yelany (March 5, 2020, 10:05 AM):**

     "Or something like you started spotting and went to the doctor they said to monitor it then a few days later say you had a miscarriage."
     - This is a clear example of Yelany proposing how to frame a false miscarriage story, indicating active involvement rather than passivity.

2. **Discussion of Lying About Pregnancy for Gain:**
   - **Yelany (March 5, 2020, 10:03 AM):**

     "Yeah I wouldn't think so but also lying about a pregnancy to get money and just lying to lie are different."
     - Here, Yelany differentiates between types of lies, seemingly rationalizing or legitimizing lying about pregnancy for specific purposes (e.g., financial gain). This also suggests engagement in the topic rather than mere receipt of advice.

3. **Encouragement to Spin Narratives:**
   - **Yelany (March 5, 2020, 10:10 AM):**

     "Then you can just spin it and tell him that you can sue him for emotional distress."
     - This reflects an ongoing discussion where Yelany is encouraging a calculated narrative to potentially influence Fitzgerald.

**Ronda's Contributions:**

- **Ronda McNae (March 4, 2020):**
  In the excerpts analyzed, Ronda's statements primarily address her personal pregnancy challenges, such as issues with staying pregnant and health concerns.

  - **Example (March 4, 2020, 2:15 PM):**
    "Getting pregnant isn't difficult but staying pregnant is the challenge..."
    - This is reflective and personal, rather than advising or suggesting any lie or manipulation.

The conversation shows **Yelany De Varona actively participating** in and even directing discussions about how to frame a false pregnancy narrative. While Ronda's contributions focus on her own pregnancy challenges, Yelany is seen suggesting detailed steps and tactics, such as faking a miscarriage.

If Yelany is now claiming she was not part of the pregnancy lie and is instead attributing the initiative solely to Ronda, the reviewed excerpts undermine that claim. Yelany's active involvement in shaping and encouraging the narrative is evident.

*(Full conversation thread MCNAE 000540-MCNAE 000907)*

# Declaration

# Exhibit F-3

# Phone Calls between Yelany de Varona and Ronda McNae

Outgoing calls to YDV = 95 min
Incoming calls from YDV = 379 min

| MONTH | DAY | YEAR | TIME | NUMBER | IN/OUT | MINUTES |
|-------|-----|------|------|--------|--------|---------|
| Feburary | 1 | 2020 | 8:08 PM | 786.302.9163 | INCOMING | 1 |
| Feburary | 3 | 2020 | 11:57 PM | 786.302.9163 | OUTGOING | 1 |
| Feburary | 4 | 2020 | 3:03 PM | 786.302.9163 | INCOMING | 2 |
| Feburary | 10 | 2020 | 10:25 AM | 786.302.9163 | INCOMING | 2 |
| Feburary | 14 | 2020 | 1:29 PM | 786.302.9163 | INCOMING | 30 |
| Feburary | 18 | 2020 | 2:55 PM | 786.302.9163 | INCOMING | 31 |
| Feburary | 19 | 2020 | 10:55 AM | 786.302.9163 | OUTGOING | 1 |
| Feburary | 19 | 2020 | 1:13 PM | 786.302.9163 | INCOMING | 17 |
| Feburary | 19 | 2020 | 3:58 PM | 786.302.9163 | INCOMING | 28 |
| Feburary | 21 | 2020 | 9:40 AM | 786.302.9163 | INCOMING | 10 |
| Feburary | 21 | 2020 | 9:50 AM | 786.302.9163 | INCOMING | 26 |
| Feburary | 21 | 2020 | 10:15 AM | 786.302.9163 | OUTGOING | 1 |
| Feburary | 21 | 2020 | 11:52 AM | 786.302.9163 | OUTGOING | 1 |
| Feburary | 21 | 2020 | 2:11 PM | 786.302.9163 | INCOMING | 61 |
| Feburary | 21 | 2020 | 3:16 PM | 786.302.9163 | INCOMING | 13 |
| Feburary | 21 | 2020 | 3:29 PM | 786.302.9163 | INCOMING | 1 |
| Feburary | 21 | 2020 | 7:35 PM | 786.302.9163 | INCOMING | 24 |
| Feburary | 22 | 2020 | 7:36 PM | 786.302.9163 | INCOMING | 7 |
| Feburary | 24 | 2020 | 8:58 PM | 786.302.9163 | INCOMING | 11 |
| Feburary | 24 | 2020 | 9:31 AM | 786.302.9163 | OUTGOING | 3 |
| Feburary | 24 | 2020 | 9:34 AM | 786.302.9163 | OUTGOING | 6 |
| Feburary | 24 | 2020 | 9:42 AM | 786.302.9163 | INCOMING | 20 |
| Feburary | 24 | 2020 | 10:46 AM | 786.302.9163 | OUTGOING | 7 |
| Feburary | 24 | 2020 | 11:35 AM | 786.302.9163 | INCOMING | 10 |
| Feburary | 24 | 2020 | 11:48 AM | 786.302.9163 | OUTGOING | 1 |
| Feburary | 24 | 2020 | 11:57 AM | 786.302.9163 | INCOMING | 3 |
| Feburary | 24 | 2020 | 1:12 PM | 786.302.9163 | OUTGOING | 1 |
| Feburary | 24 | 2020 | 3:06 PM | 786.302.9163 | INCOMING | 48 |
| Feburary | 24 | 2020 | 8:11 AM | 786.302.9163 | INCOMING | 21 |
| Feburary | 25 | 2020 | 10:47 AM | 786.302.9163 | INCOMING | 7 |
| Feburary | 27 | 2020 | 10:38 AM | 786.302.9163 | OUTGOING | 2 |
| MARCH | 1 | 2020 | 3:09 PM | 786.302.9163 | OUTGOING | 43 |
| MARCH | 1 | 2020 | 3:52 PM | 786.302.9163 | OUTGOING | 8 |
| MARCH | 3 | 2020 | 7:30 AM | 786.302.9163 | INCOMING | 5 |
| MARCH | 3 | 2020 | 7:34 AM | 786.302.9163 | INCOMING | 1 |
| MARCH | 3 | 2020 | 11:49 AM | 786.302.9163 | OUTGOING | 20 |
| | | | | | TOTAL MINUTES | 474 |

# Declaration

# Exhibit F-4



# BRODSKY FOTIU-WOJTOWICZ

Ronda McNae
rondamcnae@gmail.com

Date:   5/02/2023

Regarding:  McNae, Ronda advs Michael Fitzgerald
Invoice No:  00010

*Fees*

| Date | Staff | Description | Hours | Charges |
|------|-------|-------------|-------|---------|
| ▓▓▓ | ▓▓ | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | ▓▓ | ▓▓▓ |
| ▓▓▓ | ▓▓ | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | ▓▓ | ▓▓▓ |
| ▓▓▓ | ▓▓ | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | ▓▓ | ▓▓▓ |
| ▓▓▓ | ▓▓ | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | ▓▓ | ▓▓▓ |
| ▓▓▓ | ▓▓ | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | ▓▓ | ▓▓▓ |
| ▓▓▓ | ▓▓ | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | ▓▓ | ▓▓▓ |

*Please make check payable to Brodsky Fotiu-Wojtowicz, PLLC*

200 S.E. 1st Street, Suite 400, Miami, FL 33131 - (305) 503-5054

Brodsky Fotiu-Wojtowicz, PLLC
Page No.:     2



| 4/10/2023 | AFW | Continue pulling documents and preparing for Y. De Varona deposition; t/cs w/ counsel for W. McNae re: same and division of labor; | 7.20 | $3,960.00 |
| 4/10/2023 | HS | prepare deposition exhibits for Yelany; | 4.30 | $645.00 |
| 4/11/2023 | AFW | Continue preparing for Y. De Varona deposition | 5.20 | $2,860.00 |
| 4/13/2023 | AFW | Deposition of Y. De Varona and de-brief w/ client | 12.50 | $6,875.00 |

Brodsky Fotiu-Wojtowicz, PLLC
Page No.:    4



4/27/2023    AFW    review portions of Y. de Varona depo transcript    5.80    $3,190.00
regarding her false affidavit;

Total Fees

# Declaration Exhibit F-5

**FULL CONVERSATION THREAD CAN BE FOUND MCNAE 000540-MCNAE 000907**

**Consent and Blackout Concerns**

**Ronda McNae (April 16, 2020, 9:14 PM):**
"It doesn't necessarily mean that you have passed out; it means you have reached a level of intoxication where your brain is not writing memories, and you are incapable of consent either way."

Ronda's Disclosures About Lies and Manipulations

1.  Quote: "I caught him in so many lies about Miami. It's insane how much he gets away with."
    Date & Time: February 12, 2020, 7:58 AM
    Source: Document ID MCNAE 002089-MCNAE 002133

2.  Quote: "I told him I was working on my separation, but it was a strategy. Let him think what he wants."
    Date & Time: February 8, 2020, 10:02 PM
    Source: Document ID MCNAE 002089-MCNAE 002133

Yelany's Claims of Being Manipulated by Ronda

1.  Quote: "You never forced me to think anything. I saw it with my own eyes. But yeah, I was stupid for staying."
    Date & Time: February 12, 2020, 6:24 PM
    Source: Document ID MCNAE 002137-MCNAE 002226

2.  Quote: "Honestly, I believed a lot because I wanted to. He was so convincing, but that's not your fault."
    Date & Time: February 15, 2020, 11:05 AM
    Source: Document ID MCNAE 002137-MCNAE 002226

Quote 1:
"He's going to pay for this. He doesn't even care about the damage he causes."
- Speaker: Ronda McNae
- Date & Time: February 13, 2020, 9:43 AM
- Source: Document ID MCNAE 002089-MCNAE 002133

Quote 2:
"It's all about him. His needs. His ego. He doesn't care about anyone else."
- Speaker: Yelany De Varona
- Date & Time: February 14, 2020, 8:55 PM
- Source: Document ID MCNAE 002137-MCNAE 002226
These quotes reflect the distinct perspectives of Ronda and Yelany, with Ronda expressing frustration about the harm caused by Fitzgerald and Yelany critiquing his self-centeredness.

# Declaration

# Exhibit F-6

| Name | Time | Message | Topic |
|------|------|---------|-------|
| | | But I'm just one of those ppl that believes in right and wrong and what he's | |
| Yelany De Varona | 2/2/2020 10:09 | done is so reckless and wrong that I want him to pay | Miami |
| Yelany De Varona | 2/2/2020 10:10 | He's so reckless | Behavior |
| Yelany De Varona | 2/2/2020 10:11 | He's so sick man | Behavior |
| | | But he's going to catch something. I can't continue to have sex with him. If I'm going to stick to a game plan I need to figure out how to put condoms into the | |
| Yelany De Varona | 2/2/2020 10:12 | mix | Behavior |
| Yelany De Varona | 2/2/2020 10:12 | He's pathological liar | Behavior |
| Yelany De Varona | 2/2/2020 10:13 | Like deeply deeply delusional | Behavior |
| Yelany De Varona | 2/2/2020 10:13 | You have a family! He's so reckless | Behavior |
| | | Yeah will said the same thing. I'm going to let fitz believe Will is separated from | |
| Ronda McNae | 2/2/2020 10:19 | all this so he can't try to ruin wills career in any way | MS |
| Yelany De Varona | 2/2/2020 10:19 | He's threatened to ruin Wills career?! | MS |
| | | He said if his company knew what was going on... they would protect fitz no | |
| Ronda McNae | 2/2/2020 10:20 | matter the cost | MS |
| | | I mean when I knew he was cheating on me like 2 years ago with Carrie in the | |
| Yelany De Varona | 2/2/2020 10:36 | UK. I hung out and hooked up with a guy | Behavior |
| Yelany De Varona | 2/2/2020 10:36 | He's never even found out | YELANY |
| | | I want to fuck someone else for months and have him find out at the end of | |
| Yelany De Varona | 2/2/2020 10:38 | everything and be like oh did that hurt yeah now you know what it feels like | YELANY |
| Ronda McNae | 2/2/2020 10:39 | He is incapable to feel sorrow and empathy for others | Behavior |
| Yelany De Varona | 2/2/2020 10:40 | I need to just take his money | Money |
| Yelany De Varona | 2/2/2020 10:40 | It's all he talks about | Money |
| Yelany De Varona | 2/2/2020 10:40 | That's a narcissist | Money |
| | | So in our therapy session, the therapist said that mike needs to make me a promise or proposal for us moving forward. Like how me promises to be a | |
| Yelany De Varona | 2/2/2020 10:41 | faithful person, blah blah and if that promise is broken a consequence | Behavior |
| Yelany De Varona | 2/2/2020 10:43 | Money and half the house we are apparently buying in April/May | Money |
| | | He pulled in to the hotel | |
| | | We stayed at.. said he saw you.. and literally made me walk around the block | |
| Ronda McNae | 2/2/2020 10:45 | until you left so we didn't meet | Behavior |
| Ronda McNae | 2/2/2020 10:45 | He was adamant about me not seeing you or meeting you | Behavior |
| Ronda McNae | 2/2/2020 10:46 | He literally would make will and I think the worst of you | Behavior |
| | | Did you guys already sleep together at this point or he just didn't want you guys to figure out he's a lying sack of shit when you realize he's the drama in the | |
| Yelany De Varona | 2/2/2020 10:46 | equation | Behavior |
| Yelany De Varona | 2/2/2020 10:47 | I dont know what to say about it he's literally so mentally ill | Behavior |
| Yelany De Varona | 2/2/2020 10:47 | It's really like mental hospital status | Behavior |
| Yelany De Varona | 2/2/2020 10:47 | That's all him that's drama, crazy and unstable | Behavior |
| | | Well I'm gonna be honest... Will was like Ronda what he did in Miami to you was not ok. You were intoxicated.... you don't even remember being intimate | |
| Ronda McNae | 2/2/2020 10:48 | with me | Miami |
| | | He took advantage of you being black out then you went to your room and will | |
| Yelany De Varona | 2/2/2020 10:49 | and you had sex? | Miami |

| | | | |
|---|---|---|---|
| Ronda McNae | 2/2/2020 10:49 | That's straight up the definition of a "non violent rape"... I don't want to put words in your mouth but if you choose to file a criminal case I will support you | Miami |
| Yelany De Varona | 2/2/2020 10:49 | Yeah! 100% he took advantage of you | miami |
| Ronda McNae | 2/2/2020 10:50 | So I didn't know being blacked out meant you were still awake etc... I rarely go out and drink | Miami |
| Ronda McNae | 2/2/2020 10:50 | Literally just learned the Actual definition about being blacked out | Miami |
| Ronda McNae | 2/2/2020 10:52 | It doesn't necessarily mean that you have passed out it means you have reached a level of intoxication where your brain is not writing memories and you are in capable of consent either way. In some states there's laws bc of this | Miami |
| Ronda McNae | 2/2/2020 10:55 | I did struggle inside bc I never saw him like that... but bc I didn't fight him off I assumed I wanted and liked it | Miami |
| Ronda McNae | 2/2/2020 10:56 | I did say no at one point.. But I wasn't scared of him. I cared about him as a person | Miami |
| Ronda McNae | 2/2/2020 10:57 | I did hide from him at one point trying to think through everything | Miami |
| Ronda McNae | 2/2/2020 10:58 | So he's basically told me what happened which means he had control of the narrative of that night | Miami |
| Yelany De Varona | 2/2/2020 10:58 | That's what's fucked up | Miami |
| Ronda McNae | 2/2/2020 10:59 | The time following... days and weeks... I couldn't make sense of it but I had to keep it inside. | Miami |
| Yelany De Varona | 2/2/2020 10:59 | He was coherent and that's what's fucked up and considered rape | Miami |
| Ronda McNae | 2/2/2020 10:59 | Then he's texting me and calling me... telling me he wants to be w me and we need to talk. | Miami |
| Ronda McNae | 2/2/2020 11:00 | He insisted on coming to see me one weekend in November but I said I was out of town visiting my niece in San Francisco then he insisted on coming and meeting me there while I was exploring the city so that we could talkâ€¦ | Miami |
| Yelany De Varona | 2/2/2020 11:00 | Wow I can see how that eats you up inside | Miami |
| Ronda McNae | 2/2/2020 11:01 | Will feels he fucked up in Miami all along and wanted to cover it by seeing me on SF... | Miami |
| Ronda McNae | 2/2/2020 11:01 | However will feels that he force that time together one to get whatever he wanted and make me believe he really wanted something togetherâ€¦ However will think that was his way of covering his tracks about Miami | Miami |
| Yelany De Varona | 2/2/2020 11:02 | That's what he does to everyone!!! | Behavior |
| Yelany De Varona | 2/2/2020 11:03 | He's like I had to leave Ronda, she was getting possessive and  acting crazy | Miami |
| Ronda McNae | 2/2/2020 11:03 | He left and I was still in sf. Literally bawling my eyes out | Miami |
| Yelany De Varona | 2/2/2020 11:03 | Omg he twisted that night | Miami |
| Ronda McNae | 2/2/2020 11:03 | I was testing him... and he fucking flipped it on me. Literally made me think I was nuts | Miami |
| Ronda McNae | 2/2/2020 11:03 | He was sooooo Defensive and I had that feeling in the pit of my stomach somethings seem so off | Miami |
| Yelany De Varona | 2/2/2020 11:04 | Bc he came home after to go to drinks with me | Behavior |
| Yelany De Varona | 2/2/2020 11:04 | Seaspice night | Behavior |
| Yelany De Varona | 2/2/2020 11:07 | Dude he straight up lied to my face when I showed him his tinder profile | Behavior |
| Yelany De Varona | 2/2/2020 11:07 | He's like someone must of hacked me | Behavior |
| Yelany De Varona | 2/2/2020 11:07 | Bc I caught him on that shit once | Behavior |

| | | | |
|---|---|---|---|
| Yelany De Varona | 2/2/2020 11:11 | These are messages I found between him and Carrie. He saved her as Chris and I was on his iPad when he was out of town once Bc my computer wasn't working.. | Behavior |
| Yelany De Varona | 2/2/2020 11:12 | And I discovered they were talking again for the second time | Behavior |
| Yelany De Varona | 2/2/2020 11:12 | But if you read it. They are talking about me figuring out they are talking again | Behavior |
| Yelany De Varona | 2/2/2020 11:15 | This is their convos. It's so sick Bc he does the same thing to me | Behavior |
| Yelany De Varona | 2/2/2020 11:16 | Always talking about sex ugh | Behavior |
| Yelany De Varona | 2/2/2020 11:34 | He has mentioned how you were an actress and praised about it. Like proud to be your friend | Miami |
| Ronda McNae | 2/2/2020 11:40 | I feel stupid I fell into his trap | Miami |
| Yelany De Varona | 2/2/2020 11:42 | Like how was I so dumb to intertwine my life with this person | Money |
| Yelany De Varona | 2/2/2020 11:43 | From the beginning, he was like oh let's get this car for you. I'll pay it and it was clearly a trap | Money |
| Yelany De Varona | 2/2/2020 11:43 | Lets use your American CC for my expenses so you can get points for travel faster | Money |
| Yelany De Varona | 2/2/2020 11:43 | Ugh I'm such a sucker | Money |
| Yelany De Varona | 2/2/2020 11:44 | Then when I realized shit wasn't adding up my life/bills  were way out of my income bracket | Money |
| Yelany De Varona | 2/2/2020 11:45 | And I'm scared to go completely away and even when we were broken up stayed in contact every so often like kissing his ass almost so that he paid things. | Money |
| Yelany De Varona | 2/2/2020 11:45 | Bc he can just up and leave and I'm stuck with all these bills | Money |
| Yelany De Varona | 2/2/2020 11:52 | I put money away | Money |
| Ronda McNae | 2/2/2020 11:52 | He would tell Will and I that you weren't good for him... show As messages of you losing it on him but of course he controlled what we saw so it only supported the narrative that he wrote about you | Behavior |
| Yelany De Varona | 2/2/2020 11:52 | He's made these promises for April that Im going to see if he sticks to it | Money |
| Yelany De Varona | 2/2/2020 11:53 | He doesn't know I have other accounts that I move money into every month | Money |
| Yelany De Varona | 2/2/2020 11:54 | Yeah, he is apparently getting us match gold watching and giving me 20k to shop with in April | Money |
| Yelany De Varona | 2/2/2020 11:54 | But I'm just waiting for April to see what's for real and what isn't | Money |
| Yelany De Varona | 2/2/2020 11:54 | Matching gold Rolex watches | Money |
| Yelany De Varona | 2/2/2020 12:01 | You fuck me over repeatedly with women, treat me like shit then want to steal my dog away) | Behavior |
| Ronda McNae | 2/2/2020 12:09 | I don't want to be with him whatsoever | Miami |
| Ronda McNae | 2/2/2020 12:09 | Two days ago I told him Will & I filed For a divorce- so I could test him | Miami |
| Yelany De Varona | 2/2/2020 12:11 | He's mentally unfixable i think | Behavior |
| Ronda McNae | 2/2/2020 12:12 | Yeah I want to see how far he goes with lies... to also help you ya know | Behavior |
| Yelany De Varona | 2/2/2020 12:19 | He loved your family dynamic | Behavior |
| Yelany De Varona | 2/2/2020 12:31 | I've taken him to points where he is crying his eyes out, shaking and saying he doesn't know why he's so fucked up and doesn't want to be but it's the darkness inside him | Behavior |
| Yelany De Varona | 2/2/2020 12:31 | I dont know it's crazy | Behavior |
| Yelany De Varona | 2/2/2020 12:31 | That his mind plays with him | Behavior |
| Yelany De Varona | 2/2/2020 12:48 | Tell him you need some money for tests or something lol | LIES |
| Yelany De Varona | 2/2/2020 12:49 | He says outlandish lies why can't you | LIES |

| | | | |
|---|---|---|---|
| Yelany De Varona | 2/2/2020 12:49 | I dont know say will dropped you | LIES |
| Yelany De Varona | 2/2/2020 15:44 | Other than the fact that it's his sport of choice. Lying that is | Behavior |
| Ronda McNae | 2/2/2020 17:55 | He wanted me to keep things a secret from October until end of January | Miami |
| Yelany De Varona | 2/2/2020 17:55 | I mean I'm riding this out till May | Money |
| Yelany De Varona | 2/2/2020 21:10 | These letters are so much. It's so painful to read how much things have been stirred up and mike is the main factor. It's so gross and disappointing that someone could be so careless and not responsible for their actions. | Miami |
| Yelany De Varona | 2/3/2020 6:34 | But the picture he sent you on the screen shot thats Thomas | Son |
| Yelany De Varona | 2/3/2020 6:34 | We all went on a boat for mikes birthday when they were visiting | DAD |
| Yelany De Varona | 2/3/2020 6:36 | Yeah, I question his story of her molesting him as a child | LIES |
| Yelany De Varona | 2/3/2020 6:36 | The family dynamic is weird in general but what he claims is off | LIES |
| Yelany De Varona | 2/3/2020 6:39 | My sister (who is 24) said from the first month of knowing him that something was off and she didn't like him | Behavior |
| Yelany De Varona | 2/3/2020 6:39 | Always has wondering eyes like so he doesn't have to look into your eyes when he speaks to you | Behavior |
| Yelany De Varona | 2/3/2020 6:51 | He has no code or morals | Behavior |
| Yelany De Varona | 2/3/2020 6:51 | That is the root is my heavy issues with mike | Behavior |
| Yelany De Varona | 2/3/2020 6:51 | I don't like someone with no moral compass. There is no character in that | Behavior |
| Yelany De Varona | 2/3/2020 6:51 | I mean let's say you threw yourself on mike. It's boy code not to do anything when that's your friends wife! | Miami |
| Yelany De Varona | 2/3/2020 6:53 | But I mean while we are arguing he's come up to me like he would do something | Behavior |
| Yelany De Varona | 2/3/2020 6:57 | That's another reason I want to see this money crap through | Money |
| Yelany De Varona | 2/3/2020 6:57 | I want to help my mom. | Money |
| Yelany De Varona | 2/3/2020 6:58 | He wants to buy a million dollar to 2 million dollar home here. My mom is a realtor and I want her to get that sale Bc she's been stressed about how she's going to take care of herself | Money |
| Yelany De Varona | 2/3/2020 6:58 | And i told her she will be fine. With the commission from this | Money |
| Yelany De Varona | 2/3/2020 6:58 | For a while plus her divorce money | Money |
| Yelany De Varona | 2/3/2020 6:59 | She's super simple and doesn't need much. But I want to see mike actually purchase something so she can benefit | Money |
| Yelany De Varona | 2/3/2020 6:59 | Am I bad? Is this bad that I'm thinking this way? | Money |
| Yelany De Varona | 2/3/2020 7:03 | The money he's apparently pulling out of stock ( a few million) happens in April. Bc thats when the blackout days are lifted | Money |
| Yelany De Varona | 2/3/2020 7:06 | So may is the sweet spot. Everything will be already processed and in the accounts | Money |
| Yelany De Varona | 2/3/2020 7:15 | Ok well then I'm willing to stick it out and get the shit I need from all that payout then just bounce | Money |
| Yelany De Varona | 2/3/2020 7:16 | I will literally wipe everything clean | Money |
| Yelany De Varona | 2/3/2020 7:16 | I'm waiting for him to get me this ring he's claiming and I told him I want to write out the promises and consequences | Money |
| Yelany De Varona | 2/3/2020 7:16 | I get half the house and money! | Money |
| Yelany De Varona | 2/3/2020 7:41 | Yeah he always wants a sex room | Behavior |
| Ronda McNae | 2/3/2020 7:41 | Oh and in the house he wanted to buy for us.. he wanted dDungeon | Behavior |
| Ronda McNae | 2/3/2020 7:41 | Sex room | Behavior |
| Yelany De Varona | 2/3/2020 7:41 | He's sick | Behavior |
| Ronda McNae | 2/3/2020 7:46 | I'm not kidding... he's like my stepdad .... | Miami |

| | | | |
|---|---|---|---|
| Yelany De Varona | 2/3/2020 7:47 | Hes very sick and unhealthy | Behavior |
| Yelany De Varona | 2/3/2020 15:30 | Its like nothing is for real | Behavior |
| Yelany De Varona | 2/3/2020 15:30 | Its like he can't help it hahahha | Behavior |
| Yelany De Varona | 2/3/2020 15:30 | Hahaha what a liar | Behavior |
| Yelany De Varona | 2/3/2020 15:31 | He lives in a make believe world | Behavior |
| Yelany De Varona | 2/3/2020 15:34 | He should be an actor | Behavior |
| Yelany De Varona | 2/3/2020 16:19 | Oh!!! You should ask is this the kind of arrangement he has with his ex and their child? | LIES |
| Yelany De Varona | 2/3/2020 16:19 | Like you are trying to wrap your head around this all and want to know how he deals with that scenario | LIES |
| Yelany De Varona | 2/3/2020 16:19 | Maybe he give more info on this apparent son he has | LIES |
| Yelany De Varona | 2/3/2020 19:50 | Wait back up he tried to put it in your butt and you told him no? | Miami |
| Yelany De Varona | 2/3/2020 19:51 | He's obsessed with anal and I straight up can't | Miami |
| Yelany De Varona | 2/3/2020 20:33 | Haha we can sip wine by a beach somewhere after we get some money haha | Money |
| Yelany De Varona | 2/4/2020 7:07 | He didn't come home for 3 months till the time you guys came as a group was the first time I had seen him in 3 months | Behavior |
| Yelany De Varona | 2/4/2020 7:10 | Then he asked if will and him could meet up with me and my friends | Behavior |
| Yelany De Varona | 2/4/2020 7:10 | I think he saw how I had moved on, I was super fit and happy. So he started messaging me since the first day you guys came into town that he stopped in town saying â€œ seeing you again gives me butterfliesâ€. I love seeing you happy, you looked beautiful today. Blah blah | Behavior |
| Yelany De Varona | 2/4/2020 7:10 | And I ate it up bc it was continuous day after day | Behavior |
| Yelany De Varona | 2/4/2020 7:12 | He's like Ronda is in really good shape she CrossFit's | Behavior |
| Yelany De Varona | 2/4/2020 7:12 | The chick from his work?! | Behavior |
| Yelany De Varona | 2/4/2020 7:13 | So I'm sure she would just play like she's in shock but that bitch has to know all the fucked up shit these guys do | Behavior |
| Yelany De Varona | 2/4/2020 7:13 | She's the only one that goes out with Patrick and all the boys when they go on all boy trips no wives | Behavior |
| Yelany De Varona | 2/4/2020 7:13 | Oh lord she probably knows everything they all do | Behavior |
| Yelany De Varona | 2/4/2020 7:30 | He never wants a lot of pictures bc it's exposure I think | Behavior |
| Yelany De Varona | 2/4/2020 7:35 | Also, the only reason I think he reads my messages is bc I was txting my ex for months and he was planning to come to Miami for work so I told him to stay with me bc mike was out of town and we could spend the weekend together. Randomly a couple days later mike reached out and asks you wouldn't have anyone over our place right? Like I know we aren't together but I've never brought someone into our bed | Behavior |
| Yelany De Varona | 2/4/2020 7:36 | Wait he actually gave money towards the therapy you had to go through bc of him but didn't even pay the full bill | Money |
| Yelany De Varona | 2/4/2020 7:37 | He's awful | Money |
| Yelany De Varona | 2/4/2020 7:38 | And they were also like dude you can continue living with him. Have her get a shit load of money and share it with you and bounce | Money |
| Yelany De Varona | 2/5/2020 8:18 | I do know that mike has told me in the past if I try to keep Simon he would take me to court. | Behavior |
| Yelany De Varona | 2/5/2020 8:19 | So he can be revengeful if he is betrayed | Behavior |